UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**EDRICK FLOREAL-WOOTEN;**
**JEREMIAH LITTLE; JULIO GONZALES;**
**DAYMAN BLACKBURN**                                                   **PLAINTIFFS**

v.                            Case No. 5:22-cv-05011-TLB-CDC

**WASHINGTON COUNTY DETENTION CENTER;**
**TIM HELDER, SHERIFF OF WASHINGTON COUNTY,**
**ARKANSAS, in his official capacity; JANE or JOHN DOES 1 through 10 of**
**WASHINGTON COUNTY DETENTION CENTER STAFF,**
**in their individual and official capacities;**
**KARAS CORRECTIONAL HEALTH, P.L.L.C.;**
**DR. ROBERT KARAS, M.D.; JANE or JOHN DOES 1 through 10**
**of KARAS CORRECTIONAL HEALTH, P.L.L.C. STAFF**           **DEFENDANTS**

## COMPLAINT

COMES NOW Plaintiffs Edrick Floreal-Wooten, Jeremiah Little, Julio Gonzales, and Dayman Blackburn (collectively, Plaintiffs), for their Complaint against the Washington County Detention Center (WCDC), Tim Helder, Sheriff of Washington County, in his official capacity, Jane or John Does 1 through 10, WCDC employees, in their individual and official capacities, Karas Correctional Health, P.L.L.C., Dr. Robert Karas, M.D., and Jane or John Does 1 through 10 of Karas Correctional Health, P.L.L.C. staff, (collectively, Defendants), and state as follows:

### I.   NATURE OF ACTION

"*Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . . .*"[1]

This case is about protecting the interests of detained persons in the integrity of their own bodies through the necessity of informed consent to medical treatments. Plaintiffs are informed and believe, and thereon allege, that Defendants knowingly and intentionally disregarded U.S.

---
[1] *Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (N.Y. 1914) (Cardozo, J.), *abrogated on other grounds*, *Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957).

Food and Drug Administration (FDA) warnings by administering the dewormer Ivermectin to them as a supposed treatment for COVID-19 without prior informed consent as to the nature, contents, or potential side effects of the drugs administered. Defendants also used overt deception in the administration of Ivermectin, telling Plaintiffs that the alleged treatment consisted of mere "vitamins," "antibiotics," and/or "steroids."

The truth, however, was that without knowing and voluntary consent, Plaintiffs ingested incredibly high doses of a drug that credible medical professionals, the FDA, and the Centers for Disease Control and Prevention (CDC), all agree is not an effective treatment against COVID-19, and that if given in large doses is dangerous for humans.[2] But this was no deterrent to Defendants, whose actions affronted Plaintiffs' personal autonomy, violated their constitutional rights, and jeopardized their well-being.

## II.   JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331.

2. Venue is proper in the Western District of Arkansas pursuant to 28 U.S.C. § 1391(b) because the unlawful acts and practices alleged herein occurred within this judicial district in Washington County, Arkansas.

## III.   PARTIES

3. Plaintiff Edrick Floreal-Wooten was detained at WCDC at all relevant times herein.

---

[2] https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited Dec. 29, 2021); https://www.fda.gov/animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended-animals (last visited Dec. 29, 2021); https://www.fda.gov/animal-veterinary/product-safety-information/fda-letter-stakeholders-do-not-use-ivermectin-intended-animals-treatment-covid-19-humans (last visited Dec. 29, 2021); https://emergency.cdc.gov/han/2021/han00449.asp (last visited Dec. 29, 2021).

Mr. Wooten is a married father of three.

4. Plaintiff Jeremiah Little was detained at WCDC at all relevant times herein. Mr. Little was born and raised in Fayetteville, Arkansas, and is a father of three.

5. Plaintiff Julio Gonzales was detained at WCDC at all relevant times herein. Mr. Gonzales has one grown daughter.

6. Plaintiff Dayman Blackburn was detained at WCDC at all relevant times herein. Mr. Blackburn has a history of heart conditions, and suffered three heart attacks in 2018. He has two daughters, and one granddaughter.

7. Defendant WCDC is located in and operated by Washington County, Arkansas, a duly organized county existing under the laws of the State of Arkansas. Washington County operates WCDC and is responsible for the actions, omissions, policies, procedures, practices, and customs of WCDC and its various agents. At all times relevant herein, WCDC was acting under color of state law.

8. Defendant Tim Helder (Sheriff Helder) is the Sheriff of Washington County and is responsible for the administration and operation of WCDC and its policies, procedures, and customs. Acting under color of state law, Sheriff Helder approved and executed the contract with Karas Correctional Health, P.L.L.C., to provide healthcare at WCDC, including to the Plaintiffs, for an annual cost to Washington County taxpayers of $1,374,000.00. *See* Exhibit A at § 4.2. Sheriff Helder was aware of the administration of Ivermectin to detainees like Plaintiffs, and should have been aware given Dr. Karas's public statements regarding the use of the drug. At all times relevant herein, Sheriff Helder was acting under color of state law.

9. Defendants Jane or John Does 1 through 10 of WCDC are correctional officers employed at WCDC whose identities are as yet unknown, and who were working under color of

state law at all times relevant herein.

10. Defendant Karas Correctional Health, P.L.L.C., (KCH) is an Arkansas professional limited liability company doing business in Arkansas. At all times relevant herein, KCH contracted with Washington County to provide healthcare at WCDC, including to the Plaintiffs. At all times relevant herein, KCH was acting under color of state law.

11. Defendant Robert Karas, M.D., (Dr. Karas) is, and was at all times relevant herein, the manager and sole member of KCH, and the primary care physician responsible for the administration and operation of KCH at WCDC, and has been for many years. As relevant here, in 2020, KCH successfully bid to provide healthcare services at WCDC, and approved and executed the contract with WCDC on behalf of KCH to provide healthcare at WCDC, including to the Plaintiffs, for an annual cost to Washington County taxpayers of $1,374,000.00. *See* Exhibit A at § 4.2. At all times relevant herein, Dr. Karas was acting under color of state law.

12. Defendants Jane or John Does 1 through 10 of KCH are staff members employed at KCH whose identities are as yet unknown, and who were working under color of state law at all times relevant herein.

## FACTS

**History of the relationship between Defendants and the rise of COVID-19.**

13. For many years, WCDC and Sheriff Helder (collectively referred to as the County Defendants), along with KCH and Dr. Karas (collectively referred to as the Karas Defendants), enjoyed a mutually beneficial relationship.

14. As a part of this relationship, and in exchange for a significant amount of money, the Karas Defendants provided the County Defendants with healthcare services for the detainees housed at WCDC.

4

15. Starting in 2020 and continuing through the present, the importance of such healthcare services in the WCDC setting became particularly striking given the rise of COVID-19.

16. In conjunction with the rise of COVID-19, Dr. Karas began both publicly and privately espousing the virtues of the use of the drug Ivermectin to combat the disease. Upon information and belief, Dr. Karas began conducting research as to its efficacy against the disease, as well.

17. Upon information and belief, the Karas Defendants began utilizing Ivermectin as a treatment for COVID-19 with WCDC detainees at least as early as November 2020. *See* Exhibits B and C.

18. Upon information and belief, the County Defendants were aware by July 2021 of Dr. Karas's policy in support of the use of Ivermectin, and that he intended to administer the same to detainees.[3] Indeed the County Defendants should have been aware too, given Dr. Karas's relentless public statements on his clinic's social media page regarding the use of the drug.

19. Upon information and belief, Dr. Karas may have had a financial incentive to administer the drug Ivermectin to detainees. This is because KCH and other related entities operated by Dr. Karas sometimes purchase the drugs used at WCDC at wholesale. Pursuant to the contract between KCH and WCDC, and in addition to the annual fees payable to KCH by WCDC, WCDC is obligated to pay the costs for all prescription medications prescribed to WCDC detainees, which may have provided a direct financial benefit to Dr. Karas.[4]

20. As of August 25, 2021, Dr. Karas stated publicly that there had been 531 confirmed

---

[3] https://www.nwaonline.com/news/2021/aug/25/washington-county-sheriff-confirms-use-of/ (last visited Dec. 29, 2021); https://www.nwaonline.com/news/2021/aug/26/ivermectin-as-covid-19-treatment-for-inmates/ (last visited Dec. 29, 2021).

[4] *See* Ex. A at p. 16.

COVID-19 cases at WCDC, meaning that Karas Defendants, by and through Jane or John Does 1-10 of KCH, had administered healthcare services for the disease to at least that many detained people. Dr. Karas has admitted publicly to administering Ivermectin to such confined persons.

21. Dr. Karas remarks often on his clinic's public social media page regarding the Ivermectin treatments provided in his private practice to his private patients, and even posts signage at his clinic requesting clinical trial volunteers. The social media posts are often accompanied with precise dosing and treatment plans for his so-called "COVID protocols."

22. As recently as December 24, 2021, Dr. Karas posted publicly about the use of Ivermectin at WCDC, touting the dangerously high doses of the drug foisted on inmates like Plaintiffs.

**Plaintiffs test positive for COVID-19.**

23. Plaintiffs tested positive for COVID in late August 2021. As a result, the County Defendants relocated Plaintiffs to a barracks that was specifically designated as a quarantine block for those with the disease or those with a close contact to the same. Upon information and belief, during this time twenty-two detained peoples were housed in the quarantine block.

**Plaintiffs are treated with high amounts of Ivermectin.**

24. Once in the quarantine block, Plaintiffs were given a cocktail of drugs by Karas Defendants to allegedly treat COVID-19. The drugs were administered twice a day, and ranged in volume between 2-10 pills. The drugs consisted of high doses of vitamins and the drug Ivermectin.

25. Ivermectin is used to treat or prevent parasites in livestock animals, such as cows and horses. For humans, it is FDA approved to treat infections by some parasitic worms, head lice, or skin conditions, like rosacea.[5]

---

[5] https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited Dec. 29, 2021).

26. "High doses" is no hyperbole. By way of example, prior to receiving the drug, Plaintiff Edrick Wooten was recorded on August 22, 2021, as being 6'1" and weighing 158 pounds (72 kg). At his size, the approved dosage of Ivermectin to combat worms (one of the approved uses in humans) is 0.2 mg/kg in a single dose, which given his size, is 14 mg. Mr. Wooten, however, received 48 mg over a period of four days, or 3.4 times the approved dosage.

27. Similarly, Plaintiff Dayman Blackburn was recorded on August 21, 2021, as being 6'1" and weighing 191 pounds (86.6 kg). At his size, the approved dosage to combat worms is 0.2 mg/kg in a single dose, which is 17 mg. According to Mr. Blackburn's medical records, however, he was prescribed 36 mg of the medicine on August 22 by the Karas Defendants, followed by 24 mg a day from August 23-August 25. That dosage, totaling 108 mg, is nearly 6.3 times the approved dosage.

28. On December 24, 2021, Dr. Karas admitted publicly on his clinic's social media page to dosing inmates housed at WCDC with as much as 0.4 mg/kg of the drug Ivermectin- an astounding amount of the dewormer, and double the dosage recommended for its *intended* use (which says nothing of its use here). He stated further than this dosage regime was different than the dosage given to his private practice patients.[6]

29. At no point were Plaintiffs informed that the medications they were consuming included Ivermectin. Further, Plaintiffs were not informed of the side effects of the drug administered to them or that any results would be used for research purposes.

30. Upon information and belief, all other Plaintiffs (and numerous other detainees) received similar treatments that included inappropriately high levels of the drug Ivermectin, too.

---

[6] On December 24, 2021, Dr. Karas wrote the following on his clinic's Facebook page: "The slight difference between jail protocol and the clinic regimen being that we kept the .2-.4 mg/kg Ivermectin dosing on our jail patients."

31. Not only is Ivermectin not FDA authorized or approved to treat or prevent COVID-19 in people (or animals, for that matter),[7] but the FDA has issued a warning against using it to treat COVID-19. It can have serious interactions with other medications, and/or result in nausea, vomiting, diarrhea, hypotension (low blood pressure), allergic reactions (itching and hives), dizziness, ataxia (problems with balance), seizures, coma and even death.[8]

32. In fact, Karas Defendants told Plaintiffs that the drugs consisted of mere "vitamins," "antibiotics," and/or "steroids."

33. Had Plaintiffs been informed that the drugs they were given included the dewormer Ivermectin and informed of its nature and potential side effects, they would have refused to take it.

**Plaintiffs experienced side effects from Ivermectin and Defendants' conduct.**

34. Plaintiffs suffered side effects consistent with the overuse of Ivermectin. Specifically, they experienced vision issues, diarrhea, bloody stools, and/or stomach cramps.

35. All Plaintiffs experienced mental distress, anger, and lingering mistrust of Defendants for permitting the use of, and administering, a drug in disregard of a FDA warning and without their knowledge or consent.

36. To add insult to injury, Plaintiffs were subject to the payment of fees for medical examinations they sought after suffering side effects from the Ivermectin treatment. Pursuant to the contract between KCH and the County Defendants, those fees are payable to KCH, providing financial incentive to Dr. Karas as the sole member of KCH.[9]

---

[7] https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited Dec. 29, 2021).
[8] *Id*.
[9] Ex. A at § 4.1.

**Plaintiffs exhausted their remedies.**

37. Plaintiffs submitted grievances regarding the administration of Ivermectin without their knowledge or consent. The grievances were viewed by County Defendants, and then forwarded to Karas Defendants for review and determination.

38. The WCDC Grievance Procedure states that responses to medical grievances are not appealable;[10] thus Plaintiffs exhausted their administrative remedies prior to the filing of this suit.

**Defendants attempt to obtain consent retroactively.**

39. Upon information and belief, after the news broke publicly regarding Defendants' use and administration of Ivermectin, Defendants attempted to obtain "retroactive" consents to medical treatment from detainees, including for the use of Ivermectin.

### COUNT I – VIOLATION OF DUE PROCESS AGAINST ALL DEFENDANTS

40. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-39 above.

41. Detained persons like Plaintiffs have a due process right to voluntary and informed consent, and they possess a significant liberty interest in receiving appropriate medical treatment and avoiding the unwanted administration of drugs.

42. Consent is voluntary when "given by a person or a responsible proxy (e.g., a parent) for participation in a study, immunization program, treatment regime, invasive procedure, etc., after being informed of the purpose, methods, procedures, benefits, and risks. The essential criteria of [informed consent] are that the subject has both knowledge and comprehension, that consent is freely given without duress or undue influence, and that the right of withdrawal at any

---

[10] *See* WCDC Policy No. D11.5, Detainee Grievance Procedures.

9

time is clearly communicated on the subject." Stedman's Medical Dictionary 898 (27th ed. 2000).

43. Ivermectin is not accepted by the FDA or CDC as an effective treatment against COVID-19. In fact, the FDA has warned against such use of Ivermectin.

44. Taking Ivermectin in large doses can be dangerous for humans.

45. Despite this, Karas Defendants, acting under color of state law, administered the dewormer to Plaintiffs without their voluntary consent. Specifically, Karas Defendants provided the drug cocktail to Plaintiffs under the false premise that it was merely "vitamins," "antibiotics," and/or "steroids."

46. Upon information and belief, Dr. Karas even benefited financially from the administration of Ivermectin to detained persons like Plaintiffs.

47. Karas Defendants, acting under color of state law, further administered the drug Ivermectin to Plaintiffs without their knowing and informed consent.

48. Specifically, Plaintiffs were not given the necessary information to reach a decision about whether or not to accept the Ivermectin treatment. Prior to its administration, Plaintiffs were unaware of the potential side effects for the alleged treatment they were given (indeed, none had ever heard of the drug Ivermectin). Likewise, Plaintiffs were not informed that the FDA warned against the use of Ivermectin for the treatment or prevention of COVID-19.

49. Defendants knew or should have known that Ivermectin was not an appropriate medical treatment for Plaintiffs; thus Defendants, acting under color of state law, acted with deliberate indifference in that it administered, or knowingly permitted the administration of, inappropriate treatment to Plaintiffs.

50. Karas Defendants, under color of state law, further acted with deliberate indifference as they knew that Plaintiffs did not consent to the treatment, and should have known

that Plaintiffs would want to know the nature, contents, and potential side effects of a drug offered. Karas Defendants even went so far as attempting to obtain "retroactive consents" from detained persons, including at least one Plaintiff, for the Ivermectin treatment.

51. Indeed under Arkansas law, medical providers have a statutory duty to warn a patient of hazards of future medical treatment. *See* Ark. Code Ann. § 16-114-206.

52. It is both customary and legally required in all medical settings, both within Arkansas and beyond, that patients be given complete, accurate, and truthful information to enable them to make an informed decision as to whether to proceed with medical treatments. As medical providers, Karas Defendants undoubtedly knew this.

53. Karas Defendants failed to provide even basic (or truthful) information as to the nature, contents, and potential side effects of a drug offered in violation of the Arkansas statutory duty to warn.

54. Had Plaintiffs known the nature, contents, and potential side effects of the drug administered, they would have declined to take it.

55. The County Defendants cannot relieve themselves of their constitutional duties to provide appropriate medical care to Plaintiffs by contracting out medical care to Karas Defendants.

56. Dr. Karas, both publicly and privately, is an avid proponent of the use of Ivermectin as an alleged treatment for COVID-19.

57. The County Defendants knew or should have known as early as July 2021 about the ongoing practice and policy of administering an unproven and unapproved alleged treatment for COVID-19 on detainees in their care.

58. Upon being informed of the dangers of administering Ivermectin to detainees at

WCDC, the County Defendants still refused to put a stop to the practice.

59. As a direct and proximate result of Defendants' conduct, Plaintiffs' substantive due process rights were violated.

### COUNT II – VIOLATION OF EQUAL PROTECTION AGAINST KARAS DEFENDANTS

60. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-59 above.

61. Dr. Karas remarks often on his clinic's public social media page about the Ivermectin treatments provided to his private clinic patients (indeed, he even remarks on the use of the drug with WCDC detainees, like Plaintiffs). The posts are frequently accompanied by precise dosing and treatment plans for his so-called "COVID protocols." He also references other websites where potential or current COVID-19 private clinic patients can obtain additional information about the alleged treatments for the disease.

62. Upon information and belief, Dr. Karas provides his private clinic's COVID-19 patients specific information regarding the nature, contents, and potential side effects of the alleged treatments, including Ivermectin, prior to treatment.

63. Plaintiffs, however, do not have access to social media to view such postings. And they were not provided the necessary information to make an informed decision about the Ivermectin treatment before its administration.

64. Indeed, Karas Defendants went so far as to deny Plaintiffs the truth of what they were being given, claiming that the high dosage of dewormer was mere "vitamins," "antibiotics," and/or "steroids."

65. On December 24, 2021, Dr. Karas admitted publicly on his clinic's social media page to dosing inmates with Ivermectin in differing (and incredibly high) amounts when compared

12

to the dosage given to his private clinic patients.[11]

66.  As COVID-19 patients, Karas Defendants deliberately failed to provide Plaintiffs with the same specific information regarding the nature, contents, and potential side effects of the use of Ivermectin as that which is provided to his private COVID-19 clinic patients.

67.  Like Karas Defendants' private clinic patients with COVID-19, Plaintiffs were entitled to complete and accurate information such that they could make informed decisions as to whether to proceed with the alleged COVID-19 treatment.

68.  Despite their incarceration, Plaintiffs are similarly situated to Karas Defendants' private COVID-19 clinic patients, as *all* patients enjoy a fundamental and significant liberty interest in the right to informed consent to medical treatments.

69.  Karas Defendants have neither a rational nor a compelling governmental interest in treating COVID-19 patients- incarcerated or not- differently as it relates to obtaining informed consent prior to the administration medical treatment, including for the drug Ivermectin.

70.  In disregarding Plaintiffs' rights to informed consent, Karas Defendants treated similarly situated COVID-19 patients differently in violation of the Equal Protection Clause.

71.  Upon information and belief, Karas Defendants further treated other similarly situated detained patients at WCDC differently than Plaintiffs in violation of the Equal Protection Clause as it relates to obtaining informed consent prior to medical treatment.

WHEREFORE, Plaintiffs Edrick Floreal-Wooten, Jeremiah Little, Julio Gonzales, and Dayman Blackburn pray that the Court enter an order declaring under 28 U.S.C. § 2201 that the actions of all Defendants violated Plaintiffs' substantive due process rights under the Fourteenth

---

[11] On December 24, 2021, Dr. Karas wrote the following on his clinic's Facebook page: "The slight difference between jail protocol and the clinic regimen being that we kept the .2-.4 mg/kg Ivermectin dosing on our jail patients."

Amendment, and the Equal Protection Clause as to Karas Defendants. Plaintiffs further request entry of an injunction prohibiting all Defendants from engaging in any further such violations of law. Finally, Plaintiffs request that they be ordered to receive a medical evaluation by an independent medical provider unaffiliated with Karas Defendants, awarded their costs, fees, and any other appropriate relief to which they are entitled.

        Respectfully submitted,

        ROSE LAW FIRM,
        a Professional Association
        240 North Block Ave, Ste. A
        Fayetteville, Arkansas 72701
        Phone: (479) 289-7420

By: */s/Bourgon B. Reynolds*

        Bourgon B. Reynolds
        Arkansas Bar No. 2012290
        breynolds@roselawfirm.com
        Ryan Smith
        Arkansas Bar No. 2018192
        rsmith@roselawfirm.com

*Attorneys for Plaintiffs*

*On behalf of the Arkansas Civil Liberties Union Foundation, Inc.*