## WASHINGTON COUNTY DETENTION CENTER CONTRACT FOR
## MEDICAL SERVICES

This **AGREEMENT** ("Agreement") is dated effective as of the 1st day of January, 2021, (the "Effective Date") by and between **WASHINGTON COUNTY, ARKANSAS** ("County"), and **KARAS CORRECTIONAL HEALTH, P.L.L.C.,** an Arkansas professional limited liability company ("Karas"). County and Karas are referred to herein individually, as a "party" and, collectively, as the "parties."

### RECITALS

A. County operates an adult detention facility (the "Facility"), which may house in excess of 500 local, state and Federal pre- and post-trial detainees ("Detainees").

B. County is required by constitutional mandate to provide Detainees adequate medical and dental care.

C. County, pursuant to its obligation to ensure sound fiscal management of taxpayer dollars, published Request for Qualifications 2015-5 seeking qualifications and bids to provide quality medical and dental services to Detainees on the most efficient basis possible while maintaining standards of patient care.

D. Robert Karas, M.D., sole owner and operator of Karas, submitted the winning qualifications and bid.

E. Following the bidding process, County and Karas entered into a Contract for Medical Services whereunder Karas rendered the services to County set forth therein for the calendar years of 2019, 2020 and 2021.

F. County, in furtherance of its legal and fiscal obligations, desires to contract with Karas to provide professional medical and dental services to Detainees at the Facility for the calendar year of 2021.

G. County and Karas desire to enter into this Agreement in order to provide a full statement of their respective responsibilities during the term hereof.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises and covenants contained herein, the parties agree as follows:

### AGREEMENT

1. **DEFINITIONS**

For purposes of this Agreement, the following terms shall have the meanings ascribed thereto:

1.1. "Confidential Information" means all information, written or oral, directly or indirectly disclosed by one party to the other party, or directly or indirectly received by one party from the other

4849-2069-5640.1

EXHIBIT A

party, at any time (whether before, on or after the Effective Date), through any means of communication, including by visual observation, and the terms of this Agreement. Notwithstanding any contrary terms in the foregoing, Confidential Information shall not include (a) information that is publicly known prior to its disclosure to the Recipient or becomes publicly known through no wrongful act of the Recipient, (b) information that was in the lawful possession of the Recipient prior to its disclosure to the Recipient, if the Recipient was not then under an obligation of confidentiality with respect thereto, (c) after disclosure to the Recipient, was received by the Recipient from a third party who had a lawful right to disclose such information to the Recipient without any obligation to restrict the Recipient's further use or disclosure of the information, or (d) information that is independently developed by the Recipient without use of the Discloser's Confidential Information; provided, however, none of the preceding exclusions shall apply to Protected Health Information, as such term is defined under HIPAA.

1.2. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder, as each may be amended from time to time, including through the Health Information Technology for Economic and Clinical Health Act, (the "HITECH Act").

1.3. "Provider on Call" shall mean any Qualified Advance Care Professional designated by Karas to perform the on-call services described in the Agreement.

1.4. "Qualified Advanced Care Professional" shall mean any of the following professionals licensed to practice in the State of Arkansas: Medical Doctor ("MD"), Doctor of Nursing Practice ("DNP"), Advanced Practice Nurse Practitioner ("APRN") or Physician Assistant ("PA").

1.5. "Qualified Medical Professional" shall mean any of the following professionals licensed to practice in the State of Arkansas: Registered Nurse ("RN"), Licensed Practical Nurse ("LPN"), Paramedic, Advanced Emergency Medical Technician ("EMT"), Advance Practice Registered Nurse ("APRN"), Physician Assistant ("PA"), Doctor of Nursing ("DNP") or Medical Doctor ("MD").

## 2.  KARAS RESPONSIBILITIES

2.1. **Services.**  During the Term, Karas shall provide, and shall cause its Qualified Medical Professionals to provide, all medically necessary professional medical services to Detainees at the Facility as are consistent with the Qualified Medical Professional's licensure, specialty, practice, and training. Services will include, without limitation, the following and those additional duties set forth on Schedule 2.1 (the "Services"):

> a)  Initial Health Screening Consultation.  If during the course of any Detainee's Initial Health Screening (as defined in Section 2.2(a)), the trained correctional officer performing the Initial Health Screening determines the Detainee may have an emergent medical condition, the Facility shall notify a Qualified Medical Professional on duty and the Qualified Medical Professional will assess said Detainee within a reasonable amount of time. If the Detainee, in the sole discretion of the Qualified Medical Professional, requires medical attention that falls outside the scope of this Agreement, the Facility shall be responsible for transporting the Detainee to an appropriate healthcare facility for evaluation.

DocuSign Envelope ID: 4AC90025-DC6B-46D1-9662-238756C608D9

b)      Review of Initial Health Screenings.  A Qualified Medical Professional will review the Initial Health Screenings of all Detainees within a reasonable time of a Detainee's intake.  Any Detainee that, in the sole discretion of the reviewing Qualified Medical Professional, requires medical care will be placed on the "sick call" list or the Qualified Medical Professional may request a consult, by means of telecommunication or otherwise, with the Provider on Call.

c)      Emergency Medical Conditions.  Karas shall ensure that a Qualified Medical Professional shall be on site at the Facility 24 hours per day/7 days per week to respond to emergency medical problems of Detainees. Once properly notified that a Detainee has an urgent medical condition, a Qualified Medical Professional on duty will assess the Detainee within a reasonable amount of time to determine the appropriate treatment course, which may include, without limitation, on site treatment by the Qualified Medical Professional or Provider on Call, consultation with a Provider on Call via telecommunication, and/or transportation to an appropriate medical facility, which shall be provided at the sole cost of Facility

d)      Sick Call and Provider Call.  Karas acknowledges that Detainees have the right to request a "sick-call" appointment at any time during their detention by completing the "sick-call" appointment request form.  Karas shall cause its Qualified Medical Professionals to review the "sick-call" requests daily.  Each "sick-call" request will be triaged by a Qualified Medical Professional, with the more urgent requests, as determined in the sole discretion of the Qualified Medical Professional, scheduled to be seen first. Any Detainee requiring care by a Qualified Advanced Care Professional, will be placed on the "provider-call" list.  Karas shall ensure that a Qualified Advanced Care Professional is on-site at the Facility at least twenty (20) hours per week to conduct "provider-call." Additionally, Karas's Qualified Advanced Care Professionals shall render an additional twenty (20) hours per week in off-site services (i.e., reviewing patient records, conducting medication reconciliations, conferring with third party physicians and providers regarding patients' medical and treatment history, etc.).  A Qualified Advanced Care Professional will be available between the hours of 6 a.m. and 10 p.m. daily either in person or via means of telecommunications. In the event that the triage of sick call and doctor call requests indicates that a particular detainee requires emergent assessment or treatment during hours when a Qualified Advanced Care Professional is not available, the detainee will be sent to a local emergency room.

e)      Medication Reconciliation and Administration.  Karas will make every effort to provide prescription medication reconciliation within forty-eight (48) hours of a Detainee's detention; provided, however, it shall be the responsibility of the Facility to note any current prescriptions of a Detainee during the Initial Health Screening, as well as the name of Detainee's prescribing physician. Failure of the Facility to provide Karas with the necessary information to reconcile the prescription medications of Detainee shall excuse Karas from the requirement to complete reconciliation within forty-eight (48) hours of a Detainee's detention. Karas will have sole authority over the reconciliation process, including, without limitation, determining whether to continue, replace or discontinue a Detainee's medications. During the reconciliation process, Karas may use a therapeutic substitution for Detainees.  Karas will not continue the routine administration of narcotic pain medication and/or benzodiazepines without prior authorization from the Detainee's prescribing provider.  All prescribed medications will be administered by a Qualified Medical Professional.  Karas agrees to store all medication under a locked

DocuSign Envelope ID: 4AC90025-DC6B-46D1-9662-238756C608D9

system and will store all controlled substances in a double locking system. All controlled substances will be counted at the end of each shift.

f)   Laboratory Testing.   Karas will provide on-site point of care laboratory testing.

g)   Dental Services.  Karas will provide, or arrange for, a dentist to provide dental services at the Facility one day per month. If the dental needs of a Detainee cannot be adequately addressed at the Facility, the Detainee will be transported to a local dental provider.

h)   Mental Health Services.   Karas will provide, through its Qualified Advance Care Professionals, licensed counselors, licensed clinical social workers or psychologists (collectively, "Mental Health Professionals"), the mental health services specified in this Section 2.1(h) at the Facility a minimum of forty (40) hours per week.  Detainees identified in the Initial Health Screening as exhibiting withdrawal symptoms or suicidal ideations will be assessed by a Qualified Medical Professional and placed on an appropriate protocol as established by Karas. Karas may coordinate with the Detainee's current mental health provider, if applicable, in an effort to provide continuity of care.  A Qualified Advance Care Professional will evaluate all current psychiatric prescriptions and will be responsible for ordering any medication management.  Karas does not routinely prescribe benzodiazepines or narcotic pain medication and may choose, when possible, to use another anti-anxiety or non-narcotic pain medication.  A Detainee, or Facility on behalf of a Detainee, may request a mental health evaluation at any time.  Karas will utilize a triage system to schedule mental health appointments with a Mental Health Professional, with the most urgent, as determined in the sole discretion of Karas or the Mental Health Professional, being seen first.

i)   Medical Records.  Karas shall require its Qualified Medical Professionals to complete records (including billing records and patient medical records) relating to all professional services provided under this Agreement, including a complete medication administration record on each Detainee treated at the Facility pursuant to this Agreement.  Karas shall use the Facility's electronic health record software to maintain Detainee's medical records.  The Facility hereby grants Karas the right to use and access its electronic health record software for the purpose of treatment, payment or health care operations.  Karas will use reasonable efforts to require a Detainee to initial or sign when medication is refused and such documentation shall be maintained in the Detainee's medical record.

2.2.  **Excluded Services.**   The following services are specifically excluded as Services and Karas shall not be responsible for providing such services hereunder (the "Excluded Services"):

a) the initial health screening, which is performed by a trained correctional officer upon intake and prior to the booking of any Detainee to determine any current illnesses, prescriptions, diagnosed mental health conditions, dental problems, allergies, special dietary needs, current alcohol and drug use and overall appearance, shall be sole responsibility of Facility ("Initial Health Screening");

b) any medical or dental service outside the Qualified Medical Professional's licensure, specialty, practice and training;

c) routine eye exams, eye glasses, contacts or contact solutions;

d) any medical or dental service that cannot be performed safely or adequately at the Facility, as determined in the sole discretion of the Qualified Medical Professional; and

e) payment of any transportation required pursuant to this Agreement.

2.3. **Staffing.** During the Term, Karas shall provide Qualified Medical Professionals and other staff to ensure the Services are provided to Detainees in a timely manner. At the request of Facility, or in Karas' discretion, staffing can be adjusted to address the needs of the Facility. Karas shall cause any staff providing services hereunder to undergo a background investigation conducted by the County, at the sole cost of County, prior to providing any services pursuant to this Agreement. The County may refuse to allow any member of Karas' staff to provide the services hereunder.

2.3.1. **Investigation of Staff Members.** Karas or his designee shall be notified prior to any interview or statements from any member of Karas's staff with respect to the investigation of any non-criminal event or occurrence involving alleged misconduct of a staff member or any other action or inaction.

2.4. **Medical Administrator.** Karas shall provide a Qualified Medical Professional to serve as medical administrator (the "Medical Administrator") who will conduct certain administrative services, including, without limitation, overseeing the daily operations of the Qualified Medical Professionals providing services hereunder, coordinating any offsite medical or dental treatments for Detainees, identifying areas of improvement on an ongoing basis, reviewing and coordinating payment of medical bills of offsite providers. The Medical Administrator shall provide services at the Facility forty (40) hours per week.

2.5. **Medical Director.** Karas will appoint a medical doctor to serve as the medical director (the "Medical Director") for the Term of this Agreement. The Medical Director will be responsible for approving and assigning all protocols developed to address the Services required to be provided hereunder. The Medical Director shall be on-site at the Facility at least six (6) hours per month.

2.6. **Hospitalization and Specialty Services.** Karas agrees to make reasonable efforts to provide the Services at the Facility. In the event a Detainee requires hospitalization, Karas, through its Qualified Medical Professionals, will work with the receiving hospital to minimize the Detainees length of stay. In the event a Detainee requires a specialty medical service that cannot be met at the Facility, as determined in the sole discretion of the Qualified Medical Professional, the Detainee may be transported to an offsite provider. The Medical Administrator shall be responsible for coordinating any offsite specialty or hospital services with the offsite provider and the Facility. The Facility shall be responsible for transporting the Detainees to and from the offsite provider.

2.7. **Quality Assurance and Utilization Review Activities.** Karas and its Qualified Medical Professionals shall contribute to and cooperate in any quality assurance and utilization review activities related to the Services upon reasonable request by Facility. Karas and its Qualified Medical Professionals will participate in the CQI program and attend scheduled committee

meetings, provided that Karas is notified at least five (5) days in advance of any scheduled committee meetings.

2.8. **Policies and Procedures.** Karas will be responsible for providing policies and procedures for the medical, dental and mental health care of the Detainees in compliance with the Arkansas Criminal Detention Center Standards 2014, Chapter IX, Medical, Dental and Mental Health Care Services.

2.9. **Monthly Reports.** Karas agrees to provide the Facility with a monthly report on the following: (i) money expended by Karas in order to provide the Services; (ii) number of Detainee hospital visits; (iii) number of Detainee off-site provider visits, including dental visits; (iv) number of TB skin tests; (v) number of mental health visits; (vi) number of Hep B vaccines; (vii) number of pre-employment physicals; and (viii) number of deaths.

2.10.   **Compliance with Laws, Regulations, and Standards.** Karas shall at all times comply, and shall require its Qualified Medical Professionals to comply, with the applicable terms of this Agreement and with all applicable federal, state, and local statutes, rules, regulations, and standards applicable to the Facility.

## 3. CONFIDENTIALITY

3.1. **Duty of Care.** The party receiving Confidential Information (the "Recipient") shall use the same degree of care and protection with respect to the Confidential Information of the party disclosing Confidential Information (the "Discloser") that it exercises with respect to its own Confidential Information, but in all events at least a reasonable degree of care.

3.2. **Disclosures.** Except as hereinafter permitted in this Section, without the prior written consent of the Discloser, the Recipient shall not, directly or indirectly, disclose, distribute, republish, transmit, or otherwise make available, the Discloser's Confidential Information to any third party. Notwithstanding the foregoing:

   a)      the Recipient may disclose the Discloser's Confidential Information as expressly permitted under the terms of the Agreement,

   b)      the Recipient may disclose the Discloser's Confidential Information to:  (i) the employees of the Recipient and its Affiliates or (ii) third parties who or that have a reasonable need to know in connection with the Agreement,

   c)      the Recipient may disclose the Discloser's Confidential Information to its attorneys, accountants, financial advisors, and other similar advisors, who or that have a reasonable need to know such Confidential Information and are bound by contractual obligations or professional duties respecting such information that are no less restrictive than those set forth in this Section 3, and

   d)      provided that any such disclosure is made in accordance with the terms of Section 3.5, the Recipient may disclose the Discloser's Confidential Information if the disclosure is required by applicable laws or regulations, subpoena, or by any other similar legal or regulatory process.

3.3. **Uses.** Without the prior written consent of the Discloser, the Recipient shall not directly or indirectly use or allow its employees, agents or contractors to use the Discloser's Confidential

Information except as reasonably necessary in connection with the Agreement including, without limitation, in connection with a party's performance of its obligations under the Agreement and/or a party's exercise of rights granted under the Agreement.

3.4. **Return or Destruction**. Subject to the further terms of this Section, and except as otherwise permitted under the Agreement, upon the Discloser's written request, the Recipient promptly shall: (a) return to the Discloser, or at the Discloser's request, delete or destroy, all Discloser Confidential Information then in its possession or under its control, in whatever form, and (b) unless the Discloser otherwise consents in writing, return to the Discloser, or delete or destroy, any copies, duplicates, summaries, abstracts or other representations of any such Confidential Information or any part thereof, in whatever form, then in the possession or under the control of the Recipient. Notwithstanding any of the foregoing: (c) the Recipient may retain the Discloser's Confidential Information (including copies, duplicates, summaries, abstracts or other representations of any such Confidential Information) to the extent, and only as long as (i) permitted under the Agreement, (ii) required by applicable law, (iii) any of such Confidential Information is not reasonably available for return, deletion or destruction (in which case Recipient may retain, delete and destroy such Confidential Information in accordance with its records retention program). All such Confidential Information retained by the Recipient pursuant to this Section shall continue to be subject to the terms of the Agreement for as long as such information is retained by the Recipient.

3.5. **Notification Obligation**. If the Recipient becomes aware of any unauthorized use or disclosure of the Discloser's Confidential Information, the Recipient promptly and fully shall notify the Discloser of all facts known to it concerning such unauthorized use or disclosure.

3.6. **Ownership**. Each party's Confidential Information is and shall remain the sole and exclusive property of that party.

4. **COMPENSATION**

4.1. **Copayments.** Detainees shall be charged a copayment for "Provider call" visits ($20), "Dental call" visits ($20), "Sick call" visits ($10), Prescription medications ($10) and over-the-counter medications (S5). The Facility will charge and collect the copayment from Detainees, and shall remit the same to Karas on a quarterly basis. Karas agrees to submit a weekly report to the Facility of the Services provided to each Detainee. Karas will not deny access to any of the Services provided hereunder based on a Detainee's inability to pay.

4.2. **Compensation to Karas.** In consideration of Karas's provision of Services pursuant to this Agreement, Facility shall pay to Karas the total amount One Million Three Hundred Seventy-Four Thousand and 0/100 ($1,374,000.00) through twelve monthly installments of One Hundred Fourteen Thousand Five Hundred Fifty Dollars and 00/100 ($114,500.00) (the "Total Remittance") due on or before the fifth day of each month during the term of this Agreement, beginning with January of 2021. The Total Remittance shall consist of two components. One Million One Hundred Ninety-Nine Thousand Dollars and 0/100 ($1,199,000.00) of the Total Remittance shall be compensation to Karas for the Services performed hereunder, and each monthly payment of the Total Remittance shall include 1/12 of this compensation payment ($99,916.66). The remaining One Hundred and Seventy-Five Thousand Dollars and 0/100 ($175,000.00) of the Total Remittance shall be referred to as the "Facility Expense Advance." Each monthly payment of the Total Remittance shall include 1/12 of the Facility Expense Advance ($14,583.33). Each payment of the Facility Expense Advance to Karas may be comingled with other funds of Karas, but shall be accounted for separately by Karas. The

Facility Expense Advance funds shall be used by Karas to pay for expenses deemed reasonable and appropriate by Karas that are designated as Facility's responsibility (the "Facility Expenses") on the attached <u>Exhibit A</u>.

4.3. **Costs.** Karas and Facility each hereby agree they will be responsible for payment of costs related to the Services in accordance with the table attached hereto as <u>Exhibit A</u>. As set forth above, Karas shall receive from Facility a Facility Expense Advance in the amount of $14,583.33 per month to be utilized for payment of Facility Expenses. Karas shall be responsible for accounting for all Facility Expense Advance funds received and all Facility Expenses paid by Karas. Karas shall submit such accounting to Facility upon Facility's request, but not less frequently than quarterly. The Facility Expense Advance funds shall be reconciled each quarter, or at such frequency as may be otherwise agreed to by Karas and Facility. Through the reconciliation process, Karas shall provide to Facility an accounting for the total Facility Expense Advance funds received to date as well as the total of Facility Expenses paid by Karas. Upon reconciliation, Karas shall refund to Facility any Facility Expense Advance funds which remain on hand after payment of Facility Expenses. In the event that Karas pays Facility Expenses in excess of the amount of Facility Expense Advance funds received, Facility shall reimburse Karas for such excess payments.

## 5. TERM AND TERMINATION

5.1. **Term.** Unless earlier terminated as set forth in this Agreement, the initial term of this Agreement shall begin as of the Effective Date and shall continue until December 31, 2018 (the "Initial Term"). After expiration of the Initial Term, this Agreement may be renewed upon mutual agreement of the parties (the "Renewal Term"). The Initial Term, together with any Renewal Term(s), shall constitute the "Term" of this Agreement.

5.2. **With-Cause Termination.** In the event either party breaches its obligations under this Agreement, the non-breaching party shall have the right to terminate this Agreement by providing written notice to the breaching party and following the procedures set forth in this Section. Any such notice shall specify the actions or inactions giving rise to a breach of this Agreement and the parties shall meet within fourteen (14) days to develop a plan of correction to cure the breach. The breaching party shall proceed to cure the breach in accordance with the agreed upon plan of correction and, in the event the breaching party has not cured, or made substantial progress in curing, the breach within the agreed upon timeline to accomplish the plan of correction, or in the event that the parties do not agree upon a mutually acceptable plan of correction or timeline, the non-breaching party may thereupon terminate this Agreement as of the sixtieth (60th) day following the original provision of notice.

5.3. **Without Cause Termination.** Either party may terminate this agreement without cause by providing at least sixty (60) days prior written notice to the other party.

5.4. **Jeopardy.** Notwithstanding anything herein to the contrary, in the event this Agreement or the performance by any party hereto of any term, covenant, condition, or provision of this Agreement is likely to expose a party or its affiliates to a material risk of: (a) loss of licensure; (b) loss of participation in, or the payment or reimbursement from, the Medicare program, state-sponsored Medicaid program, or other reimbursement or payment programs; (c) loss of full accreditation by any state or nationally recognized accrediting organization; (d) a violation of any federal, state, or local law, rule, or regulation that is applicable to either party or this Agreement (whether or not, in the case of a change in law, regulation, or other standard, such change has become effective) (any such event shall be referred to herein as a "Jeopardy Issue"),

then either party may give written notice of the Jeopardy Issue to the other party. The notice shall be accompanied by an opinion of legal counsel of the party providing the notice that describes the Jeopardy Issue and, if applicable, potential corrective action for the Jeopardy Issue. The parties shall immediately initiate negotiations to resolve the Jeopardy Issue through amendments to this Agreement or other corrective action by meeting, with their respective legal counsel, on a regular basis over a period of up to fourteen (14) days following receipt of the written notice in order to consider all reasonable alternative approaches to resolve the Jeopardy Issue with the objective of agreeing upon a resolution that minimizes, to the extent feasible, any adverse impact on any party. If the parties are unable to agree upon an amendment or other corrective action to resolve the Jeopardy Issue by the end of the fourteen (14)-day negotiation process, then either party may, at its option, terminate this Agreement forthwith.

## 6. INSURANCE AND INDEMNITY

6.1. **Karas's Liability Insurance.** Karas shall, at Karas's sole cost and expense, procure, keep, and maintain throughout the Term of this Agreement, One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) annual aggregate for professional liability covering Karas and the MDs providing Services pursuant to this Agreement and applicable state statutory limits for workers compensation.

6.2. **Facility's Coverage.** Facility shall, at its sole cost and expense, procure, keep, and maintain coverage for any claim brought by any person against Karas as well as its officers, employees, agents, and contractors (i.e. contracted dentist) (collectively, the "Karas Covered Parties"), seeking monetary, injunctive, equitable or other relief as a result of any alleged action or inaction on the part of the Karas Covered Parties in conjunction with the performance of Karas's obligations under this Agreement, including all prior and future iterations hereof, which is alleged to have constituted a deprivation of the claimant's civil rights guaranteed by the laws, statutes, or constitutions of the United States or the State of Arkansas (the "Covered Claims"). Facility agrees to indemnify and hold harmless Karas and the Karas Covered Parties from all Covered Claims, as well as any and all attorney's fees and costs attributable thereto. Facility further agrees to provide a defense for the Karas Covered Parties with respect to the Covered Claims through licensed counsel of Facility's choosing. Facility's obligations to insure against, indemnify from and provide a defense with respect to the Covered Claims shall survive the termination of this Agreement and shall remain in full force and effect with respect to any Covered Claim existing now or hereafter brought against a Karas Covered Party, whether during the term of this Agreement or thereafter.

6.3. **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY DAMAGES, IRRESPECTIVE OF THE NATURE OF THE ACTION, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR LOSS OF PROFITS, LOSS OF USE, BUSINESS LOSSES, OR ANY OTHER INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, EVEN IF THE APPLICABLE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. This Section shall survive the expiration or termination of this Agreement for any reason until the expiration of the applicable statute of limitations period.

## 7. RELATIONSHIP OF THE PARTIES

7.1. **Exclusivity.** Except as otherwise expressly provided herein, Facility will not employ or contract with any other physician or third party other than Karas for the Services unless Karas is unable to provide the required staffing under this Agreement.

7.2. **Status of Karas.** In the performance of the duties and obligations of Karas under this Agreement, it is mutually understood and agreed that Karas and each person provided by Karas to provide the Services hereunder is at all times acting and performing as an independent contractor of Facility; that Facility shall neither have nor exercise any control or direction over the methods by which Karas or its Qualified Medical Professionals or Mental Health Professionals shall perform their work and functions, except that Karas and its Qualified Medical Professionals and Mental Health Professionals are expected to perform their work and functions at all times in accordance with then currently approved methods and practices of their professional Specialty; and that the sole interest of Facility is that the Services under this Agreement are performed and rendered in a competent, efficient, and satisfactory manner in accordance with community medical standards. The duties of Karas and the Qualified Medical Professionals and Mental Health Professionals under this Agreement shall not be interpreted in any way to interfere with, compromise, or supersede the exercise of their independent medical judgment when treating or consulting in the care and treatment of Detainees. It is expressly agreed by the parties hereto that no work, act, commission, or omission of Karas shall be construed to make or render Karas the agent, employee, or servant of Facility.

7.3. **No Benefits or Withholding.** Neither Karas nor any of its employees, agents, or subcontractors shall have any claim under this Agreement or otherwise against Facility for workers' compensation, unemployment compensation, vacation pay, sick leave, retirement benefits, Social Security benefits, disability insurance benefits, unemployment insurance benefits, or any other benefits. Facility shall not withhold, or in any way be responsible for, the payment of any federal, state, or local income taxes, F.I.C.A. taxes, F.U.T.A. taxes, unemployment compensation or workers' compensation contributions. Social Security, or any other payments or withholdings pursuant to any law or requirement of any governmental body/agency on behalf of Karas or any of its employees, agents, or subcontractors, and all such withholdings, payments, or obligations shall be the sole responsibility of Karas. In the event that the Internal Revenue Service ("IRS") or other governmental body/agency should question or challenge the independent contractor status of Karas, Facility shall have the right to participate in any discussion or negotiation occurring with the IRS or other such governmental body/agency, irrespective of by whom such discussions or negotiations were initiated. This Section shall survive the expiration or termination of this Agreement for any reason.

8. **GENERAL PROVISIONS**

8.1. **Compliance with HIPAA.** HIPAA governs the use and disclosure of an individual's Protected Health Information. The parties intend to comply with the applicable requirements of HIPAA in connection with this Agreement. The parties acknowledge that each party can use and disclose Protected Health Information under HIPAA for the purpose of treatment of the Detainee and for the purpose of obtaining payment for such treatment and, in certain instances, for the purposes of the health care operations of each party.

8.2. **Attorneys' Fees.** In the event that any action is brought by either party to enforce or interpret the terms of this Agreement, the prevailing party in such action shall be entitled to its costs and reasonable attorneys' fees incurred therein from the non-prevailing party, in addition to such other relief as the court may deem appropriate.

8.3. **Notices.** Whenever under the terms of this Agreement written notice is required or permitted to be given by any party to any other party, such notice shall be in writing and shall be deemed to have been sufficiently given if personally delivered, delivered by a national overnight courier service (such as Federal Express), transmitted by electronic facsimile, or deposited in the United States Mail, in a properly stamped envelope, certified or registered mail, return-receipt-requested, addressed to the party to whom it is to be given, at the address hereinafter set forth. Any party hereto may change its address by written notice in accordance with this Section.

If to Facility:
Washington County Sheriff
Attn: Detention Supervisor
1155 Clydesdale
Fayetteville, AR 72701

If to Karas:
Karas Correctional Health, P.L.L.C.
1041 North Garland Avenue
Fayetteville, Arkansas 72703

With a copy to:
Kutak Rock LLP
234 East Millsap Road
Suite 200
Fayetteville, Arkansas 72703
Attn: Kyle T. Unser

8.4. **Assignment.** Neither party shall have the right or the power to assign this Agreement nor any of the rights or obligations inuring to or imposed upon it herein without the prior written consent of the other party, which consent shall not be unreasonably withheld, and any attempted or purported assignment without such prior written consent shall be null and void and of no effect.

8.5. **No Third Party Rights.** This Agreement has been made and is made solely for the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement.

8.6. **Waiver.** All waivers of rights, powers, and remedies by a party to this Agreement must be in writing. No delay, omission, or failure by a party to exercise any right, power, or remedy to which a party may be entitled shall impair any such right, power, or remedy, nor shall such be construed as a release by a party of such right, power, or remedy or as a waiver of or acquiescence in any such action, unless such action shall have been cured in accordance with the terms of this Agreement. A waiver by a party of any right, power, or remedy in any one instance shall not constitute a waiver of the same or any other right, power or remedy in any other instance.

8.7. **Headings.** The headings contained in this Agreement are for convenience of reference only and shall in no way be held or deemed to be a part of or affect the interpretation of this Agreement.

8.8. **Schedules and Exhibits.** All exhibits and schedules referred to in this Agreement are incorporated herein by reference.

8.9. **Severability.** The provisions of this Agreement shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

8.10. **Entire Agreement.** This Agreement and all Exhibits and Schedules hereto constitute the entire agreement between the parties with regard to the subject matter hereof and thereof. This Agreement supersedes all previous agreements between or among the parties with regard to the subject matter. There are no agreements, representations, or warranties between or among the parties other than those set forth in this Agreement or the documents and agreements referred to in this Agreement.

8.11. **Amendments.** This Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that before any amendment shall become effective, it shall be reduced to writing and signed by both parties.

8.12. **Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Arkansas applicable to agreements made and to be performed wholly within that state, irrespective of such state's choice-of-law principles. Venue shall lie in Washington County, Arkansas.

8.13. **Continuing Obligations.** Whether specifically identified or not, the obligations of the parties under this Agreement which by their nature or content would continue beyond the expiration or termination of this Agreement shall survive any expiration or termination of this Agreement.

8.14. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute one and the same instrument.

8.15. **Israel.** Kara agrees that it is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel.

**[ Signature Page Follows ]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth below.

Facility:

By: _____

Joseph Wood, County Judge
Washington County, Arkansas

Date: Dec 28, 2020 | 10:45 AM CST

By: _____

Tim Helder, County Sheriff
Washington County, Arkansas

Date: 12/28/2020

Karas:

**Karas Correctional Health, P.L.L.C.,** an Arkansas professional limited liability company

By: _____

Robert Karas, M.D., P.A., Sole Owner

Date: 12/21/2020

## SCHEDULE 2.1

## SERVICES

1.      Karas shall provide, and shall cause its Qualified Medical Professionals to provide, all medically necessary professional medical services to Detainees at the Facility as are consistent with the Qualified Medical Professional's licensure, specialty, practice, and training.

2.      Karas shall cause its Qualified Medical Professionals to perform the duties listed below and will be responsible for assigning such duties to the Qualified Medical Professionals based on the Qualified Medical Professional's licensure, specialty, practice, and training:

a)  Conduct "sick-call" daily;

b)  Provide TB skin tests for Facility employees and Detainees;

c)  Report all positive TB results to the TB Director at the Arkansas Department of Health;

d)  Workman's compensation initial assessment and drug screen;

e)  Request and review outside mental health and medical records;

f)  Medication reconciliation and ordering;

g)  Maintain Medication Administration Records per Facility standards;

h)  Inventory medications and supplies and restock medications, supplies and medication carts;

i)  Promptly respond to radio traffic for medical emergencies;

j)  Review all medical diet requests of Detainees, order medically necessary dietary modifications and coordinate medically necessary diets with the food service department;

k)  Review laboratory results and Capillary Blood Glucose logs (weekly);

l)  Coordinate medical care for ADC detainees, and U.S. Marshall detainees, which may include calling for off-site appointments, coordinating directly with ADC for their detainees medical treatment per ADC standards, coordinating medical care of U.S. Marshals for their detainees according to U.S. Marshals standards, faxing medical appointments and procedure requests to the U.S. Marshals for approval, and coordinating billing with ADC and U.S. Marshalls;

m)  Review all bills and coordinate rate adjustments of offsite or contracted providers and pay all offsite or contracted facilities within 45 days of bill receipt;

n)  Assist Facility in coordinating Medicaid coverage for Detainees hospitalized greater than 24 hours;

o)   Provide Hepatitis B vaccines for employees and Hep B declination form management;

p)   Conduct venipuncture, wound repair (stapling and suturing by PA, APRN, or MD), casting and splinting of fractured bones, diagnostic imaging;

q)   Participate in JEMI;

r)   Administer medications;

s)   Review intake health screenings;

t)   Coordinate hospitalizations, outside medical care and appointments;

u)   Drug screens (309's returning from furlough, Detainees when ordered, Workers compensation injuries);

v)   Provide medical care for JDC Detainees charged as adults;

w)   Respond to Detainee medical, dental, mental health requests using Kiosk system provided by the Facility;

x)   Complete any medical paperwork and transmit the paperwork to the appropriate agency; and

y)   Perform peritoneal dialysis on-site if indicated

# EXHIBIT A

## FINANCIAL OBLIGATIONS

| Expenditure | Financial Responsibility |
|---|---|
| Qualified Health Care Professional | Karas |
| Salaries Medical Provider Salaries | Karas |
| Mental Health Provider Salaries | Karas |
| Dental Health Services | Facility |
| Prescription Medications | Facility |
| OTC Medications | Facility |
| Detainee Tubersol (TB Skin Test) | Facility |
| Facility Employee Tubersol (TB Skin Test) | Facility |
| Facility Employee Rep B Vaccine | Facility |
| Office Supplies; Paper, staples, copies, pens, etc. | Karas |
| Phone, phone service, and fax | Facility |
| Computer | Facility |
| Electronic Health Record | Facility |
| Internet service | Facility |
| Medical Supplies | Facility |
| Ancillary Services: X-ray, MRI, CT Scan, U/S, specialist visits | Facility |
| Clinical Lab Services | Facility |
| Training for Detention Center Staff | Karas |
| Hazardous Waste Disposal | Karas |
| Any County, State, National Required Licenses/Permits | Facility |
| Medical Equipment Less Than $500 | Karas |
| Repair of Medical Equipment Owned by Karas Health Care | Karas |
| Required Malpractice Insurance | Karas |
| Repair of Medical Equipment Owned by Facility County | Facility |
| Hospitalization and Emergency Care | Facility |
| Offsite specialty medical services | Facility |
| Transportation | Facility |