UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EDRICK FLOREAL-WOOTEN;
JEREMIAH LITTLE; JULIO GONZALES;
DAYMAN BLACKBURN; THOMAS FRITCH          PLAINTIFFS

v.                    Case No. 5:22-cv-05011-TLB-CDC

TIM HELDER, FORMER SHERIFF OF WASHINGTON COUNTY,
ARKANSAS, in his individual capacity;
KARAS CORRECTIONAL HEALTH, P.L.L.C.;
DR. ROBERT KARAS, M.D., in his individual capacity          DEFENDANTS

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiffs Edrick Floreal-Wooten, Jeremiah Little, Julio Gonzales, Dayman Blackburn, and Thomas Fritch (collectively, Plaintiffs), and for their First Amended Complaint against Tim Helder, former Sheriff of Washington County, in his individual capacity (Sherriff Helder), Karas Correctional Health, P.L.L.C., and Dr. Robert Karas, M.D., in his individual capacity (together, referred to as Karas Defendants), (collectively, Defendants), state as follows:

### I.   NATURE OF ACTION

"*Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . . .*"[1]

This case is about protecting the interests of detained persons in the integrity of their own bodies through the necessity of informed consent to medical treatments. Plaintiffs allege that Karas Defendants knowingly and intentionally disregarded U.S. Food and Drug Administration (FDA) warnings by administering the dewormer Ivermectin to them as a supposed treatment for COVID-19 without their prior informed consent as to the nature, contents, or potential side effects of the drugs administered. Karas Defendants also used overt deception in the administration of

---

[1] *Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (N.Y. 1914) (Cardozo, J.), *abrogated on other grounds*, *Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957).

Ivermectin, even telling Plaintiffs that the alleged treatment consisted of mere "vitamins," "antibiotics," and/or "steroids." Sherriff Helder was aware of this conduct, or should have been aware of it, but permitted it to continue.

The truth, however, was that without knowing and voluntary consent, Plaintiffs ingested incredibly high doses of a drug that credible medical professionals, the FDA, and the Centers for Disease Control and Prevention (CDC), all agree is not an effective treatment against COVID-19, and that if given in large doses is dangerous for humans.[2] But this was no deterrent to Defendants, whose actions harmed Plaintiffs by affronting their personal autonomy, violating their constitutional rights, and jeopardizing their well-being.

## II.     JURISDICTION AND VENUE

1.     This action arises under 42 U.S.C. § 1983. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over Plaintiffs' state law claim against Karas Defendants under 28 U.S.C. § 1367.

2.     Venue is proper in the Western District of Arkansas pursuant to 28 U.S.C. § 1391(b) because the unlawful acts and practices alleged herein occurred within this judicial district in Washington County, Arkansas.

## III.    PARTIES

---

[2] The Wall Street Journal reported on the findings from the largest clinical trial of the drug to date, wherein researchers concluded that Ivermectin was not an effective treatment for preventing hospitalizations from COVID-19. *See* https://www.wsj.com/articles/ivermectin-didnt-reduce-covid-19-hospitalizations-in-largest-trial-to-date-11647601200?mod=trending_now_news_3 (last visited March 21, 2021); *see also* https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited Dec. 29, 2021); https://www.fda.gov/animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended-animals (last visited Dec. 29, 2021); https://www.fda.gov/animal-veterinary/product-safety-information/fda-letter-stakeholders-do-not-use-ivermectin-intended-animals-treatment-covid-19-humans (last visited Dec. 29, 2021); https://emergency.cdc.gov/han/2021/han00449.asp (last visited Dec. 29, 2021).

3. Plaintiff Edrick Floreal-Wooten was detained at Washington County Detention Center (WCDC) at all relevant times herein. Mr. Wooten is a married father of three.

4. Plaintiff Jeremiah Little was detained at WCDC at all relevant times herein. Mr. Little was born and raised in Fayetteville, Arkansas, and is a father of three.

5. Plaintiff Julio Gonzales was detained at WCDC at all relevant times herein. Mr. Gonzales has one grown daughter.

6. Plaintiff Dayman Blackburn was detained at WCDC at all relevant times herein. Mr. Blackburn has a history of heart conditions, and suffered three heart attacks in 2018. He has two daughters, and one granddaughter.

7. Plaintiff Thomas Fritch was detained at WCDC at all relevant times herein. He is HIV positive, and, as a result, must closely monitor his health.

8. Sherriff Helder was the sheriff of Washington County at all relevant times herein, and as such was responsible for the administration and operation of WCDC and its policies, procedures, and customs. Sheriff Helder approved and executed the contract with Karas Correctional Health, P.L.L.C., to provide healthcare at WCDC, including to the Plaintiffs, for an annual cost to Washington County taxpayers of $1,374,000.00. *See* Exhibit A at § 4.2. Sheriff Helder was aware of the administration of Ivermectin to detainees like Plaintiffs and the Karas Defendants' policy of doing so, and should have been aware given Dr. Karas's public statements regarding the use of the drug at WCDC.

9. Defendant Karas Correctional Health, P.L.L.C., (KCH) is an Arkansas professional limited liability company doing business in Arkansas. At all times relevant herein, KCH contracted with Washington County to provide healthcare at WCDC, including to the Plaintiffs.

10. Defendant Robert Karas, M.D., (Dr. Karas) is, and was at all times relevant herein,

3

the manager and sole member of KCH, and the primary care physician responsible for the administration and operation of KCH at WCDC, and has been for many years. As relevant here, in 2020, KCH successfully bid to provide healthcare services at WCDC, and approved and executed the contract with WCDC on behalf of KCH to provide healthcare at WCDC, including to the Plaintiffs, for an annual cost to Washington County taxpayers of $1,374,000.00. *See* Exhibit A at § 4.2.

## FACTS

**History of the relationship between Defendants and the rise of COVID-19.**

11. For many years, the WCDC and, by extension, Sherriff Helder, enjoyed a mutually beneficial relationship with the Karas Defendants.

12. As a part of this relationship, and in exchange for a significant amount of money, the Karas Defendants provided Sherriff Helder with healthcare services for the detainees housed in his care at the same.

13. Starting in 2020 and continuing through the present, the importance of such healthcare services in the WCDC setting became particularly striking given the rise of COVID-19.

14. In conjunction with the rise of COVID-19, Dr. Karas began both publicly and privately espousing the virtues of the use of the drug Ivermectin to combat the disease. Upon information and belief, Dr. Karas began conducting research as to its efficacy against the disease, as well.

15. Upon information and belief, Karas Defendants began utilizing Ivermectin as a treatment for COVID-19 with WCDC detainees at least as early as the fall of 2020. *See* Exhibits B and C.

4

16.     Upon information and belief, Sheriff Helder was aware by July 2021 of Dr. Karas's policy in support of the use of Ivermectin, and that he intended to administer the same to detainees.[3] Indeed Sherriff Helder should have been aware too, given Dr. Karas's relentless public statements on his clinic's social media page regarding the use of the drug.

17.     Upon information and belief, Dr. Karas may have had a financial incentive to administer the drug Ivermectin to detainees. This is because KCH and other related entities operated by Dr. Karas sometimes purchase the drugs used at WCDC at wholesale. Pursuant to the contract between KCH and WCDC, and in addition to the annual fees payable to KCH by WCDC, WCDC is obligated to pay the costs for all prescription medications prescribed to WCDC detainees, which may have provided a direct financial benefit to Dr. Karas.[4]

18.     As of August 25, 2021, Dr. Karas stated publicly that there had been 531 confirmed COVID-19 cases at WCDC, meaning that Karas Defendants through its agents had administered healthcare services for the disease to at least that many detained people. Dr. Karas has admitted publicly to administering Ivermectin to such confined persons.

19.     Dr. Karas remarks often on his clinic's public social media page regarding the Ivermectin treatments provided in his private practice to his private patients, and even posts signage at his clinic requesting clinical trial volunteers. The social media posts are often accompanied with precise dosing and treatment plans for his so-called "COVID protocols."

20.     On December 24, 2021, Dr. Karas posted publicly about the use of Ivermectin at WCDC, touting the dangerously high doses of the drug foisted on inmates like Plaintiffs.

**Plaintiffs test positive for COVID-19.**

---

[3] https://www.nwaonline.com/news/2021/aug/25/washington-county-sheriff-confirms-use-of/ (last visited Dec. 29, 2021); https://www.nwaonline.com/news/2021/aug/26/ivermectin-as-covid-19-treatment-for-inmates/ (last visited Dec. 29, 2021).

[4] *See* Ex. A at p. 16.

21.     Plaintiff Fritch tested positive for COVID in December of 2020, while all other Plaintiffs (the 2021 Plaintiffs) tested positive for COVID in late August 2021. As a result, Plaintiffs were relocated to a barracks that was specifically designated as a quarantine block for those with the disease or those with a close contact to the same. Upon information and belief, hundreds of detained peoples have been housed in the quarantine block since the start of the pandemic.

**Plaintiffs are treated with high amounts of Ivermectin.**

22.     Once in the quarantine block, Plaintiffs were given a cocktail of drugs by Karas Defendants to allegedly treat COVID-19. As to the 2021 Plaintiffs, the drugs were administered twice a day, and ranged in volume between 2-10 pills. The drugs consisted of high doses of vitamins and the drug Ivermectin.

23.     Plaintiff Fritch was administered the drug by Karas Defendants in December of 2020. Karas Defendants declined to tell him that the drug was unapproved by government regulators and explicitly not recommended by credible medical authorities for the treatment of COVID-19.

24.     Ivermectin is used to treat or prevent parasites in livestock animals, such as cows and horses. For humans, it is FDA approved to treat infections by some parasitic worms, head lice, or skin conditions, like rosacea.[5]

25.     "High doses" is no hyperbole. By way of example, prior to receiving the drug, Plaintiff Edrick Wooten was recorded on August 22, 2021, as being 6'1" and weighing 158 pounds (72 kg). At his size, the approved dosage of Ivermectin to combat worms (one of the approved uses in humans) is 0.2 mg/kg in a single dose, which given his size, is 14 mg. Mr. Wooten, however, received 48 mg over a period of four days, or 3.4 times the approved dosage.

---

[5] https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited Dec. 29, 2021).

26.     Similarly, Plaintiff Dayman Blackburn was recorded on August 21, 2021, as being 6'1" and weighing 191 pounds (86.6 kg). At his size, the approved dosage to combat worms is 0.2 mg/kg in a single dose, which is 17 mg. According to Mr. Blackburn's medical records, however, he was prescribed 36 mg of the drug on August 22 by the Karas Defendants, followed by 24 mg a day from August 23-August 25. That dosage, totaling 108 mg, is nearly 6.3 times the approved dosage.

27.     As to Plaintiff Thomas Fritch, he was recorded on September 2, 2020, as being 5'7" and 192 pounds (87.09 kg). At his size, the approved dosage to combat worms is 0.2 mg/kg in a single dose, which is 17.42 mg. According to Mr. Fritch's medical records, however, he was prescribed 12 mg of the drug each day on December 16-18 and then again on December 22. That dosage, totaling 48 mg. is 2.75 times the approved dosage.

28.     On December 24, 2021, Dr. Karas admitted publicly on his clinic's social media page to dosing inmates housed at WCDC with as much as 0.4 mg/kg of the drug Ivermectin- an astounding amount of the dewormer, and double the dosage recommended for its *intended* use (which says nothing of its use here). He stated further than this dosage regime was different than the dosage given to his private practice patients.[6]

29.     At no point were Plaintiffs informed that the medications they were consuming included Ivermectin. Further, none of the Plaintiffs were informed of the side effects of the drug administered to them or that any results would be used for research purposes.

30.     Upon information and belief, all Plaintiffs (and numerous other detainees who were deceived in the treatment they were given) received treatments that included inappropriately high

---

[6] On December 24, 2021, Dr. Karas wrote the following on his clinic's Facebook page: "The slight difference between jail protocol and the clinic regimen being that we kept the .2-.4 mg/kg Ivermectin dosing on our jail patients."

7

levels of the drug Ivermectin.

31. Not only is Ivermectin not FDA authorized or approved to treat or prevent COVID-19 in people (or animals, for that matter),[7] but the FDA has issued a warning against using it to treat COVID-19. It can have serious interactions with other medications, and/or result in nausea, vomiting, diarrhea, hypotension (low blood pressure), allergic reactions (itching and hives), dizziness, ataxia (problems with balance), seizures, coma and even death.[8]

32. In fact, Karas Defendants told the 2021 Plaintiffs that the drugs consisted of mere "vitamins," "antibiotics," and/or "steroids."

33. Had Plaintiffs been informed that the drugs they were given included the dewormer Ivermectin and informed of its nature and potential side effects, they would have refused to take it.

**Plaintiffs experienced side effects from Ivermectin.**

34. Plaintiffs suffered side effects consistent with the overuse of Ivermectin. Specifically, Plaintiff Fritch, who Karas Defendants recorded as being "High Risk" as a result of his HIV status, experienced dizziness, nausea, vomiting, pain, and weakness, which he reported to the Karas Defendants. Plaintiff Fritch continues to experience worsening muscle weakness, tremors, and neuropathy today, all of which began after being given the drug. 2021 Plaintiffs experienced vision issues, diarrhea, bloody stools, and/or stomach cramps.

35. Upon reporting his symptoms to Karas Defendants, Plaintiff Fritch was told his reactions were "normal."

36. All Plaintiffs experienced mental distress, anger, and a lingering mistrust of

---

[7] https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited Dec. 29, 2021).
[8] *Id.*

Defendants and medical professional generally as a result of Defendants permitting the use of, and administering, a drug in disregard of a FDA warning and without their knowledge or consent. That distress and mistrust continues even today.

37. To add insult to injury, Plaintiffs were subject to the payment of fees for medical examinations they sought after suffering side effects from the Ivermectin treatment. Pursuant to the contract between KCH and the County Defendants, those fees are payable to KCH, providing financial incentive to Dr. Karas as the sole member of KCH.[9]

**Defendants attempt to obtain consent retroactively.**

38. Upon information and belief, after the news broke publicly regarding Defendants' use and administration of Ivermectin, Defendants attempted to obtain "retroactive" consents to medical treatment from detainees, including for the use of Ivermectin.

## COUNT I – VIOLATION OF DUE PROCESS AGAINST ALL DEFENDANTS

39. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-38 above.

40. Detained persons like Plaintiffs have a due process right to voluntary and informed consent, and they possess a significant liberty interest in receiving appropriate medical treatment and avoiding the unwanted administration of drugs.

41. Consent is voluntary when "given by a person or a responsible proxy (*e.g.*, a parent) for participation in a study, immunization program, treatment regime, invasive procedure, etc., after being informed of the purpose, methods, procedures, benefits, and risks. The essential criteria of [informed consent] are that the subject has both knowledge and comprehension, that consent is freely given without duress or undue influence, and that the right of withdrawal at any

---

[9] Ex. A at § 4.1.

time is clearly communicated on the subject." Stedman's Medical Dictionary 898 (27th ed. 2000).

42. Ivermectin is not accepted by the FDA or CDC as an effective treatment against COVID-19. In fact, the FDA has warned against such use of Ivermectin.

43. Taking Ivermectin in large doses can be dangerous for humans.

44. Despite this, Karas Defendants administered the dewormer to Plaintiffs without their voluntary consent. Specifically, Karas Defendants provided the drug cocktail to Plaintiffs under false premises, such as stating the drug was merely "vitamins," "antibiotics," and/or "steroids."

45. Upon information and belief, Dr. Karas even benefited financially from the administration of Ivermectin to detained persons like Plaintiffs.

46. Karas Defendants further administered the drug Ivermectin to Plaintiffs without their knowing and informed consent.

47. Specifically, Plaintiffs were not given the necessary information to reach a decision about whether or not to accept the Ivermectin treatment. Prior to its administration, Plaintiffs were unaware of the potential side effects for the alleged treatment they were given (indeed, none had ever heard of the drug Ivermectin). Likewise, Plaintiffs were not informed that the FDA warned against the use of Ivermectin for the treatment or prevention of COVID-19.

48. Karas Defendants knew or should have known that Ivermectin was not an appropriate medical treatment for Plaintiffs, and thus they acted with deliberate indifference in administering this inappropriate treatment to them.

49. Sherriff Helder knew or should have known that Karas Defendants were administering incredibly high doses of this drug to Plaintiffs. But he ignored it.

50. Karas Defendants further acted with deliberate indifference as they knew that

Plaintiffs did not consent to the treatment, and should have known that Plaintiffs would want to know the nature, contents, and potential side effects of a drug offered. Karas Defendants even went so far as attempting to obtain "retroactive consents" from detained persons, including at least one Plaintiff, for the Ivermectin treatment.

51. Indeed under Arkansas law, medical providers have a statutory duty to warn a patient of hazards of future medical treatment. *See* Ark. Code Ann. § 16-114-206.

52. It is both customary and legally required in all medical settings, both within Arkansas and beyond, that patients be given complete, accurate, and truthful information to enable them to make an informed decision as to whether to proceed with medical treatments. As medical providers, Karas Defendants undoubtedly knew this.

53. Karas Defendants failed to provide even basic (or truthful) information as to the nature, contents, and potential side effects of a drug offered in violation of the Arkansas statutory duty to warn.

54. Had Plaintiffs known the nature, contents, and potential side effects of the drug administered, they would have declined to take it.

55. Sherriff Helder could not relieve himself of his constitutional duties to provide appropriate medical care to Plaintiffs by contracting out medical care to Karas Defendants.

56. Dr. Karas, both publicly and privately, is an avid proponent of the use of Ivermectin as an alleged treatment for COVID-19.

57. Sherriff Helder knew or should have known as early as July 2021 about the ongoing practice and policy at WCDC of administering an unproven and unapproved alleged treatment for COVID-19 on detainees in his care.

58. Upon being informed of the dangers of administering Ivermectin to detainees at

WCDC, Sherrif Helder still refused to put a stop to the practice.

59. As a direct and proximate result of Defendants' conduct, Plaintiffs' substantive due process rights were violated.

## COUNT II – BATTERY AGAINST KARAS DEFENDANTS

60. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-59 above.

61. Karas Defendants acted with intent to cause offensive contact with Plaintiffs when they supplied Ivermectin to the same without their knowledge or consent.

62. Karas Defendants inflicted offensive contact to Plaintiffs by administering Ivermectin to them without their knowledge or consent.

63. As a result of Karas' Defendants offensive contact, Plaintiffs experienced vision issues, diarrhea, bloody stools, and/or stomach cramps. Plaintiff Fritch continues to experience worsening muscle weakness, tremors, and neuropathy, all which began after being given the drug.

64. All Plaintiffs experienced mental distress, anger, and lingering mistrust of Defendants for permitting the use of, and administering, a drug in disregard of a FDA warning and without their knowledge or consent. That distress and lingering mistrust persists even today.

WHEREFORE, Plaintiffs Edrick Floreal-Wooten, Jeremiah Little, Julio Gonzales, Dayman Blackburn, and Thomas Fritch pray that the Court award damages, including compensatory and punitive damages, against all Defendants for violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment, as well as for battery as to Karas Defendants only. Plaintiffs further request that they awarded their costs, fees, and any other appropriate relief to which they are entitled.

Respectfully submitted,

                ROSE LAW FIRM,
a Professional Association
240 North Block Ave, Ste. A
Fayetteville, Arkansas 72701
Phone: (479) 289-7420

By: */s/Bourgon B. Reynolds*

      Bourgon B. Reynolds
Arkansas Bar No. 2012290
breynolds@roselawfirm.com
Ryan Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com
Luke Vance
Arkansas Bar No. 2021141
lvance@roselawfirm.com

*Attorneys for Plaintiffs*

*On behalf of the Arkansas Civil Liberties Union Foundation, Inc.*