IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EDRICK FLOREAL-WOOTEN; JEREMIAH LITTLE;
JULIO GONAZALES; DAYMAN BLACKBURN;
THOMAS FRITCH                                                    PLAINTIFFS

VS.     NO.  5:22-cv-05011-TLB

TIM HELDER, SHERIFF OF WASHINGTON COUNTY,
ARKANSAS, in his individual capacity;
KARAS CORRECTIONAL HEALTH, P.L.L.C;
DR. ROBERT KARAS, M.D., in his individual capacity          DEFENDANTS

DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS

Come now, Defendants, by and through Undersigned Counsel, and for their Brief in

Support of Motion for Judgment on the Pleadings herein state and allege:

INTRODUCTION AND FACTUAL ALLEGATIONS

Plaintiffs, five former inmates of the Washington County Detention Center, brought suit

seeking injunctive relief and claiming violation of their right to due process, by and through 42

U.S.C. § 1983, related to medical treatment they received. The Plaintiffs then filed an Amended

Complaint seeking damages. *See* Doc. No. 34. The amendment again claims an alleged substantive

due process violation and adds a battery claim against what Plaintiffs term the "Karas Defendants."

Plaintiffs' amendment fails to allege a violation of a constitutional right, a state law battery claim,

and fails to state a claim upon which relief can be granted. Thus, it should be dismissed pursuant

to Fed. R. Civ. P. 12(c). Additionally, all Defendants sued in their individual capacities are entitled

to immunity from suit including qualified immunity. Finally, Plaintiffs no longer sue Washington

1

County, Arkansas, but have again sued Karas Correctional Health, P.L.L.C. Karas Correctional Health is likewise entitled to judgment as there is no underlying constitutional violation and Plaintiffs have failed to state a claim upon which relief can be granted against "Karas Defendants" for civil battery. Defendants deny any and all allegations of wrongdoing stated in the Amended Complaint.

Plaintiffs allege that Karas Correctional Health and Dr. Robert Karas have a contract with the Washington County Detention Center (WCDC) to manage medical care for the inmate population and that Plaintiffs were inmates in the WCDC. Plaintiffs allege that Dr. Karas conducted research as to the efficacy of the drug Ivermectin for treatment of persons infected with COVID-19. Doc. No. 34, ¶ 14. Then, Plaintiffs allege Dr. Karas used Ivermectin as a treatment for COVID-19 for inmates infected in the WCDC. *Id*. at ¶ 15. Plaintiffs allege they all tested positive for COVID-19 while detained at WCDC and were quarantined. *Id*. at ¶ 21. Plaintiffs allege that they were treated by "Karas Defendants" with Ivermectin and vitamins for COVID-19. *Id*. at ¶ 22. Plaintiffs choose to refer to Ivermectin as a "dewormer" for animals, yet they do finally admit it is FDA approved for humans for conditions such as parasitic worms, head lice, and skin conditions. *Id*. at ¶ 24. Plaintiffs then allege they were not informed they were receiving Ivermectin or its alleged side effects. *Id*. at ¶ 29. Plaintiff allege they experienced symptoms following administration of Ivermectin including, *inter alia*, dizziness, nausea, vomiting, pain, and weakness.

Plaintiffs' substantive due process claim is that they were not given informed consent before being administered Ivermectin. *Id*. at ¶¶ 40, 44. Indeed, they specifically cite an Arkansas Statute, Ark. Code Ann. § 16-114-206, to support their claims. That statute is patently a statute regarding alleged medical malpractice; indeed, an allegation of lack of informed consent is a claim of alleged medical malpractice. In fact, the Arkansas Supreme Court, in finding the statute

2

unconstitutional, noted the statute "purports to set out the burden of proof that must be met to prevail in a medical-malpractice action." *Broussard v. St. Edward Mercy Health Sys., Inc.*, 2012 Ark. 14, at 6, 386 S.W.3d 385, 389. The Court specifically noted the statute regarded medical negligence. *Id.* As to their substantive due process claim, Plaintiffs never allege any action by any Defendant "shocks the conscience," nor do they allege the violation of any right that is a fundamental right which is deeply rooted in this Nation's history and tradition. This failure alone dictates dismissal.

As to Sheriff Helder, which Plaintiffs have sued in his individual capacity only, the Plaintiffs allege the Sheriff knew Dr. Karas prescribed Ivermectin. Doc. No. 34, ¶ 16. They do not allege the Sheriff was personally involved in any way in inmate medical care and they do not allege Sheriff Helder is a medical professional.

Plaintiffs' battery claim is confusing at best. Plaintiffs don't allege any particular individual battered them. Rather, they allege that "Karas Defendants" committed civil battery. Doc. No. 34, ¶¶ 60-64. Plaintiffs allege that unnamed "Karas Defendants" acted with intent to cause offensive contact with Plaintiffs and did inflict such alleged offensive contact by allegedly failing to obtain informed consent from the Plaintiffs before the administration of Ivermectin. So, effectively, Plaintiffs are alleging battery because of alleged medical malpractice, *i.e.*, medical negligence. *See Broussard*, 2012 Ark. 14, at 6, 386 S.W.3d 385, 389. But they do not allege anyone in particularly and certainly no Defendant here harmfully or offensively touched them. Karas Correctional Health is not a person obviously and cannot be claimed to have battered anyone.

Additionally relevant to this motion is that Plaintiffs *never* allege that Dr. Karas himself administered any medicine to any of the Plaintiffs. Relatedly, Plaintiffs never allege Sheriff Tim Helder ever was personally involved in the administration of any medicine to any of the Plaintiffs.

3

Rather, Plaintiffs routinely refer to the "Karas Defendants" without delineating who allegedly did what. The failure to allege personal involvement in the administration of Ivermectin allegedly without informed consent is alone sufficient to dismiss the claims against Dr. Karas and Sheriff Helder individually. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (1983 requires personal involvement). Importantly, general responsibility for supervising the detention center is insufficient to establish personal involvement. *Reynolds v. Dormice*, 636 F.3d 976, 981 (8th Cir. 2011). Thus, additionally for this separate reason, any claim against Sheriff Helder—who is not alleged to be a medical professional or to have been personally involved in the administration of Ivermectin to Plaintiffs allegedly without informed consent—must be dismissed.

One additional introductory point must be made. Plaintiffs have cited a couple of comments regarding the efficacy of Ivermectin to treat COVID-19. That is simply too simplistic and the Plaintiffs and their Counsel are not physicians and apparently don't understand the art of medicine. Do Plaintiffs mean Ivermectin is not efficacious to treat the symptoms of COVID-19 or to prevent death of persons infected with COVID-19? They simply don't say. What is true, is that COVID-19 is *novel*, and in the United States was first identified (at least formally) in early 2020. Food and Drug Administration studies often take years before a medicine is approved for a particular use. Off-label use of medicines approved for humans (and despite Plaintiffs repeated claim that Ivermectin is a horse dewormer, it has been approved for human use for various diseases) is quite normal. Moreover, there are many studies showing *at least* that Ivermectin can be successfully used to prevent death in COVID-19 patients. To that end, not *one* inmate at WCDC that was infected with COVID-19 has died—including the Plaintiffs. And given various studies, there is scientific backing for such successful results. *See*

4

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8088823/ & Ivermectin for Prevention and Treatment of COVID-19 Infection: A Systematic Review, Meta-analysis, and Trial Sequential Analysis to Inform Clinical Guidelines - PMC (nih.gov).[1] The latter study concluded as follows: "[m]oderate-certainty evidence finds that large reductions in COVID-19 deaths are possible using ivermectin." But all of this begs the question, if there is a difference of opinion between physicians regarding the efficacy of Ivermectin's use as an anti-viral or anti-inflammatory (or an agent to save the lives of persons infected with COVID-19), who are the Plaintiffs or their Counsel to baldly assert Ivermectin is *not* efficacious? They simply are not qualified and this clearly shows this is not a constitutional case; at best, it's a case alleging without sufficient support alleged medical malpractice, which indisputably does not rise to the level of a constitutional violation. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) ("[m]ere negligence *or medical malpractice*, however, are insufficient to rise to a constitutional violation.") (citing *Estelle v. Gamble*, 429 U.S 97, 106, 97 S.Ct. 285, 292 (1976) (emphasis added)). Although, as stated, Defendants deny even medical malpractice.

For the reasons stated herein, all Defendants are entitled to judgment on the pleadings for Plaintiffs' failure to state claims upon which relief can be granted.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment once the pleadings are closed. The standard mirrors that of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss on the basis of "failure to state a claim upon which relief can be granted."  In its decision in *Bell*

---

[1] *See also* Ivermectin in COVID-19 - FLCCC | Front Line COVID-19 Critical Care Alliance (covid19criticalcare.com).

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme

Court revisited the standards for determining whether factual allegations are sufficient to survive

a Rule 12(b)(6) motion to dismiss:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid.; *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004) (hereinafter Wright & Miller) (" [T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the ASSUMPTION THAT ALL THE allegations in the complaint are true (even if doubtful in fact), see, e.g., *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic*, 550 U.S. at 555-56 (footnote omitted); see *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949,

173 L. Ed. 2d 868 (2009) (instructing that "short and plain statement" requirement "demands more

than an unadorned, the-defendant-unlawfully-harmed me accusation.").  Thus, the Eighth Circuit

Court of Appeals has recognized that, under *Bell Atlantic*, "To survive a motion to dismiss, a

complaint must contain factual allegations sufficient  'to raise a right to relief above the speculative

level. . . .'" *Parkhurst v. Tabor*, 569 F.3d 861, 865 (8th Cir. 2009) (quoting *Bell Atlantic*, 550 U.S.

at 555).   To put it another way, "the complaint must allege 'only enough facts to state a claim to

relief that is plausible on its face.'"  *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 387 (8th Cir. 2009) (quoting *Bell Atlantic*, 550 U.S. at 570); accord *Iqbal*, 129 S. Ct. at 1949 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'") (quoting *Bell Atlantic*, 550 U.S. at 557). Finally, Plaintiffs' legal conclusions have no bearing and must not be accepted as true when assessing a motion to dismiss even where a plaintiff attempts to couch them as factual allegations. *Papsan v. Allain*, 478 U.S. 265, 286 (1986).

## ARGUMENT

Plaintiffs attempt to advance a claim under the substantive component of the Due Process Clause of the Fourteenth Amendment. They attempt to assert that, through the medical care they claim they were given, their right to bodily integrity was violated. Specifically, Plaintiffs claim that the Defendants failed to obtain informed consent before administering Ivermectin as a medicine for symptoms related to Covid-19 (and to prevent death from COVID-19). As stated above, Plaintiffs are attempting to bootstrap a state law medical malpractice negligence claim (which itself would fail and for which Defendants would be entitled to immunity) for alleged lack of informed consent into a constitutional issue. Their attempt must fail as described below. Finally, Plaintiffs' battery claims must fail as discussed below.

   A.    *Plaintiffs' due process claims should be dismissed*.

The United States Supreme Court has found a right to bodily integrity encompassed within the substantive component of the Due Process Clause, but not in a case like the one currently before the Court. Rather, the existing law has found such a right potentially violated when *forced* medical procedures are visited upon persons. *See Washington v. Harper*, 494 U.S. 210 (1990). There is no allegation in this case that the Plaintiffs were forced to take Ivermectin or any other

7

medicine for COVID-19. Indeed, Defendants deny any such suggestion. On that basis alone, Plaintiffs have failed to state a claim upon which relief can be granted. Their due process claims should be dismissed.

In a similar case, where plaintiffs alleged, during an experimental treatment, that defendants "failed to disclose certain important facts regarding the protocol and their own pecuniary interests in the outcome of the experiments," the United States District Court for the Western District of Washington found the plaintiffs' due process claims failed. *Wright v. Fred Hutchinson Cancer Res. Cntr.*, 269 F.Supp.2d 1286, 1295 (W.D. Wash. 2002). In its well-reasoned opinion, the Court there noted that the Supreme Court has cautioned that it will not expand constitutional rights where such alleged rights are not "so rooted in the tradition and conscience of our people to be ranked as fundamental." *Id*. at 1296. The Washington Court said:

> A doctor's tortious failure to obtain informed consent is not a threat to our citizens' enjoyment of ordered liberty, even when the doctor is employed by the state. Although the failure to obtained informed consent necessarily throws some doubt on the voluntariness of the patient's participation in a research study, such a failure does not raise the specter of the type of involuntary, non-therapeutic experimentation which shocked the nation after World War II and gave rise to the Nuremburg Code.

*Id*.; *see also Kheriaty v. Regents of Univ. of California*, Case No. SACV 21-1367JVS, 2021 WL 6298332 (C.D. Cal. Dec. 8, 2021) (distinguishing *Heinrich ex rel. Heinrich v. Sweet*, 62 F.Supp.2d 282 (D. Mass. 1999) and finding that vaccination policy requiring vaccination for, *inter alia*, faculty at university did not implicate substantive due process)).

The Eighth Circuit set forth the rules regarding substantive due process claims in *Hall v. Ramsey County*, 801 F.3d 912, 917-18 (8th Cir. 2015) and said:

> In the context of substantive due process, an individual must overcome a very heavy burden to show a violation of the Fourteenth Amendment. To balance competing interests in a substantive due process analysis, "the question is not simply whether

8

a liberty interest has been infringed but whether the extent or nature of the [infringement] ... is such as to violate due process." *Moran v. Clarke,* 296 F.3d 638, 647 (8th Cir.2002) (en banc) (alteration in original) (citation omitted) (internal quotation marks omitted). To establish a violation, the "plaintiff must demonstrate *both* that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Norris,* 494 F.3d at 638 (quoting *Slusarchuk v. Hoff,* 346 F.3d 1178, 1181–82 (8th Cir.2003)) (internal quotation marks omitted). To satisfy the conscience-shocking standard, a government official's conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847–48 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). "[C]onduct intended to injure [an individual] in some way unjustifiable by any government interest is ... most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043. But when the acts of a government official fall "within the middle range ... something more than negligence but less than intentional conduct" the "totality of the facts in a given case" must be assessed to determine whether the behavior is conscience shocking. *Id.* at 849–50, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (citations omitted) (internal quotation marks omitted). Determining whether conduct is conscience shocking "is a question of degree." *Moran,* 296 F.3d at 647 (citation omitted) (internal quotation marks omitted). In general, substantive due process is concerned with violations of personal rights ... so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience. *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

801 F.3d at 9-17-18.

In addition, allegations of lack of informed consent stem from claims of medical malpractice and are negligence-based claims (and here that is clear, as discussed in the Introduction) which do not state claims for alleged constitutional violations. *See Popalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008).  In a case with somewhat similar allegations to those in the present case, the United States District Court for the Southern District of California said:

Before it can be said that a inmate's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be

9

substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06). *See also Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Here, Plaintiff only alleges facts that show a difference of opinion between himself and unnamed medical staff regarding the course of his medical treatment. Prior to his incarceration, Plaintiff received a medication that the medical jail staff informed him they could not provide. (*See* FAC at 3-4.) Instead, Plaintiff was prescribed a different pain medication. (*Id.* at 4.) A mere difference of opinion between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Plaintiff also alleges that he was mistakenly given the wrong medication that was "pre-made by the R.N. or LVN who delivered medication to each of the housing units." (FAC at 5.) Plaintiff claims that this medication was the same "look, texture and container" as the medication he was supposed to have received. (*Id.*) ***As a result of taking the wrong medication, Plaintiff claims he became ill***. (*Id.*) However, ***inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation***. *Estelle*, 429 U.S. at 106; *Toguchi*, 391 F.3d at 1060.

*Andrage v. County of San Diego*, Case No. 14cv1330GPC, 2015 WL 13738298 (S.D. Cal. Aug. 18, 2015) (Report and Recommendation of United States Magistrate Judge) (Report and Recommendation adopted at Case No. 14-cv-01330-GPC-BGS, 2016 WL 737445 (S.D. Cal. Feb. 25, 2016) (emphasis added)).

The United States Constitution does not require even that an inmate's medical care be free from negligence or medical malpractice. *Hall v. Thomas,* 190 F.3d 693, 697–98 (5th Cir.1999); *see also Kelly v. Gusman,* Civ. Action No. 07–611, 2007 WL 2007992, at *4 (E.D.La. July 5, 2007); *Cerna v. Texas Tech Medical Staff,* No. 2:03–CV–0322, 2004 WL 42602, at *2 (N.D.Tex. Jan.7, 2004). Rather, claims of negligence or malpractice present issues of state law for state courts, not federal constitutional issues for a federal court. *See Estelle,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Cerna,* 2004 WL 42602, at *2. Defendants deny even alleged malpractice,

but based on the allegations in the Amended Complaint, Plaintiffs' claims in the amendment (or even a non-existent malpractice claim) cannot be sustained.

Based on the foregoing, the Plaintiffs have failed to sufficiently plead a violation of their constitutional rights under the Due Process Clause and their constitutional claims should be dismissed with prejudice.

**B.** ***The individual Defendants are entitled to qualified immunity.***

Qualified immunity shields government officials from liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hamner v. Burls*, 937 F.3d 1171, 1175 (8th Cir. 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). As the United States Supreme Court made clear, qualified immunity finds its genesis in the common law. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-269 (1993).

"The immunity is an immunity from suit, not merely from liability." *Id*. (emphasis in original). Qualified immunity is a question of law, not a question of fact. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005). To determine whether Defendants are entitled to qualified immunity, the Court considers two questions: (1) whether the facts shown, construed in the light most favorable to Plaintiffs, establishes a violation of a constitutional or statutory right; and (2) whether the right violated was so clearly established at the time of the alleged misconduct that a reasonable official would have known that the alleged actions were unlawful. *Pearson*, 555 U.S. at 232. Qualified immunity operates to ensure that before they are subjected to suit, government officials are on notice their conduct is unlawful. *Id*. at 244 (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). Stated another way, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Williams v. Jackson*, 600 F.3d 1007,

1013 (8th Cir. 2010). The Court may consider these two questions in any order, but may not deny qualified immunity without answering both questions in Plaintiffs' favor. *Pearson*, 555 U.S. at 236; *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014).

Even assuming *arguendo*, Plaintiffs could survive dismissal on the first prong of qualified immunity, they cannot maintain their claims under the "clearly established" prong of the defense. "The plaintiffs have the burden of showing that the law was clearly established." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018). In *Estate of Walker*, the Eighth Circuit said:

> [t]o be clearly established, preexisting law must make the unlawfulness of the officials' conduct apparent so that they have 'fair and clear warning' they are violating the constitution; qualified immunity therefore protects 'all but the plainly incompetent or those who knowingly violate the law.' Because qualified immunity protects officials who make bad guesses in gray areas, it gives them breathing room to make reasonable but mistaken judgments.

*Id*. (quoting *White v. Pauly*, 137 S.Ct. 548, 551-52 (2017)). The law at issue—here the law regarding the substantive component of the Fourteenth Amendment Due Process Clause— should not be defined at a "high level of generality." *Ashcroft¸* 536 U.S. at 742. Plaintiffs cannot allege the violation of extremely abstract rights; the clearly established law must be "'particularized' to the facts of the case." *White*, 137 S.Ct. at 552 (quoting *Anderson v. Creighton¸* 483 U.S. 635, 640 (1987)). "In the light of preexisting law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. In *White*, the United States Supreme Court reversed the Circuit Court's denial of qualified immunity where the Circuit Court ". . . failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." *White*, 137 S.Ct. at 552. Thus, qualified immunity was appropriate.

Here, the two Defendants named in their individual capacities—Sheriff Helder and Dr.

Karas—are entitled to qualified immunity from suit. First, as shown, the Plaintiffs have failed to allege the violation of a constitutional right. Thus, under the first prong of the qualified immunity defense, *i.e.*, the merits, the Defendants in their individual capacities are entitled to qualified immunity. However, that is simply another way of stating they are entitled to judgment on the pleadings on the merits.

As to the second prong of the defense, Sheriff Helder had no personal involvement in any treatment decisions for the Plaintiffs. Non-medical governmental actors such as Sheriff Helder, are entitled to rely on medical staff as to the treatment an inmate has received, and Sheriff Helder cannot be liable for any treatment decisions. *Camberos v. Branstad*, 73 F.3d 174 (8th Cir. 1995). And there is no clearly established law, set at the appropriate level of specificity, to put Sheriff Helder on notice that anything he allegedly did or did not do violated the Plaintiffs' constitutional rights. Thus, under the second prong of the qualified immunity defense, Sheriff Helder is entitled to immunity and judgment.

Similarly, Dr. Karas is entitled to qualified immunity under the second prong of the defense. Defendants acknowledge the Eighth Circuit recently found that third-party medical providers *in some circumstances* were not allowed to raise qualified immunity as a defense, despite finding that such actors are engaged in state action or acting under color of law for purposes of Section 1983. *Davis v. Buchanan County, Mo.*, 11 F.4th 604, 617-23 (8th Cir. 2021). The circumstances present there are not present here. Nevertheless, assuming *arguendo* the Court found *Davis* applicable here, Undersigned Counsel is mindful this Court cannot overrule a panel of the Eighth Circuit. However, Dr. Karas must raise this issue to preserve it as Defendants respectfully submit the panel opinion in *Davis* was decided incorrectly. It is contradictory to find an individual a state actor subject to suit under Section 1983 yet prevent that actor from raising a

13

defense all state actors are permitted to raise. Thus, Dr. Karas asserts he is entitled to qualified immunity under the second prong of the defense. Finally, at bottom, because there is no constitutional violation well-pled in this case, all Defendants are entitled to judgment on the merits irrespective of the second prong of qualified immunity.

**C.** **Plaintiffs' battery claims should be dismissed and are barred by statutory immunity**.

The applicable statute is entitled "Tort liability - Immunity Declared," and provides as follows:

(a) It is declared to be the public policy of the State of Arkansas that all counties … and all other political subdivisions of the state  … shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.

(b) No tort action shall lie against such political subdivision because of the acts of their agents and employees.

Ark. Code Ann.§ 21-9-301. The immunity granted by the above-quoted statute to a county extends to the county's officials, employees, and by its clear terms in subsection (b), agents of a county. *See  Matthews v. Martin*, 280 Ark. 245, 658 S.W.2d 374 (1983).

Pursuant to Ark. Code Ann.§ 21-9-301, the Plaintiffs' Complaint should be dismissed because, under the statute, Defendants are "immune from liability and from suit for damages." This plain, broad grant of immunity compels the dismissal of the Plaintiffs' claims. "Municipal immunity for governmental functions has been the rule in Arkansas for over a hundred years." *Matthews v. Martin*, 280 Ark. 345, 346, 658 S.W.2d 374, 375 (1983).  The Arkansas Supreme Court has held that Ark. Code Ann. § 21-9-301 only immunizes municipalities and their officials/employees from negligence actions, *see Deitsch v. Tillery*, 309 Ark. 401, 833 S.W.2d 760 (1992), however, no case has ever provided any explanation for how the court arrived at this

14

misreading of the plain language of the immunity statute. In *Deitsch*, the court cited to *Waire v. Joseph*, 308 Ark. 528, 825 S.W.2d 760 (1992), and in *Waire,* the court cited to *Battle v. Harris*, 298 Ark. 241, 766 S.W.2d 431 (1989), but neither *Waire* nor *Battle* explain the misreading or its genesis. In *Deitsch*, the Supreme Court simply stated that Ark. Code Ann. § 21-9-301 was never interpreted to include intentional torts committed by public officials. However, this is not accurate. Prior to *Battle*, the courts *did*, in fact, apply the statute to intentional torts. In *Autry v. Lawrence*, 286 Ark. at 503, the Arkansas Supreme Court applied the immunity provided by the statute to an action against a police officer for the tort of malicious prosecution. In doing so, the Court looked more to the facts alleged than the label of the claim, which here clearly dictates dismissal based on immunity for the battery claim. *See also Trammell v. Wright*, 2016 Ark. 147, 489 S.W.3d 636. In *Harrington v. City of Greenbrier*, the Court applied this immunity to the tort of "deliberate fraud." 262 Ark. 773, 775, 561 S.W.2d 302, 304 (1978).

Most recently, the Arkansas Supreme Court applied the statute to the intentional tort of false arrest. *Trammell*, 2016 Ark. 147, 489 S.W.3d 636. As the Arkansas Supreme Court noted, Undersigned made the same argument there as Defendants make here—that the statute provides immunity for even intentional torts. *Id*. However, it was not necessary for the Court to reach that argument because the facts—as opposed to the label placed on the claim—failed to show intentional wrongdoing. Nevertheless, the issue is ripe for consideration, even if that requires the Court here to certify the question to the Arkansas Supreme Court.

Historically, federal courts applying Arkansas law have granted immunity under the statute for intentional torts as well. *See Mosier v. Robinson*, 722 F. Supp. 555, 556 (W.D. Ark. 1989) (granting summary judgment to the county when a sheriff, while under the influence of alcohol, was alleged to have beaten a person in custody); *Dumond v. Conlee*, 710 F. Supp. 1270, 1273 (E.D.

Ark. 1988) (finding the county to be immune under the above statute when a sheriff was alleged to have seized a castration victim's testicles, placed them in a jar, showed them to visitors in the sheriff's office, and ultimately flushed them down the toilet).

Even after *Battle*, Arkansas Courts have applied the statute to intentional torts. In *Loren D. Buttolph Trust v. Jarnagan*, the Arkansas Supreme Court held that a mayor/waterworks manager was immune from liability under the statute for refusing to provide water service to a non-resident customer. 302 Ark. 393, 394 95, 789 S.W.2d 466, 467 (1990). In *City of Alexander v. Doss*, the Arkansas Court of Appeals stated that actions for trespass would be immunized under § 21-9-301. 102 Ark. App. 232, 236, 284 S.W.3d 74. Additionally, the Arkansas Court of Appeals has granted immunity for intentional torts under Ark. Code Ann. § 21-9-301 in at least two cases recently.  *See Monk. v. Rogers*, 2021 Ark.App. 148, 2021 WL 1294099 (unreported) & *Elliott v. Morgan*, 2020 Ark. App. 297, 603 S.W.3d 570.  The case law indicates the courts' willingness to apply the statute to intentional torts, and is void of justification for the denial of immunity. The statute should be applied consistently to all tort claims seeking money damages, based on the language and the policy reasons of the statute.

Applying the rules of statutory construction, the language of Ark. Code Ann. § 21-9-301 is clear and unambiguous and, should be applied to all tort claims for damages.  "The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language." *Quanex Ark. Okla. Gas Corp. v. Macsteel Div. of Quanex*, 370 Ark. 481, 485, 262 S.W.3d 147, 150 (2007) (citing *Weiss v. McFadden*, 353 Ark. 868, 120 S.W.3d 545 (2003). "Where the language of a statute is clear and unambiguous and susceptible of a sensible construction, resort to extrinsic and collateral aids in construing it is not permitted. *Britt v. State*, 261 Ark. 488, 495, 549 S.W.2d 84, 87 (1977) (citing

*Cross v. Graham*, 224 Ark. 277, 272 S.W.2d 682 (1954)); *Ark. State Licensing Board for General Contractors v. Lane*, 214 Ark. 312, 215 S.W.2d 707 (1948).

"A statute is ambiguous only where it is open to two or more constructions, or where it is of such obscure or doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning." *City of Fort Smith v. Carter*, 364 Ark. 100, 108, 216 S.W.3d 594, 599 (2005) (citing *ACW, Inc. v. Weiss*, 329 Ark. 302, 947 S.W.2d 770 (1997). Statutes are construed "so that no word is left void, superfluous or insignificant," and every word is given meaning and effect if possible. *Weiss v. Maples*, 369 Ark. 282, 286, 253 S.W.3d 907, 911 (2007); *Jeske*, 365 Ark. 279, 229 S.W.3d 23. The language of Ark. Code. Ann. § 21-9-301 is clear, plain, and unambiguous. *See Hardin v. City of Devalls Bluff*, 256 Ark. 480, 483, 508 S.W.2d 559, 562 (1974) (quoting *Sullivan, Adm'r. v. Pulaski Cnty.*, 247 Ark. 259, 445 S.W.2d 94 (1969) (stating that a previous version of the act was "a statement of public policy that is plain and unambiguous and leaves no room for doubt.").

The statute plainly states that municipalities "shall be immune from liability and from suit for damages." Ark. Code Ann. § 21-9-301 (a). It is the court's duty "to declare what the law is, and not what it ought to be." *Hardin*, 256 Ark. at 485. No language in the statute indicates that the immunity applies only to negligent torts. Conversely, the counterpart tort immunity statute that applies to state employees, Ark. Code Ann. § 19-10-305, contains an exception to immunity for malicious acts or omissions. No such exception language is in the municipal tort immunity statute. Had the legislature intended to include such limiting language, it could have and presumably would have.

So, even assuming *arguendo* the Court were to find the statute ambiguous (despite *Hardin*, *supra*) the intent of the Legislature in enacting Ark. Code Ann. § 21-9-301 was to protect municipalities from "high judgments," whether from negligent or intentional torts. "The basic rule of statutory construction is to give effect to the intent of the legislature." *Weiss v. Maples*, 369 Ark. at 286; *State ex rel. Ark. Dep't of Parks and Tourism v. Jeske*, 365 at 285. "[W]e ascertain the legislative intent from the language used in the statute itself." *Britt v. State*, 261 at 495.  Crucially, a court should not add words to a statute that are not present in assessing the statute. *Our Community, Our Dollars v. Bullock*, 2014 Ark. 457, at 18, 452 S.W.3d 552, 563.

In a concurring opinion in *Southwest Ark. Communications, Inc. v. Arrington*, the Honorable Justice Glaze lamented that the lack of a system of record keeping for proceedings in the General Assembly makes it difficult to construe the intent of the legislators. 296 Ark. 141, 149, 753 S.W.2d 267, 271 (1988) (Glaze J., concurring). The paucity of information regarding legislative history in Arkansas makes it necessary to rely on the Act itself and its title to ascertain the intent of the legislature. *Id.* at 148, 270; *See also Consumers Utilities Rate Advocacy Division v. Ark. Public Svc. Comm'n*, 99 Ark. App. 228, 235, 258 S.W.3d 758, 765 (2007) ("The title of an act, while not part of the law, may be referred to in order to help ascertain the intent of the General Assembly").

Here, Ark Code. Ann. § 21-9-301 was initially enacted as Act 165 in 1969. The title of the Act reads as follows:

> AN ACT to Declare It to Be the Public Policy of the State of Arkansas That the State and Its Political Subdivision Shall Not Be Liable for Tort Under the Laws of the State of Arkansas and to Provide That No Action Shall Be Maintained Therefor; to Require All Political Subdivisions to Carry Liability Insurance On Their Motor Vehicles; to Declare An Emergency; and for Other Purposes.

18

Section 4 of the Act reads:

> It is hereby found and determined by the General Assembly that because of the decision of the Arkansas Supreme Court in *Parish v. Pitts*, 244 Ark. 1239, municipalities and all units of local government are in imminent danger of bankruptcy because of tort lawsuits and vital public services are in danger of being discontinued. Therefore, an emergency is hereby declared to exist and this Act being immediately necessary to protect the public peace, health and safety, shall take effect immediately on its passage and approval.

In *Thompson v. Sanford*, the Supreme Court recognized that the valid legislative purpose of Ark. Code. Ann. § 21-9-301 involved the need for immunity to protect governmental entities "from exposure to high judgments which would destroy them." 281 Ark. 365, 368, 663 S.W.2d 932, 934 (1984); *see also White v. City of Newport*, 326 Ark. 667, 672, 933 S.W.2d 800, 803 (1996). The language of the Act clearly and unambiguously shows that the intent of the legislature was to protect the municipalities from high judgments. There is no indication that the concern expressed by the legislature in Section 4 of the Act was limited only to negligent torts. Indeed, actions based on intentional torts have just as much potential to result in high judgments as do actions based on negligence. There is nothing to indicate that the legislature intended to protect governmental entities from only judgments resulting from negligence claims and not claims based on intentional torts.

Based on the foregoing, the Defendants (and Plaintiffs only attempt to state battery claims against the "Karas Defendants") enjoy statutory immunity from Plaintiffs' claims of battery, whether couched as negligent torts or intentional torts. Thus, Plaintiffs' battery claims should be dismissed and the Court should find Defendants immune pursuant to Arkansas statute.

Furthermore, as pled, Plaintiffs have failed to allege a battery. No harmful or offensive *touching* is alleged. In fact, there is no allegation of a *touching* at all. Plaintiffs' battery claim (against no particular individual) should be dismissed for failure to state a claim upon which relief

can be granted. *Mullins v. Helgren*, 2022 Ark. App. 3, at 11, 638 S.W.3d 864, 871-72. Plaintiffs cannot and have not alleged any Defendant forced them to take any medication or harmfully or offensively touched them. Thus, their battery claims must fail.

   **D.**      ***Plaintiffs' have failed to state a claim against the private entity Defendants***.

   Because, as stated above, there is no underlying constitutional violation and Plaintiffs have failed to state a claim upon which relief can be granted against any Defendant, there can be no liability against Karas Correctional Health. *See Los Angeles v. Heller*, 475 U.S. 796 (1986). Thus, Karas Correctional Health, the only entity sued in the Amended Complaint, is entitled to dismissal.

**CONCLUSION**

   For the foregoing reasons, the Amended Complaint should be dismissed.

TIM HELDER, et al,
*Defendants*

<u>Michael A. Mosley</u>
Michael A. Mosley
Ark. Bar No. 2002099
Jason E. Owens
Ark. Bar. No. 2003003
JASON OWENS LAW FIRM, P.A.
**Mailing Address:** P.O. Box 850 Conway,
Arkansas 72033-0850 **Physical Address:**
1023 Main St, Ste 204
Conway, Arkansas 72032
Telephone (501) 764-4334
Telefax (501) 764-9173
email: mosley@jowenslawfirm.com

&

JaNan Arnold Thomas, Bar No. 97043
ASSOCIATION OF ARKANSAS
COUNTIES
RISK MANAGEMENT SERVICES

1415 W. Third
Little Rock, Arkansas 72201
Telephone (501) 372-7550
email: jthomas@arcounties.org