IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EDRICK FLOREAL-WOOTEN;
JEREMIAH LITTLE;
JULIO GONZALES;
DAYMAN BLACKBURN;
and THOMAS FRITCH                                                                    PLAINTIFFS

V.                              CASE NO. 5:22-CV-5011

TIM HELDER, former Sheriff
of Washington County, Arkansas,
in his individual capacity;
KARAS CORRECTIONAL HEALTH, P.L.L.C.;
and DR. ROBERT KARAS, M.D.,
in his individual capacity                                                           DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

Now before the Court are Defendants' Motion for Judgment on the Pleadings (Doc. 40) and Brief in Support (Doc. 41), Plaintiffs' Response in Opposition (Doc. 42), and Defendants' Reply (Doc. 43). For the reasons stated below, the Motion is **DENIED**.

I.      BACKGROUND

The events described in the Amended Complaint began in late 2020, during the COVID-19 pandemic. At that time, the Washington County Detention Center ("WCDC") was headed by Sheriff Tim Helder, and the inmates of the WCDC received all their health care services exclusively from Karas Correctional Health, P.L.L.C. ("KCH"), which is solely owned and managed by Dr. Robert Karas.

The Amended Complaint claims that Dr. Karas became interested in developing possible treatments for the novel COVID-19 virus. He began conducting his own research and hypothesized that the drug ivermectin could be an effective treatment for COVID-19. Ivermectin is FDA-approved to address parasitic infestations, such as intestinal worms

1

and headlice, and some skin conditions, such as rosacea.  It is not—and was not at the time—approved to treat COVID-19.  Dr. Karas, however, prescribed ivermectin to two sets of test subjects.  The first set was composed of people who sought out Dr. Karas's services at his private medical clinic and agreed to take ivermectin as part of an experimental treatment for COVID-19.  The second set was composed of inmates, including Plaintiffs, who were incarcerated at the WCDC.  The inmates received Dr. Karas's treatment protocol for COVID-19 but did not know it included ivermectin.  Dr. Karas and his staff falsely told the inmates the treatment "consisted of mere 'vitamins,' 'antibiotics,' and/or 'steroids.'"[1] (Doc. 34, ¶ 32).  Critically, the inmates had no idea they were part of Dr. Karas's experiment.

      Ivermectin is known to cause a number of side-effects, including nausea, vomiting, diarrhea, hypotension (low blood pressure), allergic reactions (itching and hives), dizziness, ataxia (problems with balance), seizures, coma, and even death. *Id.* at ¶ 31 & n.7. Since Plaintiffs were not advised that their COVID "treatments" contained ivermectin, they were never warned about the drug's side effects.  In addition, Dr. Karas hypothesized that large doses of ivermectin would be most effective in combatting COVID-19.  The problem, however, was that the FDA had only approved a dosage of 0.2 mg/kg *to treat worms*.  Dr. Karas ultimately prescribed lower doses of ivermectin to his clinic patients and higher doses to his imprisoned patients.

      At first reading, it would seem highly unlikely—even implausible—that a doctor would have dosed his incarcerated patients with an experimental drug more aggressively than his private patients—but Plaintiffs point to proof in their jail medical records.  Thomas

---

[1] No party contends that ivermectin falls into one of these categories.

2

Fritch, for example, was dosed without his knowledge with *2.75 times* the amount of ivermectin required to treat a parasitic infestation, *id.* at ¶ 27; Edrick Floreal-Wooten was secretly dosed with *3.4 times* the approved dosage of ivermectin, *id.* at ¶ 25; and Dayman Blackburn was dosed with *6.3 times* the approved dosage, *id.* at ¶ 26.  Again, these Plaintiffs were suffering from COVID-19, not parasites.

Plaintiffs explain that after they ingested the COVID-19 "treatments" prescribed by Dr. Karas, they suffered side-effects consistent with ivermectin overuse.  Since they did not know they had ingested ivermectin, their symptoms were a mystery to them.  Plaintiff Fritch, whose medical condition was particularly vulnerable due to the fact that he is HIV positive, claims he "experienced dizziness, nausea, vomiting, pain, and weakness" after taking Dr. Karas's COVID-19 treatment "cocktail."  *Id.* at ¶¶ 22 & 34.  He complained about these symptoms but was assured they were "normal." *Id.* at ¶ 35.  The other Plaintiffs claim they "experienced vision issues, diarrhea, bloody stools, and/or stomach cramps" after ingesting ivermectin without their knowledge. *Id.* at ¶ 34.

Dr. Karas documented his ivermectin experiments on social media. *Id.* at ¶ 20. He admitted on his clinic's Facebook page that the voluntary participants in his "clinic regimen" received lower doses of ivermectin as compared to his unwitting "jail patients." *Id.* at ¶ 28 n.6.  Eventually, the experiments gained notoriety and became the subject of both local and national news. *Id.* at ¶ 38.  According to Plaintiffs, it was only then that "Defendants attempted to obtain 'retroactive' consents to medical treatment from detainees, including for the use of Ivermectin." *Id.* Once Plaintiffs discovered they had been the subjects of a medical experiment, they "experienced mental distress, anger, and a lingering mistrust of Defendants and medical professional[s] generally." *Id.* at ¶ 36.

Plaintiffs accuse Dr. Karas and KCH of violating their substantive due process rights under the Fourteenth Amendment by denying them voluntary and informed consent to medical treatment.[2]  In addition, they charge Dr. Karas and KCH with the tort of battery.  As for separate Defendant Sheriff Helder, Plaintiffs claim he violated their due process rights because he "knew or should have known as early as July 2021 about the ongoing practice and policy at WCDC of administering an unproven and unapproved alleged treatment for COVID-19 on detainees in his care." *Id.* at ¶ 57.  To support the due process claim against Sheriff Helder, Plaintiffs cite to the multiple public postings Dr. Karas made about his prisoner experiments on social media and argue it is reasonable to assume at this early stage in the litigation that Sheriff Helder knew or should have known that Dr. Karas was administering high dosages of an unproven, experimental drug to incarcerated inmates, without their knowledge, as a "treatment" for COVID-19.  Plaintiffs further contend that "[u]pon being informed of the dangers of administering Ivermectin to detainees at WCDC, Sherrif [sic] Helder still refused to put a stop to the practice."  *Id.* at ¶ 58.

Defendants filed an Answer to the Amended Complaint in which they admit that Dr. Karas and KCH contracted with Washington County to provide medical care to the inmates of the WCDC and that Dr. Karas used ivermectin to treat inmates who contracted COVID-19.  (Doc. 37, ¶¶ 1–3).  However, Defendants deny liability and maintain that Dr.

---

[2] In particular, the Court construes the Amended Complaint to assert an individual-capacity claim against Dr. Karas, the alleged architect of the treatment protocol for combatting COVID-19 in the WCDC and Plaintiffs' treating physician. Separate Defendant KCH is Dr. Karas's business that contracted with the WCDC to provide Dr. Karas's medical services to the jail's inmates. According to the Eighth Circuit in *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975–76 (8th Cir. 1993), "[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies."

Karas's experimental treatment protocol, including the means and methods by which he carried out that protocol, was "lawful and appropriate" and did not "violate[] any person's rights." *Id.* at ¶ 4.

Two months after filing their Answer, Defendants collectively filed a Motion for Judgment on the Pleadings (Doc. 40) and Brief in Support (Doc. 41).  As to Plaintiffs' substantive due process claims, Defendants' first argument is that the right to informed consent and bodily autonomy is only impacted when the state engages in "forced medical procedures." (Doc. 41, p. 7).  Defendants note that, here, "[t]here is no allegation . . . that Plaintiffs were *forced* to take Ivermectin or any other medicine for COVID-19," so it should follow that they have failed to state a due process claim.  *Id.* at pp. 7–8 (emphasis added). Second, Defendants contend that Plaintiffs' lawsuit amounts to nothing more than a "disagreement" with Dr. Karas's treatment decision, and that such disagreement, at most, constitutes a claim for medical negligence, which is not actionable under 42 U.S.C. § 1983.[3]  Third, Defendants maintain that Dr. Karas's experimental methods neither

---

[3] Defendants maintain that Dr. Karas sincerely believed ivermectin was a promising and possibly effective treatment for COVID-19 and that he never intended to harm Plaintiffs. He remains convinced, even today, that there is "a difference of opinion between physicians regarding the efficacy of Ivermectin's use as an anti-viral or anti-inflammatory (or an agent to save the lives of persons infected with COVID-19)." (Doc. 41, p. 5). Plaintiffs, on the other hand, contend that Dr. Karas's hypothesis about ivermectin as a treatment for COVID-19 has been overwhelmingly disproven. The FDA, the Centers for Disease Control and Prevention ("CDC"), and other members of the scientific community have all concluded that ivermectin is not an effective treatment for COVID-19 and have advised the public against using it.  (Doc. 34, p. 2, n.2; ¶ 42).

There is no need for the Court to consider here whether there is, in fact, a legitimate difference of opinion in the medical community about the efficacy of ivermectin.  For purposes of analyzing the Motion for Judgment on the Pleadings, the Court need only consider whether Plaintiffs have stated a plausible claim for the violation of their constitutional rights.  Their claim is not that Dr. Karas committed malpractice by deviating from the accepted standard of medical care. Their claim instead is that Defendants

"shock the conscience" nor violate "any fundamental right which is deeply rooted in this Nation's history and tradition." *Id.* at p. 3. Fourth, Defendants point out that Sheriff Helder cannot be individually liable for violating Plaintiffs' constitutional rights because he did not personally give any Plaintiff medication and because "non-medical governmental actors, such as Sheriff Helder, are entitled to rely on medical staff as to the treatment an inmate has received." *Id.* at p. 13. Similarly, Defendants argue that the Amended Complaint never explicitly alleges that Dr. Karas handed pills of ivermectin to any Plaintiff, which should mean they have all failed to state an individual-capacity claim against him.[4] Finally, Defendants assert that even if the Court finds a constitutional claim has been adequately stated, the doctrine of qualified immunity protects Dr. Karas and Sheriff Helder from suit.

As for the state-law battery claim, Dr. Karas and KCH argue that the Amended Complaint "do[es] not allege anyone in particularly [sic] and certainly no Defendant here harmfully or offensively touched them." (Doc. 41, p. 3). They assert that without facts showing forcible touching, the tort must be dismissed. Next, KCH maintains that only human beings may be sued for battery (and not hospitals, doctor's offices, or other medical businesses). Finally, both Dr. Karas and KCH urge the Court to find them statutorily immune from suit. They accuse the state's highest court of "misreading . . . the

---

violated their due process rights by concealing from them both the fact that they were part of an experimental drug treatment protocol and the identity of the drug being tested in that protocol, including information about the drug's possible negative side effects.

[4] This is a surprising argument in view of Defendants' admission that "Dr. Karas and his clinic, Karas Correctional Health, PLLC, provide certain medical care for inmates in the WCDC" and that "Karas Correctional Health has utilized Ivermectin to treat inmates who have contracted COVID-19." (Doc. 37, ¶¶ 1 & 4).

plain language of the immunity statute" and suggest that immunity should apply to intentional torts such as battery—despite Arkansas Supreme Court authority to the contrary. *Id.* at p. 15.

## II.  LEGAL STANDARD

Motions for judgment on the pleadings under Rule 12(c) are governed by the same legal standard that applies to motions to dismiss under Rule 12(b)(6). *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept all factual allegations in a complaint as true and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiffs' favor. *See Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

## III.  DISCUSSION

### A.  Substantive Due Process Claims

A substantive due process claim may be stated in two ways. First, a plaintiff may allege that the government has infringed his fundamental liberty interests. This claim is generally limited to protecting recognized liberty interests in "matters relating to marriage, family, procreation, and the right of bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). Second, the Supreme Court has recognized substantive due process claims when government actions "shock the conscience." *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–53 (1998); *Mendoza v. U.S. ICE*, 849 F.3d 408, 420–21 (8th Cir. 2017); *Moran*

*v. Clarke*, 296 F.3d 638, 645, 647 (8th Cir. 2002).  For the reasons explained below, the Court finds that Plaintiffs state a claim under either theory.

The Supreme Court has clearly established that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).  With respect to prisoners in an institutional setting, the Supreme Court's view is there is "no doubt" that they "possess[] a significant liberty interest in avoiding the unwanted administration of . . . drugs under the Due Process Clause of the Fourteenth Amendment."  *Washington v. Harper*, 494 U.S. 210, 221–22 (1990).

Defendants' lead argument is that this liberty interest is only compromised "when *forced* medical procedures are visited upon persons," (Doc. 41, p. 7) (emphasis in original).  They contend that because Plaintiffs voluntarily swallowed the pills they were given in the WCDC to treat COVID-19, they were not "forced" to take ivermectin.  This argument is absurd.  Plaintiffs did not know they were taking ivermectin, so they did not have the option to refuse it or have it "forced" upon them.[5]  Though the plaintiff in *Washington v. Harper* suffered from a mental illness, he was at least aware that he was taking antipsychotic drugs, and when at some point he refused to take them, his doctor recommended medicating him without his consent. 494 U.S. at 221–22.  Plaintiffs in this

---

[5] In fact, Plaintiffs allege that Dr. Karas and his staff intentionally failed to disclose that they were dispensing ivermectin by falsely telling the inmates that the pills "consisted of mere 'vitamins,' 'antibiotics,' and/or 'steroids.'" (Doc. 34, ¶¶ 29-33).

case allege they knew less about their medication than the mentally ill inmate did in *Washington*.[6]

Defendants urge the Court to follow the reasoning in *Wright v. Fred Hutchinson Cancer Research Center*, 269 F. Supp. 2d 1286, 1295 (W.D. Wash. 2002), a case they describe as "similar" to this one, *see* Doc. 41, p. 8. However, the facts in *Wright* are inapposite to those in the case at bar. The *Wright* plaintiffs *voluntarily* participated in an experimental, therapeutic treatment regimen but were not informed of all the risks, benefits, and alternatives to that treatment. *See* 269 F. Supp. 2d at 1295. After the plaintiffs passed away, their decedents brought suit, arguing that the defendants had "failed to disclose certain important facts regarding the protocol and their own pecuniary interests in the outcome of the experiments." *Id.* The court found no constitutional violation had occurred, in large part because the plaintiffs and their decedents "knew they were participating in an experiment." *Id.* In contrast to *Wright*, Plaintiffs contend they did not know they were taking ivermectin and did not know they were participating in an experiment to test the drug's efficacy on COVID-19. Dr. Karas has admitted he was giving Plaintiffs and other inmates at the WCDC ivermectin to "treat" COVID-19 as part of a protocol of his own devise. He maintains there was nothing wrong with that. *See* Doc. 37, ¶ 4.

---

[6] The Court also notes that in *Washington*, the Court held that the Due Process Clause may permit the forced medication of an inmate if the treatment was "reasonably related to legitimate penological interests," 494 U.S. at 223, for example, if the inmate was "dangerous to himself and others and the treatment was in the inmate's medical interest," *id.* at 227. Though COVID-19 was a novel, deadly virus in early 2020, the Court does not construe Defendants' Motion as arguing that a legitimate penological interest justified administering ivermectin to COVID-19-positive inmates without their knowledge and consent.

Perhaps Defendants missed the following passage from *Wright*, which *is* applicable to the facts alleged here:

> The judiciary has not hesitated to find that, where the human research subjects were not told that they were participating in an experiment and/or the government conducted the experiments knowing they had no therapeutic value, the subject's constitutionally protected right to life and/or liberty had been violated.

*Id.* at 1294.

This Court agrees with the above statement in *Wright* and finds that Plaintiffs have plausibly asserted that Defendants infringed their recognized liberty interest in bodily integrity. Separately, the Court finds that the facts in the Amended Complaint, if true, shock the conscience. Plaintiffs have stated a plausible due process claim against Dr. Karas, who allegedly ordered that they take ivermectin to "treat" COVID-19 and prescribed them high dosages of the drug without their knowledge as part of an experimental protocol. Plaintiffs have also stated a plausible due process claim against KCH, a corporation acting under color of state law that adopted an unconstitutional policy of medicating COVID-19-positive inmates with high dosages of ivermectin without their knowledge.

Turning to Sheriff Helder, the Court finds it plausible, based on the facts in the Amended Complaint, that he knew or should have known that Dr. Karas was performing ivermectin experiments on Plaintiffs without their knowledge and that he approved, condoned, or turned a blind eye to this violation of Plaintiffs' due process rights. The Amended Complaint describes how Dr. Karas disclosed the details of his COVID protocol on his clinic's social media pages. This fact tends to elevate Plaintiffs' claim about Sheriff Helder's knowledge from the realm of speculation to the realm of plausibility. Although

10

Sheriff Helder leans on the fact that he is not a medical professional and should not be required to substitute his medical judgment for Dr. Karas's or be liable for Dr. Karas's malpractice, this defense misses the mark. Plaintiffs are not accusing Dr. Karas of garden-variety medical malpractice; they are accusing him of administering them a drug without their knowledge as part of a jail-wide experimental treatment protocol for COVID-19. If discovery shows that Sheriff Helder was completely ignorant about what Dr. Karas was doing, the claim against Sheriff Helder will likely merit dismissal on summary judgment. However, at this stage of the proceedings, dismissal is inappropriate, as there are facts alleged to show Sheriff Helder knew something about Dr. Karas's experiments. Clearly, the extent of that knowledge will be key to determining Sheriff Helder's individual-capacity liability in this case.

Finally, the Court must consider whether Dr. Karas or Sheriff Helder is entitled to qualified immunity.[7] In their Motion, Defendants "acknowledge the Eighth Circuit recently found that third-party medical providers *in some circumstances* were not allowed to raise qualified immunity as a defense, despite finding that such actors are engaged in state action or acting under color of law for purposes of Section 1983." (Doc. 41, p. 13) (emphasis in original). The case Defendants are referring to is *Davis v. Buchanan County, Missouri*, 11 F.4th 604, 617–23 (8th Cir. 2021), where the Eighth Circuit acknowledged that qualified immunity could be available to an individual physician who was "performing a limited and discrete task for the state," but was not available to "employees of systematically organized private firms" that were "tasked with assuming [the] major lengthy administrative task" of providing all medical care to inmates of a

---

[7] KCH does not assert its own right to qualified immunity.

11

correctional facility. *Id.* at 619. According to the Amended Complaint, Dr. Karas, by and through KCH, has provided all health care services to several hundred inmates at a time at the WCDC "for many years" at a cost to Washington County of $1,374,000 per year. *See* Doc. 34, ¶ 10. KCH won its contract with Washington County after beating out other medical care providers in a formal bidding contest. *Id.* Therefore, the Court finds that Dr. Karas's role as "employee of a large firm systematically organized to perform a major administrative task for profit" weighs against allowing him to assert qualified immunity. *See Davis*, 11 F.4th at 622.[8]

In the alternative, if Dr. Karas were deemed eligible to assert this defense, he would not be entitled to its protections under these facts and pursuant to clearly established law. A public official is entitled to qualified immunity *unless* his conduct violated a constitutional right and that right was clearly established. *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (citations omitted). A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (alterations in original) (citations omitted).

Earlier in this Opinion, the Court found that Plaintiffs asserted plausible claims against Dr. Karas and Sheriff Helder for violating their substantive due process rights. The Court also finds that a reasonable doctor or sheriff would have understood, given the Supreme Court precedent in *Cruzan v. Director, Missouri Department of Health*, 497 U.S.

---

[8] In making this finding, the Court rejects Dr. Karas's argument that the emergent nature of the COVID-19 pandemic should alter the qualified-immunity eligibility analysis. There is no authority for that proposition. Further, the Court rejects Defendants' self-serving claim that KCH is only "a doctor of a small clinic and his staff." (Doc. 43, p. 13). This characterization is directly contrary to the facts in the pleadings.

261, 278 (1990), and *Washington v. Harper*, 494 U.S. 210, 221–22 (1990), that it was clearly established in fall 2020 that administering an experimental drug to prisoners without their knowledge would violate their due process rights.  Qualified immunity is therefore denied.  This is not a close call.

### B.     Battery Claim Against Dr. Karas and KCH

Plaintiffs separately bring a battery claim against Dr. Karas and KCH under Arkansas law.  In response, Dr. Karas and KCH contend there must be direct physical contact between a defendant and a plaintiff in order for a claim of medical battery to be stated.  Defendants cite no law for this proposition, and the Court is not persuaded that Defendants are correct.  *See* 1 Howard Brill, Arkansas Law of Damages § 33:6, Assault and battery (Nov. 2021) ("Liability for a battery does not hinge on any part of an actor's body contacting the other person's body. Therefore an action can be subject to liability for battery by causing an indirect offensive or harmful contact.").

Arkansas law generally views a physician's duty to disclose medical information to a patient in terms of medical negligence or malpractice.  *See* Ark. Code Ann. § 16-114-206(a) ("In any action for medical injury, when the asserted *negligence* . . . .") (emphasis added); (b)(1) ("when the plaintiff claims that a medical care provider *failed to supply* adequate information to obtain the informed consent of the injured person . . . .") (emphasis added).  It is not often that a patient plausibly accuses a physician of intentionally concealing the details of a treatment protocol in order to induce the patient to take a particular drug for the physician's own professional and private aims.  Such facts are unusual and would likely involve some form of deception or coercion on the physician's part.  Plaintiffs suggest that a scheme like this would only work if, as here, the

patients were a captive audience and relied on other people to hand them their medication.

After due consideration, the Court finds that the facts here state a plausible claim for medical battery based on affirmative concealment and intentional—rather than negligent—failure to obtain informed consent. The Court is persuaded the Arkansas Supreme Court would acknowledge such a claim. *See Arthur v. Zearley*, 320 Ark. 273, 283 & 285 (1995) (acknowledging plaintiffs' intentional tort claims in a medical malpractice action arising from a lack of informed consent); *Parkerson v. Arthur*, 83 Ark. App. 240, 250 (2003) (same).

As for Dr. Karas and KCH's final argument that, as state actors, they are statutorily immune from suit under Arkansas Code § 21-9-301, the Court disagrees. This statute only affords immunity to counties, their agents, and their employees for negligence. The tort at issue here, battery, does not fall into a gray area where, depending on the facts, it could sometimes be an intentional tort and sometimes a negligence tort. Battery is only an intentional tort—a fact that Defendants do not even attempt to dispute.

In the case of *Trammell v. Wright*, the Arkansas Supreme Court observed that it "has consistently held that section 21-9-301 provides city [and county] employees with immunity from civil liability for negligent acts, but not for intentional acts." 489 S.W.3d 636, 639 (2016) (citing *Deitsch v. Tillery*, 833 S.W.2d 760 (1992)). *Trammel*'s interpretation of § 21-9-301 is binding on this Court. Nevertheless, Defendants boldly ask that this settled question of statutory interpretation be certified to the Arkansas Supreme Court—perhaps in the hope that the high court will jump on the opportunity to reverse itself. The request for certification is improper. Arkansas Supreme Court Rule 6-8 permits federal courts to

certify questions of law when there is no controlling precedent or when "substantive law is unclear on an issue." *Longview Prod. Co. v. Dubberly*, 352 Ark. 207, 209 (2003). There is no straight-faced argument that there are any grounds for certification on the subject of intentional tort immunity. Defendants' briefing on the matter is tiresome and frivolous. *See* Doc. 41, pp. 14–19.

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Judgment on the Pleadings (Doc. 40) is **DENIED**.

**IT IS SO ORDERED** on this 16th day of March, 2023.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE