IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EDRICK FLOREAL-WOOTEN; JEREMIAH LITTLE;
JULIO GONAZALES; DAYMAN BLACKBURN;
THOMAS FRITCH                                                           PLAINTIFFS

VS.     NO.  5:22-cv-05011-TLB

TIM HELDER, SHERIFF OF WASHINGTON COUNTY,
ARKANSAS, in his individual capacity;
KARAS CORRECTIONAL HEALTH, P.L.L.C;
DR. ROBERT KARAS, M.D., in his individual capacity              DEFENDANTS

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Come now, Defendants, by and through Undersigned Counsel, and for their Brief in Support of Motion for Summary Judgment herein state and allege:

### I.    INTRODUCTION AND SUMMARY OF UNDISPUTED FACTS[1]

Plaintiffs, five former inmates of the Washington County Detention Center, brought suit against Defendants former Sheriff Tim Helder in his individual capacity only, Dr. Robert Karas, M.D., in his individual capacity only, and Karas Correctional Health (KCH), an entity solely owned by Dr. Karas that contracts with Washington County, Arkansas, to provide medical services to the Washington County Detention Center inmate population (WCDC).

Plaintiffs' interpretation of the FDA webpage they rely upon, the release date of which is unclear, is wrong.[1] http://www.fda.gov/consumer/consumer-updates (last visited July 20, 2023) (noting the date of the release online of the page http://www.fda.gov/consumer/consumer-

---

[1] The Statement of Undisputed Material Facts in support of the Motion for Summary Judgment is incorporated by reference herein as if repeated word for word. Fed. R. Civ. P. 10(c).

updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited July 20, 2023)

as December 10, 2021, which was after Plaintiffs in this case were treated for COVID).

As an aside, if the FDA thinks that Ivermectin is not an effective treatment for COVID as

Plaintiffs claim, why does the very page Plaintiffs cite in footnote 2 of the Amended Complaint,

note that clinical trials are ongoing with a link to such studies that are, in fact, *still occurring*?

Then Plaintiffs allege they weren't told any treatment included Ivermectin (except Fritch's

admission that he was told) and that their lack of informed consent and alleged deception by "Karas

Defendants" states a constitutional claim. Doc. No. 34, pp.1-2.

Defendants have detailed the claims in this case before at length. Doc. No. 41, pp. 1-5. In

Count I, Plaintiffs allege a violation of their rights to due process against all the above-named

Defendants. Doc. No. 34, p. 9. In Count I, Plaintiffs claim detained persons have a right to informed

consent and such is a liberty interest in receiving appropriate medical treatment. They allege taking

large doses of Ivermectin can be dangerous for human beings. Then they claim, "Karas Defendants

administered the dewormer to Plaintiffs without their voluntary consent." They further allege that

"Karas Defendants" lied to Plaintiffs and claimed Ivermectin was "vitamins," "antibiotics," and/or

"steroids." Doc. No. 34, p. 10. They allege Plaintiffs did not give "Karas Defendants" their

knowing and informed consent. *Id*. Plaintiffs then allege that Ivermectin was not an appropriate

medical treatment[2] for Plaintiffs, and thus the "Karas Defendants" were deliberately indifferent in

administering Ivermectin to Plaintiffs. *Id*. To the extent this Court has construed the allegations

against "Karas Defendants" to mean Dr. Karas individually or KCH via its practices, the

---

[2] Plaintiffs have produced no testimony or evidence from any expert (or even any medical professional) supporting this allegation or any allegation they've made. Defendants have, however, via Dr. Karas' testimony and his reliance on FLCCC data and conversations with members of the FLCCC and doctors in the community.

undisputed facts show all of Plaintiffs' actual claims against the actual Defendants have no factual or legal support.

The Court construed the Amended Complaint to allege: "Dr. Karas became interested in developing possible treatments for novel COVID-19 virus. He began conducting his own research and hypothesized that the drug ivermectin could be an effective treatment for COVID-10." Doc. No. 51. Then the Court notes Plaintiffs allege that Dr. Karas conducted an experiment involving two test subjects, one set at the WCDC and one at his private clinic. *Id.* at pp. 1-2. Plaintiffs did allege "[u]pon information and belief, Dr. Karas began conducting research as to [ivermectin's] efficacy against the disease, as well." Doc. No. 34, ¶ 14. And Plaintiffs took an out-of-context sentence from one of Dr. Karas' Facebook post to allege that WCDC patients and private clinic patients were given "slightly different" doses at a time, but they never allege an experiment, never alleged two sets of test subjects, and never alleged that WCDC patients were dosed more aggressively than private clinic patients.[3] Nevertheless, through discovery, Defendants have disproven these insinuations/allegations.

Next, Plaintiffs allege former Sheriff Helder "knew or should have known that Karas Defendants were administering "incredibly high doses" of Ivermectin but ignored the practice." *Id*. They based this claim on the presumption that Helder must have known about the use of Ivermectin as a part of a medicine protocol because Karas had mentioned it on Facebook—which

---

[3] The Court's stated in the Opinion and Order at Doc. No. 41, p. 2, that "Dr. Karas ultimately prescribed lower doses of ivermectin to his clinic patients and higher doses to his imprisoned patients" The Court also said: "…it would seem highly unlikely—even implausible—that a doctor would have dosed his incarcerated patients with an experimental drug more aggressively than his private patients—but Plaintiffs point to proof in their jail medical records." Respectfully, the undisputed facts demonstrate those events are not accurate and Dr. Karas, KCH, nor anyone working for Dr. Karas or KCH ever conducted an experiment on WCDC patients involving Ivermectin.

requires the unreasonable inferential leap that Sheriff Helder participates on social media, which also has been indisputably disproven in discovery.

Plaintiffs also allege that Karas Defendants attempted to obtain "retroactive consents," from Plaintiffs. *Id*. at 11. That was proven untrue via Plaintiffs' own testimony. Additionally, Plaintiffs cite an Arkansas statute regarding an alleged duty to warn of potential hazards for medical treatment. That statute is a medical malpractice statute premised on alleged negligence. Ark. Code Ann. § 16-114-206. That statute has been held unconstitutional, at least in part, in violation of Amendment 80 to the Arkansas Constitution. *Broussard v. St. Edward Mercy Health Sys., Inc.*, 2012 Ark. 14, 386 S.W.3d 385. But even the Court in *Broussard* noted the statute was a medical malpractice (*i.e.*, negligence) statute. *Id*. Even had it not been held unconstitutional, its invocation here undercuts all Plaintiffs' claim as it regards actions involving alleged medical negligence, which do not state a claim under the United States Constitution and for which all Defendants are entitled to statutory immunity (Ark. Code Ann. § 21-9-301), based on the undisputed facts not simply the allegations. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) ("[m]ere negligence *or medical malpractice*, however, are insufficient to rise to a constitutional violation.") (citing *Estelle v. Gamble*, 429 U.S 97, 106 (1976) (emphasis added)); *Williams v. Mannis*, 889 F.3d 926, 932-33 (8th Cir. 2018) (granting statutory immunity on the Arkansas intentional tort of outrage because the facts failed to show an outrage claim).

As stated, Plaintiffs also allege Sheriff Helder knew or should have known as early as July 2021, that Dr. Karas employed Ivermectin as part of his medicine protocol to treat COVID-19. Upon receiving a complaint, alleging that Dr. Karas was using animal grade Ivermectin and not obtaining consent, the undisputed facts demonstrate Sheriff Helder immediately spoke with KCH's

APRN Kelley Hinely and also spoke with Dr. Karas to ensure that consents to treatment were being received and was informed of the basis for the use of human grade Ivermectin.

As to Count I, there is no underlying constitutional violation based on the undisputed facts against the Defendants before the Court. Additionally, Sheriff Helder and Dr. Karas are entitled to qualified immunity for Count I. Next, KCH does not and did not have an unconstitutional policy, custom or practice that allegedly caused any underlying constitutional violation. Thus, all Defendants are entitled to summary judgment and the individual defendants are entitled to qualified immunity.

In Count II, only addressed to "Karas Defendants," Plaintiffs allege the "Karas Defendants" intended to cause an offensive "contact" with Plaintiffs when offering Plaintiffs Ivermectin allegedly without their knowledge and consent, did allegedly cause "offensive contact" to Plaintiffs via the offer and administration of Ivermectin, and that Plaintiffs experienced alleged symptoms because of the use of Ivermectin. Doc. No. 34, p. 12. Notably absent is any allegation that Dr. Karas personally treated the Plaintiffs, personally failed to advise the Plaintiffs the med protocol for COVID included Ivermectin or had any interaction (personal involvement) with Plaintiffs. *See* Doc. No. 41, pp. 3-4 (dispelling the afore-referenced claims due to the pleading failures in the Amended Complaint). The facts are undisputed and Dr. Karas had no personal involvement with any of the Plaintiffs. Additionally, the battery claim fails as the undisputed facts fail to show an alleged intentional battery by anyone, and any alleged battery was unexpectable and, thus, not foreseeable to KCH under Arkansas law; thus, KCH cannot be held vicariously liable. Additionally, Karas and KCH are entitled to statutory immunity for the state law battery claim—because the undisputed facts do not support an intentional battery by these Defendants— and summary judgment on the merits.

## II.     STANDARD OF REVIEW

"Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law." *Uhiren v. Bristol-Myers Squibb Co., Inc.*, 346 F.3d 824, 827 (8th Cir. 2003). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce of El Dorado, Ark. v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Merge v. Boehler*, 762 F.2d 621, 625 (8th Cir. 1985). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005).

## III.    DISCUSSION

### A.     The Defendants did not violate Plaintiffs' constitutional rights.

Initially, it is necessary to dispel a few misconceptions in this case.

#### *Off-label use of FDA approved medicines*

First, if a drug is approved by the FDA for one purpose, it is permissible to use that drug for other purposes in a physician's discretion. "…FDA approved indications were not intended to

6

limit or interfere with the practice of medicine nor to preclude physicians from using their best judgment in the interest of the patient." *Weaver v. Reagen*, 886 F.2d 194, 198 (2d Cir. 1989).

The United States Supreme Court and a federal statute make this clear. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 351 & n.5 (2001); 21 U.S.C. § 396. "Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize." *Buckman Co.*, 531 U.S. at 351, n.5 (quoting Beck & Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71, 72 (1998)). "The notion that off-label use is itself a 'risk' is one of two common misperceptions addressed in this article. The second is that all off-label treatment is *ipso facto* 'investigational' or 'experimental.'" Beck & Azari, 53 Food & Drug L.J. at 72.

The off-label use of a medicine *to treat a patient*, which is approved by the FDA for marketing purposes for another treatment is not experimental, investigational, and is not research. Beck & Azari, 53 Food & Drug L.J. at 81-85. And it certainly isn't here, where Ivermectin had been widely studied as reported by the FLCCC, which Dr. Karas relied on in developing his protocol to treat COVID-19.

In *Weaver*, the Second Circuit Court of Appeals quoted a drug bulletin by the FDA itself which states:

> The [Food, Drug and Cosmetic] Act does not, *** limit the manner in which a physician may use an approved drug. Once a product has been approved for marketing, a physician may prescribe it *for uses or in treatment regimens or patient populations that are not included in approved labeling*. Such "unapproved" or, more precisely, "unlabeled" uses may be appropriate and rational in certain circumstances, and may, in fact, reflect approaches to drug therapy that have been extensively reported in medical literature.
> The term "unapproved uses" is, to some extent, misleading. It includes a variety of situations ranging from unstudied to thoroughly investigated drug uses ***. [A]ccepted medical practice often includes drug use that is not reflected in

> approved drug labeling. With respect to its role in medical practice, the package insert is informational only.

886 F.2d at 198 (quoting "Use of Approved Drugs for Unlabeled Indications," 12 FDA Drug Bulletin 4 (April 1982).[4] *See also Abigail Alliance for Better Access to Developmental Drugs v. von Eshenbach*, 495 F.3d 695, 726 (D.C.C. 2007) (Rogers, J., dissenting). "[T]he FDA does not regulate physicians, and off-label prescription of medications is a long-standing practice that has not been outlawed." *Id*.

Indeed, to the extent the use of Ivermectin to treat COVID is a stand-alone claim (irrespective of their lack of consent claim) by Plaintiffs, they are wrong. Defendants attempted to ascertain what Plaintiffs were claiming already in this action: the use of Ivermectin for COVID, the alleged lack of informed consent or both? Doc. No. 43, p. 7, fn. 2. Out of an abundance of caution, Defendants are discussing both issues. Plaintiffs appear to espouse an incorrect theory that the FDA *prohibits* the use of Ivermectin (which is indisputably approved by the FDA for other uses in humans) for treatment of COVID-19.

In a somewhat similar case, an inmate sued 19 defendants, presumably medical and non-medical jail staff, for alleged deliberate indifference pursuant to Section 1983 presumably under the Fourteenth Amendment and the Eighth Amendment because the Court there notes Plaintiff was first a pretrial detainee then transferred to state prison in New Jersey. *Sanders v. Ocean County Board of Freeholders*, Civil Action NO. 16-5380 (MAS) (LHG), 2016 WL 6542834, at 1 (D.N.J. Nov. 3, 2016) (unreported). Plaintiff alleged, not that the defendants ignored his medical needs, but that their "alleged prescription of Pamelor/Nortriptyline for off-label use amount[ed] to

---

[4] Crucially, while off-label use is not prohibited (and cannot be prohibited by the FDA), the FDA couldn't decide what to do itself regarding Ivermectin for months.

deliberate indifference." *Id.* at 4. That appears to be *a* claim by Plaintiffs here. The District Court in *Sanders* said: "[o]ff-label use of medicine, however, does not prove deliberate indifference." *Id.* at 4. "'Federal law prohibits drug manufacturers from marketing a drug for an off-label purpose, but it does not preclude medical professionals from prescribing a drug for uses that are different than those approved by the FDA.'" *Id.* (quoting *Cox v. Levenhagen*, No. 12-0320, 2013 WL 3322034, at 5 (N.D. Ind. July 1, 2013) (citing *Buckman Co*, 531 U.S. at 350). Citing the Third Circuit Court of Appeals, the Court in *Sanders* said: "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Sanders*, 2016 WL 6542834, at 4 (quoting *Fantone v. Herbik*, 528 Fed. Appx. 123, 125 (3d Cir. 2013)).

Furthermore, what effective treatments existed for COVID-19 as of August 2021, particularly what anti-viral or anti-inflammatory medicine? The FDA website cited in their Amended Complaint, page 2, footnote 2, has links to "clinical trials" regarding Ivermectin and its efficacy to treat COVID. Some of the studies themselves are infirm (such as the 2020 Baghdad study with only 16 participants), some are ongoing, and some, including one in the United States is still recruiting volunteers. Further, it is unclear (although irrelevant) when the FDA statement Plaintiffs cite from the FDA website was issued. http://www.fda.gov/consumer/consumer-updates (last visited July 20, 2023) (noting the date of the release online of the page http://www.fda.gov/consumer/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited July 20, 2023)). Obviously, that was nearly two months *after* the last of the Plaintiffs here received Ivermectin at the WCDC. Nevertheless, Plaintiffs' points about the FDA are irrelevant to this legal case as shown already herein.

Furthermore, while the FDA did "tweet" an attempt at humor about Ivermectin, it literally did so on the day or the day before these Plaintiffs were prescribed Ivermectin, August 21, 2021. https://www.fda.gov/media/160265/download. And, again, it was effectively a notice to the public not to use *animal grade* Ivermectin, not obtained by a licensed pharmacy, to attempt to self-medicate with Ivermectin. That simply is irrelevant as the undisputed facts here show Plaintiffs were prescribed, offered, and accepted Ivermectin for use by humans from a licensed pharmacy in Lowell, Arkansas. More importantly, Plaintiffs' Counsel and the ACLU knew only human grade Ivermectin was obtained, and knew it was obtained through a licensed pharmacy in Lowell. *Exhibit C to Amended Complaint*, Doc. No. 34-3.

What did exist as of the time that Dr. Karas employed Ivermectin in his protocol—which saved every single inmate in WCDC that contracted COVID-19—was the FLCCC data and its reliance on numerous studies showing Ivermectin had anti-viral and anti-inflammatory properties. https://covid19criticalcare.com/protocol/i-care-early-covid-treatment/. To the extent this case regards whether or not there was a sound basis for the use of Ivermectin by doctors in their medical discretion, any such claim fails. Despite the FDA's reference to clinical trials on the webpage Plaintiffs cite in the Amended Complaint, the FDA explicitly disclaims even reviewing those studies. But Dr. Karas studied FLCCC's protocols, spoke with other physicians, and practiced medicine. And honestly that is a very modest description of all of the studies and physicians Dr. Karas has consulted with regarding treating COVID. If the Plaintiffs claim Ivermectin is ineffective, they at most are stating a state law claim of medical malpractice, but their allegations in the Amended Complaint, which are indisputably untrue, are no longer entitled to any deference in this motion for summary judgment. Indeed, they have failed to name a single purported expert in this case and there is no credible proof that any symptom the Plaintiffs claim to have experienced

was not simply due to having COVID-19. Even assuming *arguendo* the Plaintiffs were correct about the efficacy or lack thereof of Ivermectin in treating COVID, they have failed wholly to prove it. On the other hand, Dr. Karas and KCH have produced thousands of documents in discovery, including studies and links to studies, showing the efficacy of Ivermectin in treating COVID symptoms and preventing death.

The truth is, there are numerous studies indicating that Ivermectin possesses anti-viral and anti-inflammatory properties and benefits to treat COVID-19. Doc. No. 41, pp. 4-5. The undisputed factual record before this Court now indicates it was precisely this research that Dr. Karas relied upon in developing a protocol to treat inmate patients and private clinic patients. Footnote 6 on page 7 of the Amended Complaint is misleading at best. The entirety of the Facebook Post, the link of which was not provided in the Amended Complaint, clearly shows in context what Dr. Karas was explaining: that he was providing lower doses of Ivermectin at that time for jail patients than for private clinic patients and reasons for the difference, *i.e.*, inmate patients with COVID had less severe symptoms than private clinic patients with COVID at that time. His testimony further explains that. Plaintiffs' citation to a single sentence taken out of context is entitled to no deference here and is irrelevant.

### *Defendants are entitled to summary judgment or qualified immunity on Plaintiffs' claim of lack of informed consent and violation of the right to bodily integrity*.

In a recent case involving the "nonconsensual intrusion into one's body," the Eighth Circuit found no substantive due process violation. *Buckley v. Hennepin Co.*, 9 F.4th 757 (8th Cir. 2021). There, the Plaintiff was dangerously agitated, and she was given a ketamine injection forcibly. *Id*. at 763. The Court held the threshold question is "whether the behavior of the government *officer* is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."

*Id*. (emphasis added). "'[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'" *Id*. (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). Importantly, the Court found that "*Buckley's Complaint did not allege*, and her briefs on appeal did not address, the conscience shocking element of this substantive due process claim." *Id*. (emphasis added). Plaintiffs never alleged that here either. But at the summary judgment stage, the undisputed facts show no conscience shocking behavior by the Defendants before the Court.

More importantly, in *Buckley*, although it was the paramedics that forcibly injected Buckley with Ketamine to get her to the hospital safely, Buckley also sued physicians. 9 F.4th at 760. Somewhat similar to Plaintiffs' *allegations* here, Buckley sued physicians for the County due to two studies ("ketamine trials") the County conducted on the use of the drug as a pre-hospital sedative for agitated patients. *Id*. Specifically, she sued County doctors there who "allegedly implemented ambulance protocols while conducting the second study" individually and officially. *Id*. Finally, Buckley sued Hennepin County, Minnesota, and the doctors individually for "developing and implementing a county-wide ketamine protocol." *Id*. She, like Plaintiffs here, specifically attempted to claim a due process claim pursuant to her right to bodily integrity. *Id*.

As to the doctors, the Court reiterated that "…supervising physicians can be held personally liable under § 1983 only 'when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference towards the violation.'" *Id*. at 764 (quoting *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)). There, Buckley alleged, and provided support, that there was in fact a study she had unknowingly been enrolled in which showed Ketamine was more dangerous than an alternative sedative. *Id*. at 764. The Eighth Circuit said: "Buckley did not allege that the defendant physicians had any knowledge of or played

any role in responding to the call for a welfare check on Buckley, placing her on a medical transportation hold and forcibly securing her in the ambulance, and sedating her for the trip to the hospital." *Id*. at 765. While the Court expressed no opinion as to whether a claim of lack of informed consent and deceptive practices to obtain a patient's participation in an experiment would establish a constitutional violation in this Circuit under the Due Process Clause, the Court granted the doctor defendants at least qualified immunity. *Id*. at 765.

The Court noted there was no personal involvement alleged in *Buckley's treatment* and no subjective recklessness alleged against the doctors. *Id*. Even if the studies in *Buckley* were "ill-advised," the Court found the doctors not liable and entitled to qualified immunity. *Id*. Because Buckley failed to show an underlying constitutional violation, the Eighth Circuit agreed dismissal of the County was also appropriate. *Id*.

As Defendants have repeatedly argued in this case, Buckley's claim, according to the Majority Opinion, sounded in alleged medical malpractice that had to be resolved under state law. *Id*. at 762. A Section 1983 bodily-integrity claim alleging failure to obtain informed consent, is a state law claim that does not trigger Section 1983. *Maddox v. Zera*, Civil No. 20-2377 (JRT/HB), __F.Supp.3d__, 2021 WL 1732258, at 3 (D. Minn. May 3, 2021) (slip copy) (citing *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998)).

And that makes sense, even when reviewing *Washington v. Harper*, 494 U.S. 210, 235 (1990), which, although completely unlike this case based on the actual undisputed facts Defendants have shown, the Supreme Court reiterated its reluctance for the judiciary to unnecessarily intrude "'into either medical or correctional judgments.'" *Id*. (quoting *Vitek v. Jones*, 445 U.S. 480, 496 (1980)). While it is undoubtedly true prisoners can exercise their constitutional rights, the Supreme Court also balances that with deference to the correctional setting: "'courts are

ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" *Turner v. Safely*, 482 U.S. 78, 84 (1987).

Importantly, the *Buckley* Court focused on the particular government official that allegedly committed the wrong. The undisputed facts confirm neither Sheriff Helder nor Dr. Karas failed to obtain informed consent from any Plaintiff or allegedly misled any Plaintiff regarding the use of Ivermectin. Indeed, it is undisputed Dr. Karas and Sheriff Helder had no personal involvement in treating any of the Plaintiffs. The same was true in *Buckley* and the Eighth Circuit found the physicians were at least entitled to qualified immunity. 9 4th at 764-65.

As to the claim against Sheriff Helder, non-medical jail staff's reliance on medical staff does not violate the Eighth or Fourteenth Amendments. *Kayser v. Caspari*, 16 F.3d 280 (8th Cir. 1994). *See also Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). "[A] general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." *Id*. at 176. The Eighth Circuit added there: "Moreover, because Burt and Ault lacked medical expertise, they cannot be liable for the medical staff's diagnostic decision…." *Id*. In *Fantone*, 528 Fed. Appx. 123, 128 (3d Cir. 2013), the Third Circuit said: "'[i]f a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'" In *Fantone*, the Third Circuit also said: "[m]oreover, once a prison grievance examiner becomes aware of potential mistreatment, the Eighth Amendment does not require him or her to do more than 'review … [the prisoner's] complaint and verif[y] with the medical officials that [the prisoner] was receiving treatment.'" *Id*. at 128.

Sheriff Helder is not a medical professional but independently, and immediately, investigated an allegation that Dr. Karas was allegedly using animal grade ivermectin with inmate

patients without their informed consent. He confirmed that KCH was obtaining consent forms from patients at WCDC and inquired, and Nurse Hinely explained, the basis for the use of Ivermectin. On the merits, due to lack of personal involvement and lack of alleged deliberate indifference to any alleged constitutional violation, Sheriff Helder is entitled to summary judgment.

Dr. Karas is likewise entitled to summary judgment. Based on his own research via the FLCCC, review of many studies of other physicians and researchers, and his conversations with other practitioners, Dr. Karas was on firm ground for utilizing Ivermectin to treat and prevent death from COVID-19. Numerous studies supported the use of Ivermectin as an effective anti-viral and anti-inflammatory for COVID and to prevent death from COVID. *See*, *i.e.*, **Exhibits G, H, and K**. Independently dispositive of the claim against Dr. Karas is the fact he was not personally involved in treating the Plaintiffs and was not involved in any alleged violation of their constitutional rights. *Buckley*, 9 F.4th at 764.

Moreover, there is no proof that any Defendant before the Court (or anyone) intended to harm the Plaintiffs. *Buckley*, 9 F.4th at 763. Dr. Karas' protocol was clearly designed *not* to harm the Plaintiffs or anyone; rather, it was designed based on actual research of others and discussions with colleagues about how to treat a novel virus no person or entity had determined how to treat or cure.

If a non-party med-passer, despite the employee's undisputed training, failed to advise Plaintiffs what medicines they were receiving, the undisputed evidence is that was a clear deviation from the practices of KCH and Dr. Karas. [5] Although, based on the testimony of Ms. Alaytseva and Paramedic Jolana Wilson, any such allegation is denied. However, that is not a material factual

---

[5] Plaintiff Fritch conceded under oath he was advised he was receiving Ivermectin for COVID and that he was advised it was an antiparasitic that Dr. Karas was using as part of a treatment protocol for COVID.

dispute here. As stated, was no personal involvement by Dr. Karas or Sheriff Helder in Plaintiffs' medical treatment at all and no personal involvement by either Karas or Helder in allegedly failing to notify any Plaintiff of what medicines they were offered for COVID treatment. And any alleged failure by a KCH employee was *against* the clear practices of KCH based on the undisputed facts. Further, both Dr. Karas and Sheriff Helder lacked notice that any KCH employee would allegedly fail to perform their job as they were trained, and lacked the ability to foresee that any employee would allegedly fail to advise Plaintiffs what medicines they were receiving. Thus, the Defendants cannot be held liable and are entitled to summary judgment and qualified immunity. *Buckley*, 9 4th at 764-65 (physician not personally involved, entitled to judgment on the pleadings and qualified immunity);

It is undisputed that: 1) Kelley Hinely, as medical director for KCH, trains and requires providers, paramedics, and med-passers to advise inmate patients what medicines they are receiving, 2) Dr. Karas and Sheriff Helder had no personal involvement with these Plaintiffs at all (though KCH's practices require that patients at WCDC be informed of the medicines they are receiving, as Plaintiff Fritch concedes he was for instance), 3) no Defendant before the Court allegedly failed to obtain Plaintiff's consent or allegedly tricked the Plaintiffs into taking Ivermectin, 4) Plaintiffs were never forced to take any medicine, knew how to refuse medicine, and knew how to request a provider to come speak with them via the Kiosk, and finally 4) Sheriff Helder, upon being advised of an allegation of a non-existent experiment with Ivermectin and being advised that persons had not given consent for Ivermectin, investigated the issue immediately and the information he was provided did not indicate a constitutional violation. Thus, the Defendants before the Court are entitled to summary judgment on Plaintiffs' constitutional claims.

***Sheriff Helder and Dr. Karas are alternatively entitled to qualified immunity***.

This Court found in its Opinion and Order denying Defendants' Second Motion for Judgment on the Pleadings, that *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990), clearly established the alleged constitutional violations in this case. Doc. No. 51, pp. 8, 12-13. There, the United States Supreme Court said: "we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." 497 U.S. 261, 279 (1990). Thus, the right at issue was only assumed for purposes of the actual decision by the Court; it was not clearly established in that case as a result. The Court only ruled on the issue of the standard set by the State of Missouri (clear and convincing evidence) "…in proceedings where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state." *Id*. at 284. Respectfully, *Cruzan* does not clearly establish any law regarding the claims, when viewed with the undisputed facts, in this case for purposes of qualified immunity. *Rusness v. Becker County, Missouri*, 31 4th 606, 615 (8th Cir. 2022) ("Showing that a right was clearly established requires identifying controlling precedent with a close correspondence to the particulars of the present case.").

A very precise discussion and application of the qualified immunity doctrine comes from the recent decision in *Martin v. Turner*, __F.4th__, 2023 WL 4673617 (8th Cir. July 21, 2023) (slip copy) (discussing prior precedent compared to the facts before the Court and determining the law was not clearly established). The Court in *Martin* relied upon  *Graham v. Barnette*, 5 F.4th 872 (8th Cir. 2021).

In *Graham*, the Court said that to be clearly established, the law "'must have a sufficiently clear foundation in then-existing precedent.'" *Id*. at 887 (internal citations omitted). The Court said: "This generally requires a plaintiff to 'point to existing circuit precedent that involves

sufficiently 'similar facts' to 'squarely govern' 'the officers' conduct in the specific circumstances at issue ...." *Id.* (internal citations omitted). If there is no binding precedent that squarely governs the facts of a case, a plaintiff must show a 'robust consensus of persuasive authority' constituting "settled law." *Id.* "The plaintiff has the burden to prove that the right was clearly established at the time of the violation." *Id.* Importantly, "[a] right is not clearly established by 'controlling authority' merely because it may be 'suggested by then-existing precedent.'" *Id.* (internal citations omitted). *Martin* provides an excellent example of how our Court of Appeals determines whether the existing law at the time in question is clearly established, via its discussion of factual differences between the case before the Eighth Circuit in *Martin* and the cases cited by Plaintiff there. 2023 WL 4673617, at 2-3.

As argued previously, *Cruzan* is inapposite. However, under either *Cruzan* or *Harper* (discussed below), and considering the actual undisputed facts here, the Defendants could not have been on notice any alleged conduct they engaged in violated Plaintiffs' constitutional rights. The undisputed facts here are not like *Cruzan* or *Harper*, and the law, if it was violated here by Defendants (which is denied) was not clearly established as of December 2020 or August of 2021. Thus, Defendants are at least entitled to qualified immunity.

The Court also cited *Washington v. Harper*, in its Opinion and Order denying judgment on the pleadings. 494 U.S. 210, 221 (1990). Again, respectfully, given the undisputed facts developed here, *Washington* cannot operate to deny Sheriff Helder or Dr. Karas qualified immunity in the least. The Court in *Washington* ruled: "[w]e hold that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs *against his will*, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227 (emphasis added). Indeed,

in *Washington*, the issue was the "forcible injection of medication into a nonconsenting person's body." *Id.* at 230. The Supreme Court also said: "…we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge." *Id.* at 231.

The Plaintiffs all agree they accepted the medicines they were given, knew how to refuse medications, did refuse medications in the past, and it is undisputed if an inmate had any questions about a medicine offered, they could put a request to see the doctor or APRN Kelley Hinely to discuss the medicine including any possible side effects. In *Washington*, the inmate was forced to take medicine against his will. That cannot clearly establish the law here under the undisputed facts as to the claims made against the Defendants before the Court. That is true even assuming *arguendo* an employee of KCH allegedly failed to advise the Plaintiffs the medicines included Ivermectin in contradiction of the clear practices and training of KCH that required providers, paramedics, and med-passers to advise the patients at WCDC what medicines they were receiving. As stated, any such allegation is denied considering at least Ms. Wilson's testimony. But that is not a material factual dispute as discussed herein.

To reiterate, Dr. Karas and Sheriff Helder had no involvement in any treatment of these Plaintiffs and the allegation that Dr. Karas was conducting an experiment has been wholly disproven. In sum, these Defendants did not force any patient (including the Plaintiffs here) to take any medicine against the patient's will. Therefore, respectfully, on these facts as to these Defendants, *Cruzan* and *Harper* simply have no applicability.

Additionally, an alleged failure to obtain informed consent and medical malpractice do not state constitutional claims. *Estelle*, 429 U.S. at 106, fn. 14 (collecting cases). "Nothing in the Eighth Amendment precludes doctors from exercising their independent judgment and prisoners

do not have a right to a particular kind of treatment." *See Sredl v. Corr. Med. Servs., Inc.*, No. 04-4146-CV-C-NKL, 2006 WL 181959, at 6-7 (W.D. Mo. Jan. 24, 2006) (unreported) (citing *Noll v. Petrovsky*, 828 F.2d 461, 462-63 (8th Cir. 1987)). The Court said in *Noll*, "[h]owever, Noll has only shown, both below and on appeal, that another physician in the same circumstances might have ordered different tests and treatment. This evidence raises questions of medical judgment; it does not show deliberate indifference." 828 F.2d at 462.

Importantly in *Noll*, the Court also found that the Appellant there failed to show that the Defendants (the Warden and a Physician) "…were actively involved in the alleged constitutional violation." *Id*. Indisputably, assuming *arguendo* Plaintiffs were not told by non-policymaking medical staff that they were receiving Ivermectin as part of their COVID treatment, Dr. Karas, KCH, and Sheriff Helder cannot be held responsible for such alleged failure.

In this case, the undisputed facts demonstrate Dr. Karas and Sheriff Helder did not mislead Plaintiffs about Ivermectin, and if any employee of KCH did, it was against the clear practice of KCH and Dr. Karas. Dr. Karas did not conduct an Ivermectin experiment. Neither Karas nor Helder failed to obtain informed consent from Plaintiffs. Thus, the Defendants did not violate Plaintiffs' rights. But, considering the proper process of assessing whether prior precedent clearly establishes a right, as shown in *Martin* above, no binding authority clearly established Defendants violated any of Plaintiffs' constitutional right, and no robust consensus of persuasive authority clearly established Defendants violated any of Plaintiffs' rights. Thus, in the least, Defendants are entitled to summary judgment.

Dr. Karas reiterates his earlier argument before the Court that, alternatively, he too is entitled to at least qualified immunity based on the undisputed facts. The case of *Davis v. Buchanan County, Missouri*, 11 F.4th 604 (8th Cir. 2021), denying qualified immunity should not apply here.

First, the undisputed facts show KCH is an entity solely owned by Dr. Karas that only provides medical services for a single correctional facility, WCDC. It has done so only since 2016, and during that time has experienced multiple years of significant monetary losses. So, to the extent the amount of the contract Plaintiffs' mentioned in the Amended Complaint was relevant to the Defendants' second motion for judgment on the pleadings, those losses and KCH's size must be relevant here. In 2016 when it won the bid for WCDC, it employed at most 10 people. As of Nurse Hinely's deposition, it employed at most 29 people. KCH is not staffed by "purely private" employees; in fact, it is a separate legal entity than Karas Health Care and its employees work at a County Jail. Furthermore, as argued throughout this case, Plaintiffs' claims, and particularly now considering the undisputed facts, amount at most to claims of alleged negligence, which is denied. But there is certainly no evidence Dr. Karas was criminally reckless regarding five inmates he never personally treated. *Davis*, 11 F.4th at 618 (discussing *Richardson v. McKnight*, 521 U.S. 399 (1997) and dicta therein indicating that immunity was available at common law for doctors working for the government whose actions were allegedly negligent rather than deliberately indifferent) (discussing first factor regarding the historical availability of immunity).

In *Davis* the Court noted the second factor in determining whether a third-party medical provider for the government may assert qualified immunity involves three policy considerations: "avoiding unwarranted timidity," ensuring the availability of talented candidates are not deterred from public service, and preventing harmful distractions from carrying out the work of government that can often accompany damages suit. There, the Court noted that the medical companies had insurance to cover claims such as the Section 1983 claim. Dr. Karas and KCH have no insurance to cover any claim arising out of the provision for medical services at the jail, including but not limited to the claims before the Court now. While KCH does have its own policies, the undisputed

facts show that when Nurse Hinely advised that consent forms were being completed verbally to avoid transmission of COVID, Sheriff Helder instructed that KCH go back to having the forms physically signed. That is a significant undisputed fact showing oversight, which the Court in *Davis* discussed.  11 F.4th at 621.

Consider also, Ms. Alaytseva's testimony about how the accusations made in this case and in the news, which are indisputably not true, disheartened her, while also testifying she felt providing care to the inmate population working at KCH was satisfying. Such hardworking and loyal employees providing excellent service to the public, and here to detainees at a Jail, will indisputably experience unwarranted timidity continuing to work at KCH after this lawsuit alone.

The second policy factor identified in *Davis* also militates toward permitting qualified immunity. Again, the Court noted ACH and Corizon had ample insurance to handle damages suits. Not only does KCH not have such here, financially it has suffered losses in recent years. Yet, the Court cannot discount the fact that, objectively, Sheriff Helder testified KCH has operated much better than its predecessor which the County effectively terminated after one year.

Finally, regarding the third factor, consider the size of the record in this case alone. Dr. Karas and KCH employees have been at least distracted by this litigation. Furthermore, because there was no Ivermectin medical experiment by Dr. Karas or KCH on Plaintiffs or anyone, respectfully, any person would be distracted in their job where they know such an allegation is not true but the opposing litigants' sponsor makes such allegations to the national news as occurred here. KCH is much different than the entities in *Davis* and Dr. Karas (who is only sued individually) should be able to assert qualified immunity here. If the Court agrees, first, there is no constitutional violation committed by Dr. Karas on the undisputed facts (which truly obviates the need to determine the applicability of *Davis*). But even if there was a violation it was not clearly

established considering *Buckley* and other cases discussed herein and, thus, Dr. Karas, at least, if not also KCH, should be entitled to qualified immunity.

### KCH is entitled to summary judgment.

Plaintiffs have sued KCH pursuant to Section 1983 for allegedly acting under color of law. The standard to assess a Section 1983 claim against an entity such as KCH is identical to the standard to assess such a claim against a municipality. *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993). Plaintiffs must allege and prove that a policy or custom, or decision by a final policymaker, was the moving force behind their alleged constitutional violations. A policy means an "official policy, a deliberate choice of a guiding principle or procedure made by an official with authority." A custom means a prior persistent, widespread pattern of unconstitutional misconduct of which final policymaking officials have notice and to which they then exhibit deliberate indifference. *Andrews v. Fowler*, 98 F.3d 1069 (8th Cir. 1996) ("[t]here must exist a prior pattern of unconstitutional conduct that is so 'persistent and widespread' as to have the effect and force of law."). In *Andrews*, the Court said: "'[t]o establish a city's liability based on its failure to prevent misconduct by employees, *the* plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action.'" *Id*.

In *Johnson*, the Plaintiff sued, *inter alia*, a third-party medical provider for the Missouri Department of Corrections named Correctional Medical. 452 F.3d at 971. Because the Plaintiff could not show deliberate indifference by the third-party medical staff and because Plaintiff had not pointed to any policy, custom, or official action by the medical provider caused an alleged constitutional violation, the Eighth Circuit affirmed summary judgment. *Id*. at 973. KCH, like a local government, cannot be sued on the basis of *respondeat superior*. *Andrews*, 98 F.3d at 1074;

*Sredl*, 2006 WL 181959, at 7 (applying the same test for municipal liability to third-party medical provider) (citing *Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990)). In *Givens*, the Eighth Circuit reiterated the commonly stated rule that "…the law was (and still is) clear that medical negligence or disagreement with a physician's treatment decisions does not rise to the level of an Eighth Amendment violation." 900 F.2d at 1233.

In *Sanders*, the Eighth Circuit said that Section 1983 does not permit a cause of action on the theory of *respondeat superior* even against a private entity alleged to have acted under color of law. *See* 984 F.2d at 975. This is clear from the wording of Section 1983 itself: There the Plaintiff had not pled that the private corporation had a policy or custom of false arrests or malicious prosecution and affirmed dismissal. *Id*. at 976. There are two basic circumstances under which municipal liability will attach against a private entity alleged to have acted under color of law:

> (1) where a particular municipal policy or custom itself violates federal law, or ***directs*** an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences.

*See Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir.2008) (emphasis added).

First, KCH's policies and practices are designed to ensure that inmate patients sign a consent to treatment upon intake. Detainees sign consent to treatment forms upon booking. Additionally, Nurse Hinely who generally runs KCH's medical treatment in the WCDC, in consultation with Dr. Karas, and trains KCH staff, testified that staff at the WCDC working for KCH are required, whether they are the initial medical providers assessing an inmate's condition or med-passers, following the initial providers assessment of an inmate's condition, to advise patients at WCDC the medicines they are offered for a particular ailment. The medical providers, paramedics, and med-passers who interact with patients at WCDC regarding medicines, are to ensure that the medicines prescribed to an inmate are conveyed to the inmate before being offered

24

to the inmate. It is also undisputed that WCDC inmate patients (particularly the Plaintiffs here) know how and have declined medicines at their will. That is, no inmate is "forced" any medication and Plaintiff's medical records demonstrate they know how to refuse medications. Paramedic Jolana Wilson also testified that KCH's practice, when she began a protocol for treating COVID-19 for jail patients, was to inform the patient of the medicines prescribed. She further testified that inmates are advised if they have questions about a medicine, they should put in a request on the Kiosk for a provider to come and discuss the medicine with the patient.

Plaintiffs (except for Fritch who admitted he was advised about Ivermectin) claim they were not told the medicines they were offered for COVID included Ivermectin. Even assuming *arguendo* that were true, it inconsistent with the practices of KCH at the time the Plaintiffs here were assessed by a medical provider and determined to have COVID-19 infections. Those alleged actions by non-parties would constitute a complete deviation from the practices testified to by Nurse Hinely, Jolana Wilson, Dr. Karas, and others.

As to the constitutional claim against KCH, Plaintiffs cannot show a policy that directed[6] KCH employees to act unconstitutionally or a custom, that existed prior to Plaintiffs being offered Ivermectin, that was allegedly a widespread pattern of unconstitutional misconduct. An alleged violation by a subordinate non-party of the established practices cannot bind KCH or Dr. Karas. Furthermore, Nurse Hinely conducts annual training and recently completed retraining of all KCH staff. Thus, even if an alleged custom existed, Plaintiffs cannot show KCH deliberately failed to take remedial action. *Andrews*, 98 F.3d at 1075.

---

[6] *Handle v. City of Little Rock*, 772 F. Supp. 434 (E.D. Ark. 1991) (policy unconstitutional only if it directs employees to act unconstitutionally); *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 992 (8th Cir. 2015).

So, for a claim to be mounted against KCH—which is solely owned by Dr. Karas, not a third-party medical provider unlike KCH—Plaintiffs must prove a policy or custom caused their alleged constitutional violations, or it was caused by the decision of a final policymaker. The undisputed evidence in this case is that medical providers and med passers are required to inform inmate patients of what medicines are being offered. A failure to advise a patient at WCDC of what medicines they have been prescribed would contravene the policies, customs, practices of KCH, and be inconsistent with how all KCH employees are trained. And assuming *arguendo* it occurred, final policymakers did not have prior knowledge of any provider or med passer failing to follow the policies, customs, and practices of KCH before the date Plaintiffs claim their rights were violated. Thus, there is no evidence of notice (prior to any alleged constitutional violation) to final policymakers of KCH of an alleged violation of the policies of KCH and no evidence of deliberate indifference. *Andrews*, *supra*. Thus, there is no evidence Plaintiffs can provide to establish liability for KCH under Section 1983.

### *KCH and Dr. Karas are entitled to summary judgment regarding the battery claim.*[7]

In denying Dr. Karas and KCH judgment on the pleadings for Plaintiffs' battery claims, the Court cited two opinions: *Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995) and

---

[7] Defendants argued statutory immunity from battery (an intentional tort) in its second motion for judgment on the pleadings. So as not to offend the Court, but to preserve Defendants' argument, Defendants simply reiterate those arguments herein as if repeated word for word pursuant to Fed. R. Civ. P. 10(c) due to the Eighth Circuit granting statutory immunity to an outrage claim per its supplemental jurisdiction in *Williams v. Mannis*, 889 F.3d 926, 932-33 (8th Cir. 2018). Defendants ***do not*** reincorporate their request that any matter be certified to the Arkansas Supreme Court. However, based on the undisputed facts here, *Trammell v. Wright*, 2016 Ark. 147, 489 S.W.3d 636 (2016), should control as the undisputed facts do not reveal any wrongful intent by Dr. Karas or KCH, or by any employee of KCH, even assuming *arguendo* an employee allegedly failed to advise Plaintiffs Ivermectin was part of their COVID treatment. State law battery claims require tortious intent. Thus, the undisputed facts do not show an intentional tort as in *Trammel* and *Williams*. *See also Young v. Blytheville Sch. Dist.*, 2013 Ark. App. 50, 425 S.W.3d 865 discussed in the body of the brief.

*Parkerson v. Arthur*, 83 Ark. App. 240, 250, 125 S.W.3d 825 (2003). Respectfully, two issues were present in *Zearley*: 1) whether an attorney can testify and act as an advocate during a class certification hearing, and 2) whether class certification was appropriate. 320 Ark. at 278-290. Yes, the case involved claims regarding lack of informed consent and included a battery claim, but the Arkansas Supreme Court did not rule on the merits of the claim. Indeed, the Arkansas Supreme Court has routinely held: "[o]ur focus is whether the Rule 23 requirements have been met, and it is totally immaterial whether the petition will succeed on the merits or even if it states a cause of action. This Court will not delve into the merits of the underlying claims when deciding whether the Rule 23 requirements have been met." *Municipal Health Benefit Fund v. Hendrix*, 2020 Ark. 235, at 4, 602 S.W.3d 101, 106. Thus, respectfully, the Court in *Zearly* did not and could not have decided whether a lack of informed consent claim might constitute a battery.

In *Parkerson II*, *i.e.*, the published opinion cited by this Court, the Arkansas Supreme Court affirmed the grant of summary judgment because Plaintiff did not have an expert to support her claims of medical battery or lack of informed consent. *Id*. at 249-50, 125 S.W.3d at 831. Indeed, there the Court held: "[u]nder Ark. Code Ann. § 16-114-206(b) (1987), a plaintiff must 'always' provide expert medical testimony from which a jury could determine whether the medical-care provider breached his or her duty to disclose necessary for the informed consent to be given." *Id*. at 249, 125 S.W.3d at 831. The Court then said: "[o]nce appellant's informed-consent claim was dismissed, there were no longer any genuine issues of material fact to be resolved in appellant's battery claim, because that claim is based on appellant's assertion that she was not adequately informed of the risks or the experimental nature of the surgery using the Orthoblock…." *Id*. at 250, 125 S.W.3d at 832.

The Plaintiffs have not identified any expert to testify about their lack of informed consent claim. Thus, to the extent *Parkerson II*, holds any relevance to this case, it dictates summary judgment for Dr. Karas and KCH on the state law battery claim. Further, while the Supreme Court found that the Appellant in *Parkerson I* was claiming battery regarding the issue of informed consent, the Court then discussed the fact that the battery claim regarded the doctor allegedly appearing drugged before the surgery. And, as argued before, the Appellant there was deceived by *the Doctor Defendant*, regarding the use of Orthoblock, which did result in "contact," or a "touching." 2001 WL 719055, at 6. That did not happen here regarding any Defendant before this Court and, thus, for this independent reason *Parkerson I* is inapposite.

Additionally, the treatise cited by the Plaintiffs and the Court in the motion for judgment on the pleadings phase of this case relies on the Restatement (Second) of Torts § 18 (1965), regarding battery. Under the Restatement first an actor is subject to liability if he or she "acts intending to cause a harmful or offensive contact with the person of the other …" and "an offensive contact with the person of the other directly or indirectly results." *Id*. First, even assuming *arguendo* Plaintiffs (or at least the Plaintiffs treated in August of 2021) were not provided information that the medicines they were offered included Ivermectin, there is no evidence that the person who allegedly failed to inform them of such did so with the intention to cause harmful or offensive contact.

Defendants deny Plaintiffs were not informed of Ivermectin as part of their treatment, particularly considering the testimony of Paramedic Jolana Wilson. She and others clearly testified that it is the practice of KCH to inform patients at WCDC of the medicines they are offered for treatment. But Plaintiffs claim they were not told the medicines included Ivermectin (except for Plaintiff Fritch, who testified he was advised he was offered Ivermectin and that it was an anti-

parasitic, asked no questions about it, and took it). Plaintiffs have still not presented a material dispute as to the claims here against the Defendants actually sued, Dr. Karas individually, Sheriff Helder individually, and KCH only. And more importantly, there is no evidence that any employee of KCH (or any Defendant before the Court) intended to cause an offensive contact, directly or indirectly, with the Plaintiffs. There is no evidence of the requisite wrongful intent by Dr. Karas or KCH (the only Defendants against whom the battery claim has been brought) or any employee of KCH. *See also* Howard W. Brill, Arkansas Law of Damages § 33:6. Former Chief Justice Brill states clearly in his treatise that "[battery] requires an intent, specifically defined as an intent to injure the victim …" and "[a] harmful contact occurs when, objectively, the contact was *meant to injure or cause harm to the other person*." *Id*. (emphasis added). There is no evidence of wrongful intent here by anyone, but certainly not the actual Defendants before the Court.

Again, the undisputed proof demonstrates Dr. Karas did not deceive any of the Plaintiffs regarding the inclusion of Ivermectin in his protocol for treating COVID-19 and did not treat the Plaintiffs at all. Rather, the undisputed evidence is that KCH employees, including providers, paramedics, and med-passers, were all trained to inform a patient at WCDC what medicines they were prescribed. It is also undisputed the Plaintiffs knew how and did use the Kiosk at WCDC to ask medical providers of KCH questions about medicines or medical treatment. It is undisputed that, according to Mr. Gonzales, Ivermectin looked distinct and was in capsule form. That is all to say, Plaintiffs were supposed to be informed of the medicines provided for COVID via Dr. Karas and KCH's practices and training, and Plaintiffs knew how to ask questions about side effects or anything else regarding such medicines. Plaintiffs also knew how to and often did refuse medicines. Dr. Karas individually and KCH (the only two Defendants against whom battery is asserted) are entitled to summary judgment on these bases alone.

Even assuming *arguendo*, that *Young*, *infra* does not govern this case, an employer can only be held liable for the intentional tort of an employee that was done within the employee's course and scope of employment and was not "unexpectable." *Porter v. Harshfield*, 329 Ark. 130, 136-37, 948 S.W.2d 83, 86 (1997) (adopting the Restatement of Torts 2d, 245 (1958)); *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 49 S.W.3d 107 (2001). That is, the intentional tort must be foreseeable. *Edwards v. City of Rockport*, No. 04-6136, 2005 WL 3805944, at 2-3 (W.D. Ark. Sept. 29, 2005). In *Edwards*, the Honorable Judge Dawson found that the City Defendant could not be liable for an alleged state law battery on the basis of *respondeat superior* where the alleged conduct—excessive force by a police officer—was not foreseeable. *Id*.

Furthermore, Arkansas Code Annotated § 21-9-301 grants counties, cities, and school districts *and any of their boards, commissions, agencies, authorities, or other governing bodies*, immunity from claims of alleged negligence. *Young v. Blytheville Sch. Dist.*, 2013 Ark. App. 50, at *8-9, 425 S.W.3d 865, 872-73; *see also Arkansas River Educ. Servs. v. Modacure*, 371 Ark. 466, 469-70, 267 S.W.3d 595, 597-98 (2007) (applying immunity statute to educational cooperative providing services to public school district). In *Young*, while a minor had been the victim of intentional wrongdoing, that was not enough to find the *School District* engaged in intentional tortious conduct. *Id*. at *9, 425 S.W.3d at 873. Thus, the Arkansas Court of Appeals affirmed the Circuit Court's grant of statutory immunity to the School District. Here, in the least, Dr. Karas and KCH are statutorily immune from suit because there is no proof of intentional wrongdoing by Dr. Karas or KCH via its practices—those are the only Defendants battery is asserted against. Assuming *arguendo* an employee failed to advise Plaintiffs that Ivermectin was included in the protocol for COVID treatment, the clear practice that is undisputed is that

paramedics, medical providers, and med-passers were to advise each patient at WCDC the medicines they were receiving for COVID treatment and all Plaintiffs knew (a) how to request additional information from Nurse Hinely or another medical provider about any medicine via the Kiosk, (b) knew how to refuse medication, and (c) it is undisputed Dr. Karas did not treat Plaintiffs. Thus, alternatively, Dr. Karas and KCH invoke statutory immunity.

> ### *Plaintiff Fritch's claims must be dismissed under the Prison Litigation Reform Act for failure to exhaust administrative remedies*.

Plaintiff Fritch admitted under oath he never filed a grievance regarding his claims in this lawsuit. It is also undisputed that the WCDC Rules and Regulations for inmates require an inmate, who believes his or her civil rights have been violated or they have been abused, to file a grievance with various information within 10 days of the alleged event. It is further undisputed that KCH requires all detainees to place all non-emergency medical requests on the kiosk, and medical staff review and respond to those requests. *Williams v. Karas et al.*, Civil No. 5:21-cv-5174, 2022 WL 4088764, *Report and Recommendation* (W.D. Ark. Aug. 16, 2022)) (slip copy).

In *Williams v. Karas*, this Court adopted the Report and Recommendation of the Honorable Magistrate Judge Christy Comstock. *Williams v. Karas et al.*, Civil No. 5:21-cv-5174, 2022 WL 4088193, at 1 (W.D. Ark. Sept. 6, 2022) (adopting Report and Recommendation found at 2022 WL 4088764 (W.D. Ark. Aug. 16, 2022)) (slip copy). Judge Comstock recommended dismissal of the Complaint due to Mr. Williams' failure to exhaust available administrative remedies *at the WCDC* under the Prison Litigation Reform Act regarding claims related to COVID and Ivermectin against Dr. Karas, KCH, and Sheriff Helder,.[8] 2022 WL 4088764, at 2-3. Judge Comstock said: "[t]he Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: '[n]o action shall

---

[8] Williams was booked into the WCDC on August 20, 2021.

be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" 2022 WL 4088764, at 2. As Judge Comstock found, "[e]xhaustion is mandatory." *Id*. (citing *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

Judge Comstock, citing precisely the same Inmate Handbook (Rules and Regulations) noted above, found Williams failed to exhaust his administrative remedies under the PLRA and, thus, recommended dismissal. His Honor adopted the Report and Recommendation of Judge Comstock. Plaintiff Fritch has admitted he did not exhaust any grievance regarding his claims here within the timeframe required by the WCDC Rules and Regulations (Inmate Manual). Thus, for the same reasons that Plaintiff Williams' case was dismissed without prejudice, Mr. Fritch's claims here must be dismissed without prejudice under the PLRA.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request the Court grant their motion and dismiss this action with prejudice.

TIM HELDER, et al,
*Defendants*

Michael A. Mosley
Michael A. Mosley
Ark. Bar No. 2002099
JASON OWENS LAW FIRM, P.A.
**Mailing Address:** P.O. Box 850 Conway,
Arkansas 72033-0850
**Physical Address:** 1312 Oak Street
Conway, Arkansas 72034
Telephone (501) 764-4334
Telefax (501) 764-9173
email: mosley@jowenslawfirm.com