**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**EDRICK FLOREAL-WOOTEN; JEREMIAH LITTLE;**
**JULIO GONAZALES; DAYMAN BLACKBURN;**
**THOMAS FRITCH**                                                                    **PLAINTIFFS**

**VS.     NO.  5:22-cv-05011-TLB**

**TIM HELDER, SHERIFF OF WASHINGTON COUNTY,**
**ARKANSAS, in his individual capacity;**
**KARAS CORRECTIONAL HEALTH, P.L.L.C;**
**DR. ROBERT KARAS, M.D., in his individual capacity               DEFENDANTS**

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Come now, Defendants, by and through Undersigned Counsel, and for their Statement of

Undisputed Material Facts herein state and allege:

### *KCH APRN Kelley Hinely*

1.      Kelley Hinely is an employee of Karas Correctional Health (KCH), who generally

oversees KCH's medical operations at the Washington County Detention Center (WCDC).

**Exhibit A**, **Depo. of Kelley Hinely**, 13:2-4. At the time of the events allege in this case (December

2020 and August of 2021) she reported to Dr. Robert Karas, and all KCH employees reported to

Ms. Hinely. **Exhibit B**, Affidavit of Kelley Hinely.

2.      She is not an employee of Dr. Robert Karas' private clinic, but does some work

there on occasion when needed. *Id*. at 13:18-23. Karas Health Care and Karas Correctional Health

are two separate businesses and are not comparable according to Nurse Hinely. *Id*. at 14:17-24.

3.      Ms. Hinely has a master's degree in nursing with a board certification as a nurse

practitioner in family medicine. *Id*. at 9:21-25 – 10:1. She began working for KCH in 2016. *Id*. at

14:1.

1

4.      She is the medical director for KCH. *Id*. at 15:15-22. Before becoming medical director in 2018, she worked as a Nurse Practitioner for KCH. *Id*.

5.      She has many duties including training employees and providing patient care. *Id*. at 16:4-16, 46:21-25 – 47:1-5.

6.      KCH has other medical staff, and also utilizes medication passers (med-passers) who have been through training and their skills are reflected on check-off sheets. *Id*. at 19:11-21.

7.      At the time of her deposition, KCH had 29 employees total. *Id*. at 20:5-9.

8.      The most important facet of med-passer's training is that a med-passer makes sure when passing medicine to an inmate that it's the right person, the right time, the right medicine, and the right dose. *Id*. at 49:7-15.

9.      Med-passers are trained prior to performing their tasks independently. *Id*. at 51:6-10.

10.     She performs annual trainings with med-passers. *Id*. at 51:25 – 52:1.

11.     During booking, a new detainee meets with a KCH medical staff member and, *inter alia*, and it's at that time each detainee gives their consent to treatment if they want treatment while detained. *Id*. at p. 54.

12.     Med-passers advise detainees of the medications that have been ordered for them. *Id*. at 55:5-10, 130:19-25 – 131:1-21 (discussing that med-passers are required to advise WCDC patients of what medicines the patients are receiving). If an inmate does request information about a medication, which they know how to do, Nurse Hinely advised a medical provider meets with the patient and gives them a handout. *Id*. at 135:5-12; *see also Id*. at p. 136.

13.     Med-passers advise detainees if they have any questions or issues to request a sick call via a Kiosk. *Id*. at 55:14-18. Med-passers are instructed via their training to advise a detainee

to refer questions such as potential medication side effects to a licensed medical professional, such as Nurse Hinely, via a sick call on the Kiosk. *Id*. at 56:1-10.

14.      The medicine protocol developed by Dr. Karas as of August 26, 2021, to treat a person with COVID included Ivermectin of 12 to 24 milligrams, based on weight, once daily for five days. *Id*. at 59:9-11, 60:7-15.

15.      There was a time during the pandemic that included August of 2021, that KCH employees were not passing pencils or documents back in forth to avoid COVID transmission. *Id*. at 73:23-25 – 74:1-4.

16.      She testified that a corrections officer is present for med-passer safety, and that a med-passer gives a patient at WCDC their medicine, telling the patient what the medicines are, and marking given or refused. *Id*. at p. 74.

17.      Med-passers are required to inform patients at WCDC what medicines they are being given during pill call every single time it occurs. *Id*. at 75:1-8.

18.      Nurse Hinely testified that prior to the Fall of 2021, she was never made aware of any med-passer not following the procedure requiring the med-passers to go over the list of drugs on the distribution list with each jail patient. *Id*. at 153:1-11.

19.      Med-passers were instructed, as a practice of KCH, to inform patient inmates at WCDC that Ivermectin was "an antiparasitic that had been shown to help in the treatment of COVID; and that if a patient at WCDC had further questions about the medicine, they can put those in the kiosk and a licensed person would discuss it with them, and they can refuse it at any time." *Id*. at 156:25 – 157:1-4.

20.      She was never informed that any med-passer allegedly forced any patient to take any medicine. *Id*. at 157:5-8, 162:19-23. She has never been made aware of any med-passer

allegedly misleading any patient by telling the patient that Ivermectin is a vitamin, antibiotic, or steroid. *Id*. at 163:8-24.

21.     After the news broke accusing Dr. Karas of using horse dewormer as a treatment for COVID on jail inmates without their knowledge, which is denied, the Plaintiffs (excluding Mr. Fritch who was treated for COVID in 2020) then refused Ivermectin. However, they did not refuse any other medications offered for COVID treatment. *Id*. at 158:3-18. The point to Nurse Hinely was that, the Plaintiffs' acceptance of other medications for COVID treatment but specific refusal of Ivermectin lead her to believe they were told they were offered Ivermectin, despite their claims otherwise. *Id*. at 159:4-6.

22.     KCH nor Dr. Karas has ever had any financial interest with Lowell Pharmacy pertaining to orders for Ivermectin. *Id*. at 161:6-16, 162:10-13.

23.     Consent to treatment cannot be bypassed by KCH employees via a computer system. Meaning, it has to be addressed. *Id*. at 166:21-24.

24.     However, there was a time that, in order to attempt to minimize contact and avoid COVID transmission, the consent for treatment was obtained verbally from a WCDC patient prior to any treatment. *Id*. at 167:10-22 – p. 168.

25.     There was never a study or experiment conducted on inmates at WCDC since KCH has had the contract with the County. *Id*. at 175:19-23.

26.     The Plaintiffs all signed consents for medical treatment via a consent form. **Exhibit S**, *Consent forms*.

### *KCH Paramedic Jolana Wilson*

27.     Jolana Wilson, is a paramedic that works for KCH and has held that position since December of 2019. **Exhibit C**, **Deposition of Jolana Wilson**, 7:25 – 8:1-5. She has never worked

full time for Dr. Karas' private clinic, but has worked there very few days, less than a week, when needed. *Id*. at 7:17-24.

28.     Ms. Wilson works nights for KCH. Her job duties include performing sick calls, overseeing intake for incoming inmates to WCDC, entering kiosk messages, and performing triage for sick calls to get a patient to the appropriate provider. *Id*. at 8:6-11.

29.     Upon being hired by KCH, Ms. Wilson received training. She shadowed other paramedics that did sick calls and inmate intakes. *Id*. 10:1-7.

30.     Wilson began working for KCH during the pandemic, and she described the work as hectic because so many people were coming down with COVID-19, and further described the time as fast-paced. *Id*. at 10:20-25.

31.     Wilson was also trained regarding the COVID-19 protocols that Dr. Karas had established for COVID-positive inmate patients. *Id*. at 11:7-16. She testified: "there was protocols that we followed, but – you know, swabbing them and then putting – just starting of protocols which included the medications, which we just hit a protocol button that was on there, and then that went to the review for the provider." *Id*. at 11:11-15.

32.     In her role for KCH, she would test inmates at WCDC for COVID-19. *Id*. at 15:19-25. This included the time at issue in this case, August of 2021. *Id*.

33.     Wilson also oversaw the intake process for inmates. She testified: "so an intake coordinator, they go out into the sally port. They – they ask the detainee if they've been sick recently, tested positive for COVID, ask them about the symptoms of COVID, and – or see if there's anything else wrong with them." *Id*. at 16:19-24.

34.     Wilson testified that inmates, at the time of intake, would sign medical consent forms for treatment by KCH. *Id*. at 17:15-21. Dr. Karas testified that the consent form signed

covers all prescriptions he or another provider at KCH may prescribe an inmate for a condition. **Exhibit D**, *excerpts of* **Deposition of Dr. Robert Karas**, 93:6-17.

35.     If an inmate tested positive for COVID-19, Wilson would start an already-established protocol of medicine for the inmate. *Id*. at 20:1-6. Upon pushing the button to begin a protocol, the information would be sent for review by a medical provider. *Id*.

36.     After reviewing notes, Ms. Wilson testified that on August 21, 2021, 29 detainees were booked into the WCDC. *Id*. at 26:18-22.

37.      Ms. Wilson testified that KCH's practice when she starts a med protocol is to advise the detainee/patient what the medicines the detainee is going to receive. *Id*. at 38:5-10. She made clear that such practice was KCH's practice. *Id*. So did Dr. Karas. **Exhibit D**, *excerpts of* **Deposition of Dr. Robert Karas**, 95:1-10.

38.     Ms. Wilson could also not dispute that in August of 2021, there were approximately 300 detainees that were positive for COVID-19, a situation she considered an emergency. *Id*. at 38:11-16.

39.     Ms. Wilson also testified that when a protocol is started and detainees are informed of the medicines they are going to receive, the detainees know that if they have any questions about any of the medications they can request a provider via the Kiosk to come and discuss such medicines with the detainee. *Id*. at 38:20-24.

40.     She further testified that detainee do, from time to time, request a provider to come and discuss a medicine with the detainee via the Kiosk. *Id*. at 38:25 – 39:1.

41.     Ms. Wilson further testified that when she previously worked in an ambulance as a paramedic, she did precisely what she did for KCH: she would start a protocol of medications before the patient could be seen by a licensed physician or APRN. *Id*. at 39:10-25.

6

42.     Ms. Wilson testified that WCDC jail staff, that were not KCH medical jail staff, were not involved in prescribing any medications to detainees. *Id*. at 40:1-4.

43.     Furthermore, she did not have discussions with non-medical jail staff about medications for detainees as such would present a HIPPA issue. *Id*. at 40:5-12.

44.     The medicine protocols were created during the pandemic by Dr. Karas. *Id*. at 41:10-12.

45.     And Ms. Wilson testified that as part of her training with KCH, that when starting protocol meds to advise an inmate/detainee what the medicines were that were started. *Id*. at 41:13-16.

46.     Finally, Ms. Wilson testified that she was not aware of any KCH employee not following the training to advise detainees what medicines they were going to be given once a medicine protocol was started. *Id*. at 41:17-18.

### ***KCH Med-passer Vladislava Alaytseva***

47.     Ms. Vladislava Alaytseva (who goes by Vlada) is employed for KCH at the WCDC. **Exhibit E**, 4:13-21, 7:9-11. She began working for KCH full time in 2016. *Id*. at 8:14-17. Her job title is "med passer." *Id*. at 8:21-23.

48.     Her responsibilities as a med passer including prepping the medicine cart, cleaning the meds, but mostly distributing the prescribed medications. *Id*. at 9:24-25, 10:3-4. She also held that title and had those responsibilities in December of 2020 and as of today. *Id*. at 9:5-10.

49.     She reports to the manager at KCH John Beckham and APRN Kelley Hinely. *Id*. at 9:12-17. In December of 2020, she recalls she reported to APRN Kelley Hinely. *Id*. at 9:18-22.

50.    "Pill call" is when jail officers call out into a particular cell block to advise inmates that KCH med passers are coming into the block with a med cart to distribute medications. *Id*. at 10:5-7.

51.    Med passers know which medications to give a detainee because KCH has a software system that has a list of medications for each patient. The patient's picture is on the med cart software system along with the list of medications for each patient. *Id*. at 11:6-14.

52.    If a detainee was quarantined because they were positive for COVID-19, med passers wore full protective gear, but still distributed medications for detainees in a quarantined block. *Id*. at 12:2-9.

53.    She testified that med passers would take vitals (pulse, oxygen, and usually blood pressure) of every detainee in a quarantined cell block. *Id*. at 12:17-25.

54.    Ms. Alaytseva testified that WCDC non-medical security officers were present for pill calls, for security purposes, and would observe pill distribution and check detainees' mouths after pills were distributed to ensure that a detainee swallowed the medicine. *Id*. at 13:21-23, 44:19-25. Officers do that to prevent what is known as "cheeking," which is where detainees hide pills in their mouths for purposes of misusing it later or selling the medication to another detainee. *Id*. at 45:1-5.

55.    She testified that the WCDC officers were present for medical staff's safety and that there was no normal discussion with WCDC officers during pill call. *Id*. at 14:20-24. Otherwise, KCH med passers do not have interactions with WCDC correctional staff as part of their employment. *Id*. at 23:21-25.

56.     She testified that she would confirm a patient/detainee's identity for purposes of distributing medicines and that she would not discuss the medicines for detainees with WCDC correction officers as such would constitute a violation of HIPPA. *Id*. at 15:2-6.

57.     Ms. Alaytseva testified that she received training as an employee of KCH as to how to conduct a pill call (or med pass). *Id*. at 15:7-10.

58.     Her training included instructing her to "always establish that it's the correct person. You know, they train you where the medication is located on the cart. Just there are some different places on the cart, like over-the-counter meds are in a certain place; prescription meds are in a certain place." *Id*. at 16:2-10.

59.     She further testified: "they trained me to make sure the name of the prescription – of the individual is on their prescription; that I'm giving the correct dosage. I'm marking each medication given – given and/or refused. Yeah, let me correct myself. You cannot mark a medication given and refused. So the individual – each individual medication has to be given or refused." *Id*. at 16:11-18.

60.     Crucially, in response to Plaintiffs' Counsel's question: "Do you remember any instruction as to whether you were to identify to the detainee what medication they  were receiving?" Ms. Alaytseva testified: "Yes. In any case, anytime a detainee or a patient is given any new medications, they are allowed to ask us what they are. I'm allowed to answer what they are. And as far as any further questions, as far as side effects or things like that, I ask them to refer those questions back to the kiosk so that as provider can answer those." *Id*. at 16:19-25 – 17:1-2.

61.     She testified: "And so, yes – to answer your question, yes, we were instructed to give the name of the medication to the detainees." *Id*. at 17:12-14.

62. Ms. Alaytseva's initial training by KCH occurred in 2016. However, she testified she received additional training after 2016 as a team, they received additional collective training or updates on their training. *Id*. at 18:12-18.

63. Specifically, she testified: "And then more recently, sometime in the COVID years – I cannot tell you the exact time – we were asked to fill out training forms where a supervisor was to sign off on our basic skills and observe us during med pass just to make sure we're doing everything correctly." *Id*. at 18:18-22.

64. In fact, Ms. Alaytseva testified she recalled a med passer working for KCH being disciplined for failure to adhere to these training standards of how to conduct pill call. *Id*. at 20:6-11.

65. Ms. Alaytseva has never had any conversation with former Sheriff Helder regarding pill call. *Id*. at 24:22-25.

66. Ms. Alaytseva testified she is familiar with Ivermectin. *Id*. at 25:1-2. She testified: "It's an FDA-approved antiparasitic that has alternative uses in lowering the viral load of COVID." *Id*. at 25:3-5. She was informed about Ivermectin by Dr. Karas prior to its use by KCH. *Id*. at 25:6-25 – 26:1-10, 26:18-21, 27:15-16. Dr. Karas informed KCH employees about Ivermectin in a group format. *Id*. Moreover, he informed the group that ivermectin had been shown to have antiviral properties off-label. *Id*. at 52:7-10.

67. Ms. Alaytseva was also trained by KCH to inform a detainee what medication they were distributed and what it was form. She testified: "And if it had an off-label use, and that's what they were taking it for, then I am to inform them that that's what they're taking it for and it's an off-label use." *Id*. at 32:25 – 33:1-6. This included Ivermectin. *Id*. at 57:12-18, 58:4-6.

68.     Ms. Alaytseva testified that the records of Plaintiff Fritch indicate that she provided him Ivermectin, 12 milligrams, on December 17, 2020. *Id*. at 39:22-25 – 40:1-3, 23-25 – 41:1-2.

69.     Ms. Alaytseva is aware she and other med passers have been accused in this lawsuit of tricking detainees into taking Ivermectin, and she emphatically testified: "It is not true." *Id*. at 45:15-21.

70.     She emphatically denied that KCH employees conducted experiments on detainees with Ivermectin. *Id*. at 46:22-25 – 47:1-5. She further testified she was aware what a placebo was and that she was unaware of any KCH employee being given a placebo as part of an alleged COVID experiment or study. *Id*. at 46:6-10.

71.     Ms. Alaytseva further testified she was unaware of any KCH employee engaging in experimentation of any kind regarding medication for COVID on inmates at the WCDC. *Id*. at 46:11-14.

72.     When asked if she had heard any credible information regarding such an alleged experiment, Ms. Alaytseva testified she did not and if she did, she would report such and that such is against her personal morals. She would report it to her supervisors but also jail staff. *Id*. at 46:15-23. When asked how she felt about being accused of tricking detainees at WCDC regarding Ivermectin, Ms. Alaytseva testified: "I feel disheartened about that having worked somewhere where I feel I have a purpose in helping that specific demographic of detainees. I – I'm only there for that long because it feels like a satisfying job both financially, with my time, and as well as how it makes me feel to help people, especially those that are detained." *Id*. at 54:24-25 – 55:1-9.

73.     When asked whether she was aware of any information that any detainee at WCDC were "lied to about ivermectin in any way, shape, or form as part of COVID treatment," Ms. Alaytseva said "No." *Id*. at 46:24-25 – 47:1-4.

74.    Every detainee that contracted COVID-19 in the WCDC and that was treated by KCH recovered. *Id*. at 51:3-12.

### ***The FDA and Ivermectin***

75.    Plaintiffs have cited a website put up by the Food and Drug Administration in their Amended Complaint at Doc. No. 34, p. 2, fn. 2. It seems, according to the FDA's own site, the website was not put on the Internet by the FDA until December 10, 2021, after all of Plaintiffs' allegations in this case occurred.[1] If it was earlier, that is not clear from the FDA's site.

76.    One main concern of the webpage discussed above is persons using "animal formulations of ivermectin" for the treatment of COVID-19 in humans. *Id*. Indeed, the FDA noted reports of patients requiring medical attention "after self-medicating with ivermectin ***intended for livestock***." *Id*. (emphasis added).

77.    Ivermectin is approved by the FDA for various uses to treat humans, including "infections caused by some parasitic worms and headlice and skin conditions like rosacea." *Id*.

78.    Importantly, on the very webpage from the FDA Plaintiffs cite in their Amended Complaint, the FDA states: "[c]urrently available data do not show ivermectin is effective against COVID-19. Clinical trials assessing ivermectin tablets for the prevention or treatment of COVID-19 in people are ongoing." *Id*.

79.    However, the same webpage states: "[i]f your healthcare provider writes you an ivermectin prescription, fill it through a legitimate source such as a pharmacy, and take it *exactly* as prescribed." *Id*. (emphasis in original). It further states: "[t]alk to your health care provider about

---

[1] http://www.fda.gov/consumer/consumer-updates (last visited July 20, 2023) (noting the date of the release online of the page http://www.fda.gov/consumer/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited July 20, 2023).

available COVID-19 vaccines and treatment options. Your provider can help determine the best option for you, based on your health history." *Id.*

80.     In fact, there was no Emergency Use Authorization (EUA) for medicines that were anti-virals or anti-inflammatories to treat COVID-19, that are still approved by the FDA for that purpose, before Paxlovid was approved December 22, 2021—also after the events in this lawsuit. www.fda.gov/drugs/emergency-preparedness-drugs/emergency-use-authorizations-drugs-and-non-vaccine-biological-products.

81.     As of this writing, it appears there are only 2 FDA-approved anti-viral medications for treatment of COVID-19, Paxlovid (first approved via EAU December 22, 2021) and Lagevrio (first approved via EAU December 23, 2021). Both of those approvals occurred after the events alleged in the First Amended Complaint.

82.     It is true that the FDA, ironically on August 21, 2021, sent out a "tweet," via Twitter attempting to humorously warn people not to take *animal grade* Ivermectin to treat COVID-19. https://www.fda.gov/media/160265/download.

83.     It is undisputed that Dr. Karas never prescribed *animal grade* Ivermectin to any of the Plaintiffs and it is undisputed that the Ivermectin they were offered by employees of KCH was not *animal grade*. Of course, Plaintiffs knew this. *See Exhibit C to Amended Complaint* Doc. No. 34-3.

84.     Rather, as the FDA advised in the same post Plaintiff's reference in the Amended Complaint, if a person's doctor prescribes Ivermectin, it should be filled through a legitimate source such as a pharmacy and taken exactly as prescribed. http://www.fda.gov/consumer/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last visited July 20, 2023).

85.     Dr. Karas obtained human grade Ivermectin for treatment of COVID-19 from a licensed pharmacy in Lowell, Arkansas. *Amended Complaint*, *Exhibit C*, Doc. No. 34-3. Plaintiffs' continued reference to Ivermectin as a "dewormer" or insinuations they were given animal grade Ivermectin is contradicted by their own Amended Complaint.

86.     Interestingly, but still irrelevant legally, is the link to "clinical trials" in the FDA webpage cited by Plaintiffs in the Amended Complaint. For instance, there's a 2020 University of Baghdad study that consisted of 16 participants, the results of which are unclear based on the layout of the pages. There are numerous other studies listed to determine the efficacy of Ivermectin as treatment for COVID-19—indeed, the "clinical trials" page shows there are *currently* as of this writing ongoing studies regarding Ivermectin as a treatment for COVID-19, there are studies the status of which the United States does not know, and there are studies that are still in the recruiting phase.  http://www.clinicaltrials.gov/search?term=ivermectin&cond=COVID-19.  One currently underway, according to the FDA and clinical trials website, is taking place in San Antonio, Florida. https://www.clinicaltrials.gov/study/NCT05045937?term=ivermectin&cond=COVID-19&rank=6.

But, as the webpage says: "[t]he U.S. government does not **review** or approve the safety and science of all studies listed on this website." Once again, the National Library of Medicine that maintains the site of which the FDA links in its December 10, 2021, webpage states: "[b]efore joining a study, **talk to your health care professional about possible risks and benefits**. http://www.clinicaltrials.gov/search?term=ivermectin&cond=COVID-19.

### *The Front Line COVID-19 Critical Care Alliance (FLCCC) Covid Treatment Recommendations*

87.     In March of 2020, "[t]he FLCCC Alliance was created by highly published, world-renowned physicians and scholars from around the world with the goal of developing life-saving

protocols    to    prevent    and    treat    COVID-19    at    all    states    of    illness."

http://www.covid19criticalcare.com

88.     The FLCCC, even before the events alleged in this case, developed protocols of medicines it recommended to treat COVID "…based on the best (and most recent) literature. covid19criticalcare.com/protocol/i-care-early-covid-treatment/; *See also* **Exhibit F**, ***Supp. Responses to Plaintiffs' RFP 12***, attached FLCCC documents.[2] *See also* **Exhibit G**, FLCCC I-Mask+ Protocols as of August 11, 2021. **Exhibit D**, 68:13-15. *See also* **Exhibit H**.

89.     Currently, it recommends as a "first line therapy," *inter alia*, Ivermectin at the dosage of .4 to .6 mg/kg, at one dose for at least 5 days or until symptoms resolve. *Id*. The FLCCC recommended dose is and has always been based on a patient's weight, and it recommends different Ivermectin amounts to treat COVID-19. *Id*. Dr. Karas explained the conversion from the mg/kg denomination to milligrams prescribed of Ivermectin. **Exhibit D**, 33:10-14.

90.     The FLCCC I-Mask+ Protocol states: "Ivermectin, an anti-parasitic medicine whose discovery won the Nobel Prize in 2015, has proven, highly potent, anti-viral and anti-inflammatory properties in laboratory studies. In the past 4 months, numerous, controlled clinical trials from multiple centers and countries worldwide are reporting consistent, large improvements in COVID-19 patient outcomes when treated with ivermectin." **Exhibit G**, FLCCC I-Mask+ Protocol as of August 11, 2021.

---

[2] To the extent Plaintiffs attempt to claim the FLCCC documents are hearsay, (1) Defendants request the Court take judicial notice of the adjudicative fact that FLCCC maintains a website that contains protocols for treating COVID-19 (Fed. R. Evid. 201), (2) alternatively, the documents are not admitted for the truth of the matter asserted, but rather the effect on the hearer (Dr. Karas) or the basis for action (his decision to include Ivermectin at FLCCC's recommended doses or lower as part of his protocol to treat COVID-19) (*see Curtis Lumber Co., Inc. v. Louisiana Pacific Corp.*, 618 F.3d 762, 783, n.18 (8th Cir. 2010) and (3) as a basis for Dr. Karas' expert opinions regarding why he utilized Ivermectin and its efficacy. Fed. R. Evid. 703.

91.     As of August 11, 2021, the FLCCC's treatment protocol recommended 0.4-0.6 mg/kg per dose and that such dose be taken daily for five days or until a patient has recovered. **Exhibit G**. Dr. Karas testified that his protocol for COVID treatment was developed by him, and, although the FLCCC later recommended higher doses, Dr. Karas's protocol remained within the original dosing recommendations of the FLCCC. That is, Dr. Karas did not change his protocol to increase Ivermectin doses to .4-.6 mg/kg as the FLCCC later recommended. **Exhibit D**, 34:23-25 – 35:1-8.

### *Dr. Robert Karas, M.D.*

92.     There was a time at WCDC when KCH had a COVID medical protocol. **Exhibit D**, 26:3-4. While in certain circumstances Ivermectin was used prior to the Summer of July of 2021, Dr. Karas believes the "protocol" started shortly after the Delta wave of the virus in the Summer of 2021. *Id*. at 27:2-5.

93.     As it pertains to this case and the actual claims made, the "protocol" was as follows: for a COVID positive patient, if a patient was under 150 pounds, the patient would receive one dose of 12 mg of Ivermectin daily for five days; if a COVID positive patient weighed greater than 150 pounds, the patient would receive one dose of 24 mg Ivermectin daily for five days. *Id*. at 27:6-16.

94.     When creating the COVID protocol, Dr. Karas as already stated studied the FLCCC information, but he also consulted with other providers, in and out of Fayetteville, Arkansas. *Id*. at 30:12-20. He explained in great detail numerous sources he relied upon in creating the protocol under oath. *Id*. at 36:2-25, 37:8-18.

95.     Regarding the COVID protocol for KCH, Nurse Hinely did most of the employee training, although the protocol was discussed between Dr. Karas and all employees. *Id*. at 85:2-8.

16

96.     As protocols evolved through the pandemic and ivermectin was used, Dr. Karas discussed ivermectin and how it works with employees of KCH. *Id*. at 96:18-25 – 97:1.

97.     Again Dr. Karas—completely contradicting Plaintiffs' insinuation in footnote 6 of the Amended Complaint—explained the differences between the use of Ivermectin in WCDC and his private clinic, noting that if higher doses were used, that occurred in his private clinic not the WCDC. *Id*. at 39:20-25 – 40:1-9. He explained that Ivermectin at lower doses appeared to work better at WCDC that in his private clinic, as he had in the Facebook post. *Id*. *see also* **exhibit 2 to Exhibit D**.

98.     He further explained that due to the proximity of inmates versus when a private clinic patient might come in (or wait to come in) to the private clinic, lower doses of Ivermectin at WCDC appeared to work better. *Id*. at 42:12-25. That is, he explained at WCDC, treatment often begins much sooner for a patient than at his private clinic—private clinic patients may wait days with symptoms to come in while inmate patients are confined in one location with a medical provider already present. Thus, if a person with symptoms is treated sooner, the outcome is likely better. Further, he and an APRN might choose different doses based on countless factors including how long a person has been sick, rick factors, gender, age, diabetic. *Id*. at 44:5-17.

99.     Dr. Karas did offer employees Ivermectin for prophylaxis, but never WCDC patients. *Id*. at 50:4-15.

100.    Dr. Karas recalls Sheriff Helder calling him about former Justice of the Peace Madison calling the Sheriff regarding the use of Ivermectin at WCDC for treatment. *Id*. at 57:13-20. That is when Dr. Karas advised Sheriff Helder that Ivermectin was used as part of treatment at WCDC for COVID positive patients. *Id*.

101.    If Dr. Karas prescribes a patient a medicine, he tells the patient what the medicine is. *Id*. at 95:5-10.

102.    **The Plaintiffs here (and all WCDC detainees) were never part of an experiment by Dr. Karas or KCH regarding Ivermectin. *Id*. at 150:17-25. Dr. Karas has never conducted experiments on the Plaintiffs or any WCDC patient regarding COVID and Ivermectin**. *Id*. at 167:8-12.

103.    Dr. Karas never administered any medicine to the Plaintiffs. *Id*. at 152:3-5.

104.    The FDA website Plaintiffs refer to in the Amended Complaint does not prohibit physicians from using Ivermectin to treat COVID-19. *Id*. at 154:2-9.

105.    The Lowell pharmacy from which KCH obtained Ivermectin is a "legitimate source" to obtain Ivermectin for use in humans. *Id*. at 155:22-25 – 156:1-4.

106.    Dr. Karas was never giving greater doses of Ivermectin to WCDC patients than to comparable patients at his private clinic. *Id*. at 155:19-25.

107.    After a complaint to the Arkansas State Medical Board, Dr. Karas provided the Board with the standard consent form all detainees, including forms for all Plaintiffs. *Id*. at 164.

108.    The Board took no adverse action against Dr. Karas. *Id*. at 164:1-3.

108.    Before allegations made against Dr. Karas in the news on or about August 25 or 26, 2021, no information had ever come to Dr. Karas' attention that anyone working for KCH allegedly failed to advise WCDC patients what medicines they were given, including Ivermectin. *Id*. at 166:15-24.

109.    The practice of KCH is to advise any patient what medicines they are given if they are sick. *Id*. at 166:25 – 167:1-3. And WCDC patients are free to refuse any medication offered. *Id*. at 167:6-7.

110.    No allegation has ever come to Dr. Karas' attention that anyone working for KCH at WCDC forced any of the Plaintiffs to take Ivermectin against their will. *Id*. at 167:13-17.

### ***Sheriff Tim Helder***

111.    Sheriff Helder was the Sheriff of Washington County in December of 2020 and August of 2021. He was Sheriff from 2005 until his retirement in 2022. **Exhibit M**, **Deposition of Sheriff Helder**, 8:2-7, 9:18-19.

112.    Washington County has a Detention Center and did in December of 2020 and August of 2021. *Id*. at 9:20-25, pp. 10-11 (explaining detention center and administrative offices).

113.    Sheriff Helder did not have interactions on a regular basis with WCDC detainees. *Id*. at 12:25 – 13:1-4.

114.    Before KCH began providing medical services to WCDC, WCDC (at the time Sheriff Helder started in 2005) had a nurse or possibly two who were full-time employees. There was a doctor that would periodically come to the WCDC. Then WCDC moved to a new facility and went from housing around 280-300 detainees up to over 700. *Id*. at 26:21-25.

115.    The County then contracted its medical care of detainees to a third-party known as Southern Health Partners out of Tennessee, who won the bid for the contract. *Id*. at 27:1-10.

116.    Southern Health Partners has existed since 1994 and provides medical, dental, and mental health services to inmates in county and city jails in 14 different states, including Arkansas. https://southernhealthpartners.com/why-choose-us/

117.    WCDC used Southern Health Partners for one year and Sheriff Helder testified the County or he "basically fired them at the end of the year." **Exhibit M**, 27:11-16.

118.    The County again bid out the medical services contract, and Dr. Karas approached the Sheriff about the possibility of bidding on the contract. *Id*. at 27:16-18. That intrigued the

Sheriff "because of the experience that [he'd] had with this national company that really had no investment in our community." *Id*. at 27:18-21.

119.    Sheriff Helder liked that Dr. Karas already had a local medical clinic and that his employees would be local employees. *Id*. at 28:1-7.

120.    Sheriff Helder testified that after KCH began doing medical for WCDC, lawsuits against the County/WCDC went to virtually none, and the Sheriff attributed that to the fact that KCH was serious about making sure medical staff was present at WCDC 24/7. *Id*. at 31:17-24.

121.    Sheriff Helder and his correctional staff relied on KCH to treat patients. *Id*. at 34:25 – 1-4. Sheriff Helder and his correctional staff's reliance on KCH included relying on KCH for medical treatment and for medications given to inmates. *Id*. at 35:2-4.

122.    Sheriff Helder does not have a personal Facebook page. *Id*. at 43:4-5. The Sheriff's Office has a Facebook page (*Id*. at 43:1-3) and the Sheriff had access to it. *Id*. at 43:12-15. But the Sheriff did not draft posts for the Sheriff's Office Facebook page; rather, the Sheriff's Public Information Officer generally did that. *Id*. at 43:16-20. On occasion, the Sheriff might post something on, for instance, Veteran's Day. *Id*. at 43:21-24.

123.    The Sheriff does not recall ever personally posting anything during COVID on the Sheriff's Office Facebook page and, again, didn't have a personal Facebook page. *Id*. at 43:19-25.

124.    Crucially, the Sheriff testified he didn't know if KCH, Karas Health Care, or Dr. Karas has or had a Facebook page because he's not a "Facebook guy." *Id*. at 75:3-11

125.    Plaintiffs' Counsel read a post from the Sheriff's Office Facebook page that stated: "[i]n light of this, out in-house medical team, Karas Correctional Health, has been developing protocol ***for screening and accepting detainees*** brought by the" WCDC. *Id*. at 46:22-25. The Sheriff did not recall the post. *Id*. at 46:20.

20

126.    The Sheriff understood the post to regard screening in the sally port for COVID before detainees were brought into WCDC. *Id*. at 47:9-25.

127.    Plaintiffs' Counsel also showed Sheriff Helder another Facebook post from the Sheriff's Office that said: "[w]e will continue to follow all CDC and ADH guidelines and adapt to them as they change, and we will look to new ways to keep our detainees and our employees safe." *Id*. at 80:89-11.

128.    The Sheriff understood that post to regard screening, not treatment of COVID, and the post says nothing regarding treatment of COVID. *Id*. at 80:8-24.

129.    A (now) former County Justice of the Peace Eva Madison called Sheriff Helder around August 25, 2021, and complained about Dr. Karas' use of Ivermectin in his COVID treatment protocol. *Id*. at 82:17-25. She asked the Sheriff why KCH was using Ivermectin to treat detainees allegedly without the detainees' consent. *Id*.

130.    Sheriff Helder first learned of Ivermectin when Madison called him to his recollection. *Id*. at 58:9-15. This was the first time Sheriff Helder was made aware Ivermectin was used as a COVID treatment by KCH. *Id*. at 65:10-17.

131.    Sheriff Helder immediately investigated the allegation by Madison. *Id*. at 79:16-20.

132.    Sheriff Helder spoke to APRN Kelley Hinely and Dr. Karas after the former County Justice of the Peace's allegations against Karas which she made to Sheriff Helder. *Id*. at 79:3-9, 65:18-22, 66:1-25.

133.    On the date Madison called the Sheriff to complain, the Sheriff had a face-to-face meeting with Nurse Hinely to ask whether Ivermectin was being used as a treatment for COVID in the WCDC and whether Nurse Hinely or KCH staff were using Ivermectin without the consent of the detainees. *Id*. at p. 66. Nurse Hinely confirmed Ivermectin was used as a COVID treatment

for detainees and when asked whether detainees were given Ivermectin without their consent, Nurse Hinely responded: "Absolutely not. We're following protocol." *Id*.

134.    He testified Nurse Hinely said: "they're [detainees] notified. Whether it's a cold or it's COVID or whatever it might be, we are notifying them as is policy." *Id*. at 67:1-2.

135.    Nurse Hinely advised that KCH's practice with any patient at WCDC was to go over the patient's diagnosis and then go over the treatment protocol and the medicines to be prescribed to the patient. *Id*. at 71:8-16.

136.    Nurse Hinely, in response to the Sheriff's question, did advise that KCH began doing consent forms verbally with detainees to avoid transmission of the virus via passing pens and paper. *Id*. at 67:4-9, 82:2-9.

137.    Either Dr. Karas or Nurse Hinely informed Sheriff Helder when they spoke after the former Justice of the Peace's complaint to the Sheriff, that there was research about the use of Ivermectin to treat COVID. *Id*. at 79:10-13.

138.    Sheriff Helder is not a physician. *Id*. at 79:14-15.

139.    He has never treated anyone for COVID. *Id*. at 80:25 – 81:1-2.

140.    When the Sheriff spoke to Nurse Hinely, he asked and she confirmed that inmates were completing consent to treatment forms. *Id*. at 82:2-9. The Sheriff was advised by Nurse Hinely there was a time that obtaining consents to treatment occurred verbally do avoid passing pens and paper, to avoid potential spread of COVID. *Id*.

141.    He followed up with Nurse Hinely and instructed her to go back to getting the consent forms signed physically by detainees. *Id*. at 70:15-25.

142.    After the conversations with Madison and Nurse Hinely, Sheriff Helder spoke with another physician colleague about Ivermectin. *Id*. at 68:12-25 – 69:1-14.

### *Plaintiff Thomas Fritch*

143.    Unlike his Co-Plaintiffs, Mr. Fritch concedes and even alleges that he was advised the medicines he was given included Ivermectin and that such was an approved medicine to treat parasites. *Fritch v. Karas*, Case No. 5:21-cv-05156-PKH-CDC, Doc. No. 1, p. 7. He alleged: "[t]hey then started giving me medication, Ivermectin vitamins and other stuff. When I asked what Ivermectin was for, I was told it is to treat parasites and it was their treatment for COVID-19." He then admits he has been falsely informed by someone other than the Defendants that Ivermectin is only for use in animals. *Id.*

144.    Mr. Fritch vacillates between alleging "I was never told it was voluntary nor was I given an option to take something else" and "I was scared from dieing (sic) from Covid-19 and felt I had no other choice." *Id.* at p. 7. Of course, he contradicted the claim he took it involuntarily at his deposition. **Exhibit I**, **Deposition of Thomas Fritch**, 40:14-25 – 41:1-3.

145.    Furthermore, he testified: "I already know that I don't have to take any kind of medication that they prescribe to me." *Id.* at 46:2-5. He admitted that he was able to refuse medication if he wanted to. *Id.* at 51:1-5.

146.    In testimony, he stated that when someone he referred to as "Nurse Jenna had handed me the vitamins, she had put a separate pill in my hand. And I had asked what that pill was, and she said it was for parasites." **Exhibit I**, 28:6-22. He then testified: "[a]nd I had asked what that pill was, and she said it was for parasites. And I had made the statement that, well, I don't have parasites. I have COVID. And she said that she didn't know, but that's what they were giving for COVID. And that was it. ***So I took it***." *Id.* at 28:18-22.

147.    Plaintiffs have alleged that Fritch was not told Ivermectin was unapproved by government regulators (indisputably false as shown herein) and "explicitly not recommended by

credible medical authorities for the treatment of COVID-19." Doc. No. 34, ¶ 23. Plaintiffs have provided no expert witnesses or any physician to provide evidence in this case and their reliance on the FDA's website in this instance *is* inadmissible hearsay that should be excluded if they are claiming the FDA are the alleged "credible medical authorities."

148.    He claimed he knew of no other medications given by medical professionals for COVID-19 in December of 2020 for COVID-19. *Id*. at 52:1-8.

149.    He claimed in the former case before consolidation that, after taking Ivermectin, he was "…so afraid of taking any medication offered by the Karas medical staff except my HIV medication…." *Fritch v. Karas*, Case No. 5:21-cv-05156-PKH-CDC, Doc. No. 1, p. 7.

150.    However, under oath he admitted he sought and received from Karas medical staff two COVID vaccinations in April and May of 2021 respectively. **Exhibit I**, 30:10-24 And he received continuous other treatment after May of 2021 from Karas medical staff. *Id*. at pp. 32-36.

151.    He further testified about his claim that he had dizziness and nausea from taking Ivermectin: "Again, I'm going to be honest about it, I don't know if that was from the ivermectin or from me having COVID …." *Id*. at 53:12-21. He is unaware of any lasting effects from taking ivermectin. *Id*. at 53:22-25 – 54:1-2.

152.    In In that case, which is now consolidated, he alleged medical malpractice (a claim that has been dropped in the Amended Complaint, Doc. No. 34). Now, with the other Plaintiffs' Counsel, he has attempted to elevate his claim to an alleged due process violation due to alleged lack of informed consent. He also appears to allege a battery claim as well. However, he was treated with Ivermectin in December of 2020, and filed his original suit in September of 2021. He did not allege a battery claim until July of 2022.

153.    Mr. Fritch did not file any grievance with WCDC or the County regarding being prescribed Ivermectin before he filed his lawsuit. *Id*. at 58:22-25 – 59:1-13.

154.    The Washington County Detention Center Handbook, Rules and Regulations for Detainees, permits detainees to file a grievance if they feel they have been subject to abuse or their civil rights have been violated, via the Kiosk. It states: "[a] grievance must be submitted within ten days from the time the event complained of occurred," and must include the date and approximate time of the event, name(s) of person(s) involved, name(s) of any witness(es), and pertinent details of the event. **Exhibit L**, WCDC Rules and Regs for Detainees, pp. 19-20. The Jail Administrator or their designee reviews all grievances, and if an inmate feels their grievance was improperly handled, the inmate may appeal to the Sergeant or Lieutenant. *Id*. at pp. 19-20.

### *Plaintiff Edrick Floreal-Wooten*

155.    Plaintiff Floreal-Wooten received a COVID vaccination at the WCDC. He requested the vaccine via the Kiosk at WCDC, and when medical personnel came to give him the vaccine he voluntarily accepted it. This occurred on September 1, 2021, after he claims he discovered he was prescribed Ivermectin for COVID in August of 2021. **Exhibit V**, **Deposition of Floreal-Wooten**, pp. 7 -8.

156.    Plaintiff Floreal-Wooten claims he saw a doctor in September of 2021 after getting out of WCDC, claiming stomach pains. That physician did not tell Mr. Floreal-Wooten he was having stomach pains allegedly due to taking Ivermectin. *Id*. at 16:9-17.

157.    Plaintiff Floreal-Wooten has not seen any other doctor for any alleged problems due to taking Ivermectin. *Id*. at 18:10-12.

158.    Plaintiff Floreal-Wooten has never met Dr. Karas and has never met Sheriff Helder. *Id*. at 20:22-25 – 21:1-2.

25

159.    Plaintiff Floreal-Wooten has had multiple incarcerations at WCDC, and cannot dispute that in 2018 was presented with and signed the patient consent form for medical treatment. He admitted the signature on the 2018 form was his signature. *Id*. at 22:2-22.

160.    Plaintiff Floreal-Wooten refused a COVID vaccine upon entry into WCDC in July of 2021 and knew how to refuse medications at WCDC that were offered to him. *Id*. at 27:1-24, p. 28. Indeed, he admitted that priori to refusing the COVID vaccine in July of 2021, he was informed what the vaccine was. *Id*. at 73:11-16.

161.    Plaintiff denied the allegation that, after getting COVID and being prescribed Ivermectin, anyone from KCH (or anyone), came to him and tried to get him to sign an alleged "retroactive consent form." *Id*. 29:14-19.

162.    When he contracted COVID in August of 2021 in the WCDC, Plaintiff Floreal-Wooten cannot recall who offered him medicines, but claims whomever it was said "take these pills, they're for COVID, to help you get over the symptoms." *Id*. at pp. 35-39. He claims he asked three times what each pill he was given was, was allegedly only told the pills were to help with COVID symptoms yet took them anyway despite not getting an answer to his question as to the identity of each pill. *Id*.

163.    Floreal-Wooten concedes he could have refused the medications offered to him for COVID in August of 2021. *Id*. at 39:15-16.

164.    Plaintiff knew how to use the kiosk. *Id*. at 40:4-14. "Sick call" is an option on the kiosk screen. *Id*. at 40:15-18.

165.    Plaintiff never sought treatment for any alleged symptoms due to taking Ivermectin before his release in September of 2021 from WCDC. *Id*. at 41:11-14.

166.    In November 2021, he reentered WCDC and thereafter made sick call requests about other medicines he had, thus, he knew how to make sick call requests about medicines. *Id*. at 42:6-25 – 43:1-3.

167.    Plaintiff has no information or document, nor can he testify, that Dr. Karas or Sheriff Helder allegedly told anyone to trick the Plaintiff into taking Ivermectin. *Id*. at 63:5-12.

### *Plaintiff Julio Gonzales*

168.    Mr. Gonzales testified that his claim in this case is that he was given Ivermectin without his knowledge or consent. **Exhibit J**, **Deposition of Julio Gonzales**, 5:6-11. That is the only claim he is alleging here. *Id*.

169.    He is under the misunderstanding that he was given medication meant only for animals, not human beings. *Id*. at 7:1-7; *but see Exhibit C to Amended Complaint*, Doc. No. 34-3. He claimed he and Mr. Floreal-Wooten looked up Ivermectin on Google with the search term "What's the definition of Ivermectin." *Id*. at 8:2-5.

170.    At his deposition, Undersigned performed a google search "What is ivermectin used for?" *Id*. at 9:3-5. The search yielded the following information that Mr. Gonzales read into the record: "Ivermectin is approved for human use to treat infections caused by some worms and head lice and skin conditions like …." *Id*. at 9:5-18.

171.    Mr. Gonzales has no information about how patients at Dr. Karas' private clinic were treated with ivermectin for COVID. *Id*. at 10:1-4, 42:3-7.

172.    Mr. Gonzales has no documents that suggest he was part of an experiment regarding the use of ivermectin. *Id*. at 10:5-7.

173.     Mr. Gonzales consented to a COVID vaccine by employees of KCH while in the WCDC. *Id*. at 10:8-13. He is unaware if he had any symptoms from receiving the vaccine in May of 2021. *Id*. at 11:7-9.

174.     Mr. Gonzales knows how to use the Kiosk system at the WCDC. There are tabs on a digital screen for different things an inmate can do at the Kiosk. *Id*. at 11:10-20. That includes a button for "sick call." *Id*. at 11:21-22.

175.     Mr. Gonzales knew how to make sick calls on the Kiosk. *Id*. at 11:23-25.

176.     Mr. Gonzales was previously incarcerated in the WCDC in June of 2016 and signed a consent for treatment at that time by KCH. *Id*. at 12:25 – 13:1-4. Plaintiff Gonzales, despite admitting the validity of his signature on the consent form, stated he didn't recall ever seeing that form. *Id*. at 13:11-16. However, he testified he might have seen it previously, he simply did not recall. *Id*. at 14:22-25 – 15:1.

177.     He cannot testify that when he was booked into WCDC in 2021 he was not presented with and signed another medical consent form, he just claims he cannot recall. *Id*. at 15:6-12.

178.     Mr. Gonzales has never met Dr. Robert Karas and has never met former Sheriff Tim Helder. *Id*. at 15:13-16.

179.     Mr. Gonzales testified that it was a "Dr. Karas staff member" that gave him Ivermectin in August of 2021 after he contracted COVID, but it was not Dr. Karas and it was not former Sheriff Helder … because he testified he never met either of them. *Id*. at 17:17-21.

180.     He claims that whoever offered him Ivermectin claimed that the medicines he was offered were vitamins. *Id*. at 16:1-5. Defendants deny the same, but it is assumed *arguendo* as the

28

standard of review requires and is not a relevant fact as argued in the brief in support of the motion for summary judgment.

181.    Mr. Gonzales was never present for any conversation between Dr. Karas and any KCH staff member who gave him Ivermectin where Dr. Karas allegedly told the med-passer what to inform Gonzales or what not to inform him. *Id*. at 19:2-16.

182.    Medical staff saw Mr. Gonzales and other patients every day while the positive patients were quarantined, *i.e.*, 14 days. **Exhibit J**, 22:1-13.

183.    Mr. Gonzales was administered Ivermectin for 4 days after testing positive for COVID. *Id*. at 22:14-20.

184.    After allegedly learning about Ivermectin as part of the medicine protocols, Mr. Gonzales was no longer offered Ivermectin, but was offered vitamins after that time and took them. *Id*. at 30:4-11, 38:2-6. He claims that after August 25, 2021, when he refused Ivermectin anymore, whoever offered him medicine thereafter took the Ivermectin pill out of the medicines that were offered in front of Mr. Gonzales. *Id*. at 31:1-7. And he knew that the pill that was taken out of the medicines offered was Ivermectin. *Id*.

185.    He has never advised any medical professional after whatever he advised KCH staff in August of 2021, that he had "any symptoms because of taking ivermectin." *Id*. at 41:7-10.

186.    Mr. Gonzales has never sought or received any treatment by any medical personnel for any alleged symptoms related to taking ivermectin. *Id*. at 41:11-13.

187.    While Mr. Gonzales testified that KCH staff allegedly came by after August 25, 2021, to obtain his signature on some form, when asked what the form said or if it had any information about Ivermectin on the form Mr. Gonzales did not know. *Id*. at 50:18-25 – 51:1-17, 52:9-11.

29

### *Plaintiff Jeremiah Little*

188.    Plaintiff Little has never met Dr. Karas or former Sheriff Helder. **Exhibit T**, **Deposition of Jeremiah Little**, 7:1-5

189.    Little recognized and recalls he has signed the patient consent form upon being incarcerated in WCDC. *Id*. at p. 10.

190.    After having COVID and claiming he had not been told about Ivermectin, Little still sought and received treatment from KCH. *Id*. at 15:10-17.

191.    At WCDC, Little knew how to use the kiosk, and knew how to use the med call to seek medical attention on the kiosk. *Id*. at 16:16-24.

192.    Little knew how to ask KCH employees about medicine and knew he could refuse medicine at WCDC and has refused medicine at WCDC. *Id*. at 17:13-25 – 18:1-4.

193.    Little has never had any medical treatment for any alleged problems associated with taking Ivermectin. *Id*. at 22:6-8, 31:7-11.

194.    After getting COVID in August of 2021 at WCDC, no one from KCH brought Mr. Little a "retroactive" consent form to sign. *Id*. at 28:4-7.

### *Plaintiff Dayman Blackburn*

195.    Plaintiff Blackburn is familiar with the Kiosk at WCDC and understands that is where he could make medical requests. **Exhibit U**, 9:1-4

196.    Mr. Blackburn cannot dispute anything Dr. Karas did or did not advise med-passers at the WCDC regarding the protocol medicines for COVID-19. *Id*. at 35:19-25 – 36:1.

197.    Blackburn has never talked to Dr. Karas and Dr. Karas has never given Mr. Blackburn medicine. *Id*. at 36:2-5.

198.    No doctor or medical professional has advised Mr. Blackburn that any symptoms he has had occurred from taking Ivermectin. *Id*. at 36:25 – 37:1-4.

199.    Mr. Blackburn has never met Sheriff Helder and Sheriff Helder has never given Mr. Blackburn medicine. *Id*. at 38:8-13.

200.    No WCDC jail staff ever gave Mr. Blackburn medicine. *Id*. at 48:1-4.

### *The Ivermectin offered and administered to Plaintiffs*

201.    Plaintiff Floreal-Wooten was offered and accepted 12 mg of Ivermectin on 8/22/21, 8/23/21, and 8/24/21 for Covid treatment. He refused Ivermectin on 8/25/21. **Exhibit Q**, *Karas and KCH Response to RFA No. 9*. *See also* **Exhibit A**, **Deposition of Kelley Hinely**, pp. 70-120.

202.    Plaintiff Blackburn was offered and accepted one daily dose of 24 mg of Ivermectin after testing positive for COVID-19 on 8/22/21, 8/23/21, 8/24/21, and 8/25/21. (note: Undersigned mis-typed the dates in the response to Plaintiffs' RFA 14). **Exhibit Q**, *Karas and KCH Response to RFA No. 14. See also* **Exhibit A** pp. 70-120.

203.    Plaintiff Fritch was offered and accepted a single daily dose of Ivermectin for COVID-19 on December 16, 2020, December 17, and December 18, 2020. **Exhibit Q**, *Karas and KCH Response to RFA No. 18*; *but see* **Exhibit A**, p. 107.

204.    Plaintiff Little was offered and accepted 24 mg of Ivermectin for COVID treatment on 8/22/21, 8/23/21, and 8/24/21. He refused any offer of Ivermectin on 8/25/21. **Exhibit Q**, *Karas and KCH Response to RFA No. 23. See also* **Exhibit A** pp. 70-120.

205.    Plaintiff Gonzales was offered and accepted Ivermectin for COVID treatment on 8/22/21, 8/23/21, and 8/24/21. Plaintiff Gonzales refused any offer of Ivermectin on 8/25/21. **Exhibit Q**, *Karas and KCH Response to RFA No. 28. See also* **Exhibit A** pp. 70-120.

206.    Dr. Karas and KCH utilized the recommended dosages of Ivermectin by the FLCCC or less than that recommended by the FLCCC as to each Plaintiff in this case for COVID treatment. **Exhibit Q**, *Karas and KCH Response to RFA No. 39*; *See* **Exhibit G, FLCCC I-Mask+ Protocol as of August 2021**.

207.    As he testified, the dosages of Ivermectin for his COVID protocol which Dr. Karas testified was implemented in the Summer of 2021, included a prescription for Ivermectin for five days, and it depended on a patient's weight, which was the criterion used by the FLCCC in its recommended protocols. **Exhibit D**, **Deposition of Dr. Karas**, 27:11-13. The protocol created by Dr. Karas included Ivermectin at 12 milligrams for patients under 150 pounds and 24 milligrams for patients above 150 pounds. *Id*.

208.    While the FLCCC later (after August 2021) recommended higher doses of Ivermectin for COVID treatment (*see* **Exhibit K**, **FLCCC I-Care Early Covid Treatment as of 1/26/23**), Dr. Karas and KCH retained FLCCC's early recommendations of lower doses. Indeed, as **Exhibit K** shows, as of January of 2023, the FLCCC, for instance, recommends a patient weighing between 131 and 150 pounds receive 27 to 40.5 mg of Ivermectin daily for five days to treat COVID. **Exhibit K**.

### *The Use of Ivermectin to treat COVID-19.*

209.    Plaintiffs reference a single sentence from a Facebook post by Dr. Karas in December of 2021. There was much more stated in the post and the single sentence Plaintiffs' reference has been misconstrued and taken out of context to allege a non-existent medical experiment. The important part of the Facebook post reads:

> With it taking a while to hit Arkansas my coworkers and myself were able to read up a bunch on COVID treatment options others were using all over the county and all over the world for that matter.

...

Knowing what a disaster it would be for Covid to break out at Washington County Detention Center, the states 2nd Larges jail, we started giving all inmates upon intake a prophylactic vitamin regimen of Vitamin D 3 5,000 I.U., Vitamin C 2,00mg, and Zinc 100 mg daily for 14 days.

While other Arkansas correctional facilities were devasted by early Covid correctional facilities were devastated by early Covid outbreaks and the Marshal project showed Arkansas had the second-highest prison infection rate in the U.S., we were able to keep Covid out of the detention center until November 2020.

During the initial northwest Arkansas outbreak associated heavily with the local poultry plants, we had approximately 30-40 of our clinic patients that ended up in the hospital with 6 of them passing away.

We made contacts with almost all of the local hospitals and followed most of our patients daily by talking with their physician's or nursing staff.

It was shortly after this [After he and his family contracted Covid, Dr. Karas reviewed studies from England] "[i]t was shortly after this that studies in England starting showing steroids were effective in lowering mortality in treating Covid during the second pathoimmunological/immune dysregulation phase of the disease.

Information and studies continued to come out on repurposed medicines that might be beneficial in treating Covid. After further reading and discussion with a physician colleague of mine that was the most well read and up to date on Covid pathology, I decided to first try ivermectin on about a 50-year-old Hispanic gentleman that came into the Lowell clinic with a high fever and low oxygen saturation.

During this time a patient had told me about the Frontline Covid Critical Care website. I then watched some educational YouTube videos with a Dr. Paul Marik M.D., a medical school professor and one of the founders of the FLCCC. At that time, their protocols were similar to … ours with the main difference being we were using montelukast and they were using an over-the-counter medication called quercetin.

I discussed this with my pharmacist John Lykins, the owner of the Lowell pharmacy. He said that quercetin and montelukast have similar properties that probably help with the cytokine storm that takes place in Covid.

I actually emailed Dr. Marik in regards to this and he had heard of Montelukast use in Covid treatment but hadn't had a chance to review the literature on it. Since then, I have had many correspondences back and forth with Dr. Marik and other members of the FLCCC.

During the large general public wave in Arkansas, I came down with my second infection Christmas morning. With this second infection I was much more symptomatic like influenza and bedridden for two days but my symptoms resolved quicker like the 10 days of fatigue associated with my initial infection. For my Christmas infection on top of our regular treatment meds and two days of IV vitamin C, I also took ivermectin on day 2 and day 3.

...

The start of 2021 there was more literature coming out on the use of ivermectin for prevention of primary infection. At this time, we started offering it to our patients.

...

We followed FLCCC dosing guidelines for this with the 0.2 mg/kg on Day 1, then Day 3, and then every two weeks. **Following the FLCCC's lead we changed our guidelines to weekly around April and have kept them here**. <u>**The FLCCC now recommends twice weekly dosing for prophylaxis but after discussion with Dr. Marik and a search of the literature we kept our regimen at weekly Ivermectin dosing for prevention**</u>.

...

Hence our early treatment of Covid with what I considered a high dose Vitamin D.

...

Then in February 2021 good studies came out of Spain and India where they using very high dose Vitamin D resulting in significantly decreased mortality in hospitalized patients.

...

Then in late June we started to get a few cases of Covid as Southwest Missouri was getting hit very hard with the new Delta variant.

. . .

It was the next week in the clinic where we started to see multiple really sick patients. The Delta variant was hitting harder and faster and making men age 30-55 extremely sick. After seeing this along with talking to some of my local physician colleagues working in the hospitals, we starting implementing our current MID-D3 100,000 and C-Caleb (some of the C-Caleb guidelines come from direct discussion with Dr. Marik and the current inpatient FLCCC guidelines as patients that would normally be admitted to the hospital were now being sent home with

home 02) regimens more uniformly with all our clinic patients and implemented the current jail protocol. The slight difference between jail protocol and the clinic regimen being that we kept the .2-.4 mg/kg Ivermectin dosing on our jail patients. **We did this as none of our initial 20-40 cases of Delta at the jail where we have men primarily in high-risk category for Delta, showed any clinic signs of severe disease. Our jail patients are treated extremely early in the disease and we monitor their pulse and oxygenation twice daily for 10 days. Our jail protocols have worked perfectly including approximately 170 cases of the Delta variant**.

. . .

Unfortunately, this new Delta variant has been **hard on our clinic patients**. **We have averaged about 200 patients a day for the last 6-8 weeks and I have worked every days since July 12 and been physically at the office all but 2 of those days**.

*See Exhibit 2* **to Exhibit D**, which is the entire Facebook post at issue.

210.     As the Court can see, (a) nowhere does Dr. Karas even suggest he has two sets of test groups; rather he was prescribing doses of Ivermectin, per guidance from FLCCC at that time, including his direct discussions with Dr. Marik and other medical colleagues. And (b) nowhere can any reasonable inference be drawn that Dr. Karas was providing *greater* levels of Ivermectin to inmate patients than recommended by the FLCCC or than he prescribed to clinic patients. Rather, the only reasonable construction of the entirety of the post demonstrates his *clinic* patients were experiencing worse symptoms and, thus, he used less dosages of Ivermectin per inmate patient (which was still consistent with FLCCC guidelines) than he did for clinic patients. His testimony confirms this. **Exhibit D**, 31:17-25 – 32:1-20 (explaining, as his Facebook post did, that dosages of Ivermectin as recommended by the FLCCC did *not* go up for WCDC patients with COVID because the WCDC patients "never got very sick.").

211.     Dr. Karas clearly testified that at WCDC, he used lower doses of Ivermectin. **Exhibit D**, 39:16-24. The Facebook post, again, explains why. Comparing inmates in a confined setting who were not getting as sick as free world patients is comparing apples to oranges.

212.     After being asked again, Dr. Karas gave the same answer: "we didn't use as high of doses of ivermectin at the jail because our inmates did fine with the – with the doses we were using. Our – our inmates got treated really early in the – prevention – or during the – they would get tested anything they had symptoms, and so we would – we would get medicine in them right away. And that differs than the outside in the clinic where we might not see a patient until they come to us with COVID pneumonia already; so therefore, we might have to use different doses or different treatments on them (private clinic patients) if they're further along and they're sicker. **Exhibit D**, 42:9-21.

213.     Dr. Karas (or anyone working for KCH) never conducted an Ivermectin experiment with the Plaintiffs or any WCDC patient who had COVID. **Exhibit D**, 167:8-12.

214.     Dr. Karas (or anyone working for KCH) never conducted an Ivermectin experiment, ever, involving two sets of test subjects, one being COVID patients at the WCDC and one being patients at Dr. Karas' private clinic. *Id*.

215.     Dr. Karas did research (the term "research" should be regarded as lawyers do, as in legal research; it is not tantamount to a study or experiment) possible treatments for COVID positive patients to save their lives as all physicians in this Nation and World should have after the pandemic began. That "research," was not an experiment, and to the extent the term "research" in the Amended Complaint has been construed to allege an experiment, any such allegation is false and not supported by any evidence from the Plaintiffs. **Exhibit D**, 30:3-20 (explaining that researching treatments meant he and others he worked with were "reading on it" and that "most people were reading up on COVID all the time, most physicians, or they should have been.").

216.     Dr. Karas reviewed studies compiled by the Front Line COVID-19 Critical Care Alliance (FLCCC), which was founded by a group of leading critical care specialists in March

2020 dedicated to helping prevent and treat COVID. covid19criticalcare.com/about-the-flccc/;
**Exhibit D**, **Deposition of Dr. Karas**, 38:17-24. Again, to the extent Plaintiffs attempt to assert the
webpage and its information is hearsay, see footnote 2 herein.

217.    While later in the pandemic, the FLCCC revised its recommendations to
recommend higher doses of Ivermectin per a patient's weight, KCH and Dr. Karas stayed at the
earlier FLCCC guidelines which recommended lower doses of Ivermectin because as he testified:
"[w]e were having good success at our jail with our treatment, and the dosing that we had, that's
what we stayed on. We didn't follow the FLCC's exactly. I independently came up with our
protocols, and they – and, you know, they are very similar to the FLCCC's website protocols, but
not exact." **Exhibit D**, 34:23-25 – 35:1-4.

218.    His reading included reviewing information from a Facebook group of physicians
as well as FLCCC, called U.S.A. Physicians COVID-19, which shared a lot of information from
other physicians and physician assistants, nurse practitioners throughout the United States, and the
World, regarding what other medical professionals were using and having success with in treating
COVID. **Exhibit D**, 36:11-20. Additionally, Dr. Karas reviewed additional scientific articles. *Id*.
at 36:21-22.

219.    Dr. Karas also relied, in creating COVID protocols, on his 20 years of medical
experience treating viruses as well as discussions with physician colleagues. **Exhibit D**, p. 37.

220.    In a supplemental response to Plaintiffs' Request for Production of Documents No.
12, which requested "…documents …or other information that You received or created Related to
your use of Ivermectin on patients as a COVID-19 treatment or preventative," Dr. Karas and KCH
responded that KCH did not conduct reports, experiments, or studies etc. related to Ivermectin use
at the detention center. The following website was used as a reference: Home – FLCCC | Front

Line COVID-19 Critical Care Alliance (covid19criticalcare.com) which includes several supporting documents and analyses. **Exhibit F**, *Supplemental Response to Plaintiffs' RFP No. 12*, and *attached* FLCCC study summary and I-Mask+ Prevention & Early Outpatient Treatment Protocol for COVID-19 as of October 12, 2021**.**

221.    Dr. Karas never administered Ivermectin or any protocol medicine to any Plaintiff, and never lied to any Plaintiff about what the medicine was. **Exhibit D**, 168:17-23.

222.    On August 1, 2021, an employee of KCH emailed APRN Kelley Hinely, with an attached list of medications to replace an older list that was on the med-carts used by the med-passers. The revised list of medications was immediately used on the med-cart. **Exhibit N**, *Email of August 1, 2021, to Kelley Hinely with attached revised med list for med-cart*.

223.    As to Ivermectin, the revised list—which again was placed on the med-cart for med-passers to refer to when describing medicines offered to patients at WCDC—states "Anti-parasite (Used here to inhibit replication of COVID virus)" **Exhibit N**, *August 1, 2021, email to APRN Kelley Hinely with attached revised med list for med cart*.

### ***Lack of Foreseeability***

224.    There is no evidence that Dr. Karas, Kelley Hinely, or KCH expected or anticipated any employee would fail follow KCH"s practices to inform patients at WCDC what medicines they were offered for COVID-19. **Exhibit B**, *Affidavit of APRN Kelley Hinely*, ¶¶ 12-13. As she testified, the established practice is that med-passers follow their training which includes advising inmate patients what medicines they are being offered. *Id*.

225.    Before the allegations made by Plaintiffs to news media on August 25, 2021, no one and no information had ever indicated to Dr. Karas that any employee of KCH lied to the Plaintiffs and told them that Ivermectin was actually a vitamin. **Exhibit D**, 168:24-25 – 169:1-2.

226.    Before Plaintiffs' allegations to the news media in late August, no one and no information ever indicated to Dr. Karas that any employee of KCH told allegedly told an inmate who had COVID that the Ivermectin offered to the inmate was an antibiotic. **Exhibit D**, 169:3-13.

227.    It has never come to Dr. Karas' attention that any person working or who worked for KCH told any of the Plaintiffs that the Ivermectin offered to treat their COVID was actually a steroid. **Exhibit D**, 169:14-18.

228.    Since the news media allegations by Plaintiffs in late August of 2021, Dr. Karas has never obtained any information that any employee of KCH tricked or misled the Plaintiffs (or any inmate patient) into taking ivermectin by claiming it was vitamins, antibiotics, or steroids. **Exhibit D**, 170:2-7. Because that allegation of a trick or misrepresentation made by Plaintiffs and others to the news, never happened. **Exhibit D**, 170:9-10.

229.    A med-passer named Janna Hinely did testify via deposition and her testimony was confusing at best. She testified she can inform detainee patients what a medicine is they are offered, but then testified she does not advise what the medicines offered to inmate patients are prescribed for. **Exhibit B**, *Affidavit of APRN Kelley Hinely*, ¶ 14. That is against the clear practices of KCH and Dr. Karas to inform inmate patients what their medicines are. Nevertheless, based on Jolana Wilson's testimony (and Fritch's concession) Defendants' deny they were not told the medicines they were receiving included Ivermectin.

230.    Immediately upon reviewing Janna Hinely's deposition transcript received this Summer (2023), Nurse Hinely scheduled retraining of all KCH staff which occurred during two sessions: one on July 14, 2023, and one on July 20, 2023. **Exhibit B**, *Affidavit of Kelley Hinely*. Janna Hinely attended the July 20, 2023, training and was tested afterward as all KCH employees were. Kelley Hinely testified: "[o]ne of the specific items we trained on during the retraining was

that, even if a medical provider or paramedic has earlier advised a detainee what medicines have been ordered, it is still the established practice of KCH for medicine passers to follow up on that information during pill call and ensure that the detainee is the correct detainee and to advise the detainee of the medicines they have been offered." **Exhibit B**, *Affidavit of APRN Kelley Hinely*, ¶ 16.

### *The Nature of KCH*

231.    KCH had and has a contract with Washington County to provide healthcare to inmates at WCDC. **Exhibit D**, 170:18-24.

232.    Dr. Karas testified that KCH lost money running KCH at least once in the last couple of years. **Exhibit D**, 171:6-9.

233.    Tracey Moore, who works for Dr. Karas, but has personal knowledge of the profits and losses of KCH, provided an affidavit (which was given to Plaintiffs' Counsel during discovery) with a report obtained and verified by Tracey Moore from the accountant for KCH, detailing profits and losses for KCH from the first year KCH contracted with Washington County in 2016 through the year 2022. **Exhibit P**, *Affidavit of Tracey Moore and attached exhibit*.

234.    The information provided demonstrates some years KCH operated with varying degrees of profits but operated at a lost in 2020 in the amount of $66,561.61, operated at a profit of $37.86 in the year 2021, operated at a loss of $306,196.32 in the year 2022. The overall amount made from 2016 to 2022 by KCH for its work at WCDC is $270,777.34. **Exhibit P**, *Affidavit of Tracey Moore and attached exhibit*.

235.    As alleged, Dr. Karas is the sole owner and president of KCH, and is its medical director. **Exhibit D**, 9:5-25 – 10:1-4. He personally provides some care at WCDC, and his presence there increased during the pandemic. *Id*. at 10:5-23.

236.     KCH has no insurance that would cover any claim in this case or a case like it from any entity. Thus, any damages would be paid directly by KCH. **Exhibit D**, **Deposition of Robert Karas**: 173:2-6.

237.     In 2016, the first year KCH existed and won the contract for healthcare at WCDC, Dr. Karas testified he believed KCH had probably less than 10 employees. **Exhibit D**, 18:10-13. As of his deposition, he believed KCH employed approximately 20-25 people. *Id*. at 13:12-16.

TIM HELDER, et al,
*Defendants*

Michael A. Mosley
Michael A. Mosley
Ark. Bar No. 2002099
JASON OWENS LAW FIRM, P.A.
**Mailing Address:** P.O. Box 850 Conway,
Arkansas 72033-0850
**Physical Address:** 1312 Oak Street
Conway, Arkansas 72034
Telephone (501) 764-4334
Telefax (501) 764-9173
email: mosley@jowenslawfirm.com