# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

EDRICK FLOREAL-WOOTEN;
JEREMIAH LITTLE; JULIO GONZALES;
DAYMAN BLACKBURN; THOMAS FRITCH                    **PLAINTIFFS**

**v.**                          **Case No. 5:22-cv-05011-TLB-CDC**

TIM HELDER, SHERIFF OF WASHINGTON COUNTY,
ARKANSAS, in his individual capacity;
KARAS CORRECTIONAL HEALTH, P.L.L.C.;
DR. ROBERT KARAS, M.D., in his individual capacity          **DEFENDANTS**

## PLAINTIFFS' RESPONSE TO KARAS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION[1]

This case is about the violation of Plaintiffs' constitutional right to bodily integrity and informed consent. Karas Defendants, however, muck up the record with a myriad of irrelevant issues and supposed factoids, such as the dubious science regarding the efficacy of the Karas Covid Protocol,[2] or whether the FDA made statements in 2023 regarding the rights of physicians to prescribe medicines. (*See* Doc. 87). All of that is immaterial noise. The central issue before the Court is as follows: do the undisputed material facts establish that Karas Defendants obtained Plaintiffs' informed consent such that Karas Defendants are entitled to judgment as a matter of law? The answer to that question is no, and therefore, Karas Defendants' Motion for Summary Judgment (the "Motion") should be denied. The salient facts for this central issue are as follows:

- Dr. Karas was the architect of his own COVID-19 protocol, the Karas Covid Protocol, which included a cocktail of various prescription and non-prescription drugs. The Karas

---

[1] At the outset, Plaintiffs withdraw their claims against Tim Helder, Sheriff of Washington County, Arkansas. Because Dr. Karas and Karas Correction Health P.L.L.C. (KCH) are the only remaining defendants, Plaintiffs will refer to them collectively here as "Karas Defendants."

[2] Defendants' briefing refers to the treatment regimen each jail patient received as "Dr. Karas's protocol." (Doc. 76, p. 15). Plaintiffs will refer to the treatment regimen as the "Karas Covid Protocol."

Covid Protocol was constantly "evolving," as Dr. Karas actively evaluated the efficacy of his preferred treatment.

- As part of his research into the efficacy of COVID-19 treatments, Dr. Karas collected data from his jail patients who were put on the Karas Covid Protocol. Dr. Karas shared the data with various third parties affiliated and unaffiliated with Washington County Detention Center (WCDC) to facilitate research endeavors into COVID-19 treatments.[3]

- In mid-2021, in response to the Delta wave, Dr. Karas actively encouraged individuals to use the Karas Covid Protocol as a COVID-19 treatment and preventative.

- When detainees tested positive for COVID-19 in August 2021, a KCH paramedic (who notably lacked any prescriptive authority) ordered the Karas Covid Protocol for detainees by pushing a button that "automatically" ordered the drug cocktail.

- Each Plaintiff received ivermectin as part of the Karas Covid Protocol. Plaintiffs received no information about the Karas Covid Protocol, and they did not know that they were being given ivermectin to treat COVID-19.[4] When they asked about the drug, they were told it was mere vitamins, steroids, and antibiotics. Had they been so informed, they would have refused to take it.

- Notably, the decision to prescribe the Karas Covid Protocol for Plaintiffs Floreal-Wooten, Blackburn, Little, and Gonzales was not reviewed by a Kelley Hinely, KCH's nurse practitioner, until *after* they had taken multiple rounds of the drug cocktail.

- Crucially, Karas Defendants have not offered a single piece of evidence regarding the specific information provided to Plaintiffs before or during the administration of the Karas Covid Procotol.

Taken together, accepted as true, and evaluated in the light most favorable to Plaintiffs, these salient facts demonstrate that Karas Defendants had no intention of obtaining Plaintiffs' informed consent in violation of Plaintiffs' constitutional rights. Karas Defendants' motion should be denied, and the case should proceed to trial, or, in the alternative, summary judgment should be entered in favor of Plaintiffs.[5]

---

[3] According to Karas Defendants, this was not done as part of an "experiment." Rather, they contend that this was merely part of a process where "[i]nformation was gathered for the purpose of determining what medical protocols were working." Plaintiffs' SSUMF ¶ 16.

[4] Plaintiff Fritch was told one of the drugs was "for parasites" but there is no evidence that he was given any information beyond that. Plaintiffs' SSUMF ¶ 24.

[5] Fed. R. Civ. P. 56(f)(1) authorizes the Court to enter summary judgment for the nonmoving party.

## **LEGAL STANDARD**

Summary judgment is appropriate only when the moving party demonstrates (1) that there is no genuine dispute as to any material fact; and (2) that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must accept all the nonmoving party's properly supported assertions as true and resolve all reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court is concerned only with "material" facts, or facts that "might affect the outcome of the suit under the governing law."[6] *Id.* at 248. Importantly, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, the ultimate question at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## **ARGUMENT**

I.      **Plaintiffs' Substantive Due Process Claims.**

As this Court has already explained, Plaintiffs may succeed on their substantive due process claims in two ways. (Doc. 51, p. 7). First, Plaintiffs may demonstrate that government action infringed on certain of their fundamental liberty interests, namely "matters relating to marriage, family, procreation, and the right of bodily integrity." *Albright v. Oliver*, 510 U.S. 266,

---

[6] Countless of the "facts" Karas Defendants include in their Separate Statement of Undisputed Material Facts are simply not "material." Indeed, Defendants' briefing does not cite to a single alleged or real material fact. Instead, Karas Defendants simply "incorporate by reference" their entire Separate Statement of Undisputed Material Facts via Fed. R. Civ. P. 10(c) as if the facts were "repeated word for word." (Doc. 76, p. 1 n.1). Notably, such adds an additional 41 pages to Karas Defendants' briefing, resulting in a 73-page brief. Karas Defendants also, in an attempt to not "offend the Court," incorporated their arguments from their Rule 12(c) motion related to statutory immunity, which adds another five pages. This far exceeds the 35 pages allowed by the Court, which Plaintiffs aver is procedurally improper. (Doc. 74). And it is certainly improper (perhaps dispositively so) for the party moving for summary judgment to put the onus upon the Court to decide what purported factual assertions support their respective arguments.

272 (1994). Second, Plaintiffs may show Defendants' actions "shock the conscience." *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–53 (1998); *Mendoza v. U.S. ICE*, 849 F.3d 408, 420–21 (8th Cir. 2017); *Moran v. Clarke*, 296 F.3d 638, 645, 647 (8th Cir. 2002). The Supreme Court has clearly established that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 278 (1990). With respect to prisoners in an institutional setting, the Supreme Court's view is that there is "no doubt" they "possess[] a significant liberty interest in avoiding the unwanted administration of . . . drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper,* 494 U.S. 210, 221–22 (1990). Sister circuits have inferred from this firmly rooted right a corollary right: "the right to receive information required to decide whether to refuse treatment." *See Knight v. Grossman*, 942 F.3d 336, 342 (7th Cir. 2019); *Pabon v. Wright*, 459 F.3d 241, 249–50 (2d Cir. 2006); *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002); *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990).

Defendants are not entitled to summary judgment on Plaintiffs' substantive due process claim for at least two reasons. *First*, and most importantly, Defendants have failed to offer any evidence about what information *these Plaintiffs* were given about ivermectin or the Karas Covid Protocol. Each Plaintiff testified that he was not given any information about the drug or treatment regimen.[7] In Plaintiffs' view, this omission in Karas Defendants' case means they cannot offer any evidence to dispute Plaintiffs' testimony, and so the Court should enter summary judgment in favor of Plaintiffs. *Second*, even if the Court finds a dispute as to whether Plaintiffs gave informed

---

[7] Plaintiffs acknowledge that Fritch testified that he was told that the drug was for "parasites." **Plaintiffs' SSUMF ¶ 24**. When he questioned the drug, the med-passer told him "I don't know. It's what we're [giving] for COVID." *Id.* Plaintiff Fritch was never told what ivermectin was, what it was for, or anything related to its potential side effects, including any risks stemming from his status as an HIV-positive patient. *Id.* Plaintiffs contend that telling Plaintiff Fritch the drug is "for parasites" is tantamount to telling him nothing at all in violation of his constitutional rights.

consent, that dispute is genuine because a reasonable jury could find from the totality of the evidence that Karas Defendants prescribed and administered the Karas Covid Protocol—including ivermectin—without Plaintiffs' knowledge or informed consent. Plaintiffs will handle each of these points in turn.

### A.    Karas Defendants have offered no evidence that these Plaintiffs were informed about the Karas Covid Protocol or ivermectin.

As the moving party, Karas Defendants shoulder the burden of demonstrating that they are entitled to judgment as a matter of law based on material, undisputed facts. To be entitled to summary judgment, Karas Defendants must point to undisputed evidence that shows they obtained informed consent from Plaintiffs prior to administering the Karas Covid Protocol. In short, Karas Defendants have failed to carry that burden.

It is undisputed that each Plaintiff was prescribed and given the Karas Covid Protocol as a purported treatment for COVID-19. **Plaintiffs' SSUMF ¶¶ 31-32**. And all parties agree that ivermectin was given to each Plaintiff as part of the Karas Covid Protocol. **Plaintiffs' SSUMF ¶¶ 18-19**. The ultimate question for the purposes of this motion then, is whether Plaintiffs *knew* they were being prescribed and given ivermectin, and whether they *consented* to it. Since this case began, these Plaintiffs have not wavered from the position that they were never told anything about the Karas Covid Protocol or ivermectin. **Plaintiffs' SSUMF ¶ 20**. They were never given any information about the side effects of taking ivermectin. **Plaintiffs' SSUMF ¶ 21**. In fact, when certain Plaintiffs asked about the drug cocktail, they were told that the drugs are vitamins, antibiotics, and/or steroids and will help them feel better.[8] **Plaintiffs' SSUMF ¶ 23**. Incredibly, it was not until this case that certain Plaintiffs became aware that they had been given other

---

[8] Karas Defendants concede that the Court must accept this fact as true for purposes of the present motion, but Karas Defendants contend it is somehow "not relevant." (Doc. 77, ¶ 180).

medicines as a part of the Karas Covid Protocol. **Plaintiffs' SSUMF ¶ 22**. Put simply, there is ample evidence in the record to support Plaintiffs' position that they did not know they were being prescribed ivermectin and did not consent to it.[9] These properly supported facts, accepted as true, are likely sufficient on their own to defeat the instant motion.

However, the evidence Karas Defendants offer in support of their motion is insufficient to dispute Plaintiffs' facts. Specifically, Karas Defendants never attempt to demonstrate what these Plaintiffs (besides Plaintiff Fritch) were told when they were being prescribed or given the Karas Covid Protocol. They offer no testimony or evidence that any agent of Karas Defendants discussed the Karas Covid Protocol with these Plaintiffs. **Plaintiffs' SSUMF ¶¶ 48-49**. And they offer no testimony or evidence that any agent of Karas Defendants told Plaintiffs they were being prescribed or given ivermectin. **Plaintiffs' SSUMF ¶¶ 48-49**. In other words, they never directly refute Plaintiffs' testimony and evidence that Karas Defendants failed to tell them anything about the Karas Covid Protocol. Not only should that end the analysis, but it should also warrant entry of summary judgment in favor of Plaintiffs on this claim.

That said, Karas Defendants do summarily claim throughout their motion that they "deny Plaintiffs were not informed of Ivermectin as part of their treatment." (*See e.g.*, Doc. 76, p. 28). But rather than relying on specific testimony or evidence about what these Plaintiffs were told, they appear to rely on three purported "undisputed" facts. But they all miss the mark. *First,* Karas Defendants contend that Dr. Karas cannot be responsible for failing to obtain Plaintiffs' informed consent because he never physically administered the drugs to these Plaintiffs. (Doc. 76, p. 16).

---

[9] Karas Defendants also allege that Plaintiff Fritch did not file a grievance and therefore did not exhaust his administrative remedies. Karas Defendants rely on Mr. Fritch's testimony in support of this argument. Plaintiff Fritch's testimony on this subject is confusing at best, and, in fact, he admitted that he did not recall when he asked for additional information and to see another medical provider. **Plaintiffs' SSUMF ¶ 24**. That aside, Plaintiff Fritch could not have filed a grievance within 10 days of being given ivermectin because he did not find out about it until nearly eight months later.

As discussed in more detail in Section C, *infra*, it is undisputed that Dr. Karas was solely responsible for the creation of the Karas Covid Protocol. The Plaintiffs were all treated with the Karas Covid Protocol, and Dr. Karas was the final decision-maker for the patients he treated. Because these patients were treated with the Karas Covid Protocol, Dr. Karas was responsible.

*Second*, Karas Defendants claim it was "the practice of KCH to inform patients at WCDC of the medicines they are offered for treatment." (Doc. 76, p. 28). As explained below in Sections B(2)-(3), *infra*, this purported practice is far from undisputed. To whatever extent there was a theoretical practice of KCH with respect to medicines, which Plaintiffs dispute, that purported practice was both out of sync with constitutional requirements and, in any case, indisputably not followed here.

*Third,* Karas Defendants note that each Plaintiff was "never forced to take any medicine" and that they knew how to refuse unwanted medical treatment. (Doc. 76, p. 16). To the extent Karas Defendants suggest that the onus was on Plaintiffs to refuse medical treatment for which they have not been made reasonably aware, such does not pass the constitutional smell test.[10] The burden here was on Karas Defendants to ensure informed consent. Karas Defendants failed to obtain it, in violation of a clear constitutional right.

Notably, even if Karas Defendants' evidence puts the issue of informed consent into dispute (which it does not), such dispute is genuine because a reasonable jury, when presented with the entire story of the creation, evolution, implementation, and administration of the Karas Covid Protocol, could find that Plaintiffs did not (and frankly, could not) give informed consent.

---

[10] Karas Defendants appear to be arguing that because each Plaintiff knew how to refuse unwanted medical treatment, and had done so in the past, they must have consented to the Karas Covid Protocol. The opposite is more likely true. That Plaintiffs knew how to refuse unwanted medical treatment bolsters their testimony that they did not know what they were being prescribed or given. Had they known, they would have refused it, consistent with their past practice of refusing treatments. This is a fact issue for the jury to evaluate and decide.

**B.    A reasonable jury could find that prescribing and administering the Karas Covid Protocol was the only treatment plan Karas Defendants intended to use to treat Plaintiffs for COVID-19, and that informing Plaintiffs of this treatment plan—and obtaining their consent for it—was never a concern for Karas Defendants.**

Viewing only Karas Defendants' actions at the moment Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn were given ivermectin in August 2021 does not tell the full story. The creation, evolution, and implementation of the treatment protocol these Plaintiffs were given happened well before August 2021. As detailed below, the entire story paints a very clear picture: Dr. Karas was the mastermind behind a protocol of his own devise, and it was his intention that every jail patient who tested positive for COVID-19 be prescribed the Karas Covid Protocol— regardless of whether they knew it or wanted it.

### 1.    The creation and evolution of the Karas Covid Protocol.

Dr. Karas was the architect of the Karas Covid Protocol used at the WCDC. **Plaintiffs' SSUMF ¶ 1**. But Dr. Karas did not create this "protocol" overnight—it "changed often" and "evolved." **Plaintiffs' SSUMF ¶ 2**. And although Dr. Karas would routinely refer to the FLCCC (Front Line COVID-19 Critical Care Alliance) website when discussing his protocol, the Karas Covid Protocol did *not* in fact mirror the FLCCC's guidance or protocol. **Plaintiffs' SSUMF ¶ 1**. Rather, the evolution of the Karas Covid Protocol was a direct result of Dr. Karas's own personal experience and research. **Plaintiffs' SSUMF ¶ 3**. These research methods included reading online articles, browsing various Facebook pages, following "a guy named John Campbell, Dr. John Campbell, on YouTube," and communicating with friends and colleagues. **Plaintiffs' SSUMF ¶ 4**. Dr. Karas also found "a nice cartoon thing" from Dr. Marik that explained "the pathophysiology of COVID in the lungs" to be "helpful." *Id.* Indeed, Dr. Karas was always fine-tuning his protocol, and he eventually employed differing protocols at his private clinic and jail practice. **Plaintiffs' SSUMF ¶ 5**. Dr. Karas was so confident in his research that he openly and actively encouraged

people to use the Karas Covid Protocol as a treatment for COVID-19, but particularly ivermectin. **Plaintiffs' SSUMF ¶ 17**.

Notably, as part of his research, Dr. Karas collected and documented outcomes and treatment regimens for his jail patients who were being treated for COVID-19. **Plaintiffs' SSUMF ¶ 7**. Dr. Karas directed Kelley Hinely to make this spreadsheet, which was eventually called Dr. Karas's "Detention Center Data." **Plaintiffs' SSUMF ¶ 12**. According to Dr. Karas, he was "gathering data and trying to help other providers start to research . . . options that could be used to treat COVID, [or] repurpose drugs." **Plaintiffs' SSUMF ¶¶ 14, 16**. To do so, Dr. Karas required that the spreadsheet contain "[a]ll our treatment protocol, whatever we used, . . . IV vitamin C, vitamin pack, melatonin, Deadron, prednisone, Pepcid, steroid inhaler, albuterol inhaler, Tylenol, ivermectin, D3 . . . , all our treatment medicines." **Plaintiffs' SSUMF ¶ 13**. In April 2021, at the behest of one of his Facebook colleagues, Dr. Karas circulated his "Detention Center Data" to an individual at McGill University in Quebec, Canada, who was researching the efficacy of one of the drugs in the Karas Covid Protocol drug cocktail: montelukast. **Plaintiffs' SSUMF ¶ 8**. Dr. Karas sent both his jail data and his private clinic data to this individual. **Plaintiffs' SSUMF ¶¶ 8-9**. Dr. Karas believed his "jail data" would "help support" this individual at the university in her research because it showed "whatever we did worked . . . it's fairly statistically significant." **Plaintiffs' SSUMF ¶ 11**.[11] Dr. Karas also sent this data to other third parties, including individuals associated and unassociated with WCDC. **Plaintiffs' SSUMF ¶ 15**. Dr. Karas chose not to tell the more than 300 jail patients that their information would be shared with third parties. **Plaintiffs' SSUMF ¶¶ 7, 10**.

---

[11] In an email to Kelley Hinely, a KCH employee, and Tracey Moore, an employee at Dr. Karas's private clinic, Dr. Karas referred to the individual at McGill University as a "researcher lady." **Plaintiffs' SSUMF ¶ 12**.

## 2. Karas Defendants "automatically" ordered the Karas Covid Protocol to treat jail patients for COVID-19.

It is well-documented that in August 2021, certain jail patients, including Plaintiffs, were placed on the Karas Covid Protocol after they tested positive for COVID-19, and that they were given ivermectin as part and parcel of the same. What is not well known, however, is the process that Karas Defendants followed when prescribing and administering the Karas Covid Protocol to Plaintiffs, and likely for good reason.

Prior to April 2021, Karas Defendants' treatment plan for COVID-19 was *not* a one-size-fits-all-approach—treatment decisions were made on a patient-by-patient basis. **Plaintiffs' SSUMF ¶ 26**. But on or around April 2021, in response to the Delta wave, Karas Defendants' treatment plan changed. When the Delta wave hit, Dr. Karas "used all the meds on everybody" and eventually "*gave everybody the . . . same meds*." **Plaintiffs' SSUMF ¶ 28** (emphasis added). Notably, during and after the Delta wave, Dr. Karas was actively urging people to use the Karas Covid Protocol as a treatment for COVID-19. **Plaintiffs' SSUMF ¶ 27**. And by August 2021, it appears that that was the *only* treatment plan for jail patients that tested positive for COVID-19 at WCDC.

In August 2021, the process for prescribing the Karas Covid Protocol started—and basically ended—with Jolana Wilson. Ms. Wilson, a paramedic at KCH, tested each Plaintiff for COVID-19 on August 21, 2021. **Plaintiffs' SSUMF ¶ 32**.[12] After each Plaintiff tested positive, Ms. Wilson hit a "button" that "automatically" ordered the prescription set for the Karas Covid Protocol.[13] **Plaintiffs' SSUMF ¶ 38**. This "prescription set" was built by Dr. Karas and/or Kelley Hinely based on the then-existing protocol regimen. **Plaintiffs' SSUMF ¶ 29**. In other words, the

---

[12] Plaintiff Fritch was not tested or treated for COVID-19 in August 2021.
[13] This was a different process than was followed at Dr. Karas's private clinic, where providers apparently wrote actual prescriptions for each drug in the Karas Covid Protocol. **Plaintiffs' SSUMF ¶ 39.**

prescription set included whatever assortment of medications Dr. Karas included in the Karas Covid Protocol at that time. **Plaintiffs' SSUMF ¶ 30**. According to Kelley Hinely, "when [Ms. Wilson] pushed that button, it put these orders . . . automatically into the system for the med passers." **Plaintiffs' SSUMF ¶ 38**. Ms. Wilson would also put the patient "on review" for the provider (either Kelley Hinely or Dr. Karas) to review. **Plaintiffs' SSUMF ¶ 40**. This part of the process was no doubt necessary because Ms. Wilson, a paramedic, does not have prescriptive authority and *cannot prescribe prescription drugs*. **Plaintiffs' SSUMF ¶ 33**. According to Karas Defendants, Ms. Wilson was not actually prescribing drugs, she was merely ordering a pre-set prescription set on behalf of medical providers, like Dr. Karas. **Plaintiffs' SSUMF ¶ 34**. Indeed, Ms. Wilson made clear that she could not actually treat patients because doing so is "not in [her] scope" of practice. **Plaintiffs' SSUMF ¶ 41**.

Next, after Ms. Wilson "ordered" the prescription set, the drugs were automatically sent to the med passers to distribute the pills to the jail patients at the appropriate time.[14] However, as previewed above, when Ms. Wilson ordered the prescriptions, she also put the patient "on review" for a provider to review. **Plaintiffs' SSUMF ¶ 40**. Notably, no provider reviewed Ms. Wilson's actions until *after* the Plaintiffs had already taken sometimes multiple rounds of the drug cocktail. **Plaintiffs' SSUMF ¶ 42**. By way of example, Ms. Wilson "ordered" the Karas Covid Protocol for Plaintiff Floreal-Wooten at 11:40 pm on August 21, 2021. **Plaintiffs' SSUMF ¶ 43**. Plaintiff Floreal-Wooten was given the drug cocktail at approximately 8:30 am and 7:15 pm on August 22, 2021, and approximately 7:30 am on August 23, 2021. **Plaintiffs' SSUMF ¶ 44**. But Kelley Hinely reviewed and "approved" the protocol afterwards, at 8:32 am on August 23, 2021. **Plaintiffs' SSUMF ¶¶ 45, 46**. This exact same sequence of events occurred with respect to Plaintiffs

---

[14] Plaintiffs will discuss KCH's purported practice and procedures when administering medication to jail patients in the next section.

Blackburn, Gonzales, and Little—each were prescribed and given the Karas Covid Protocol *before* Kelley Hinely reviewed and approved the decision. **Plaintiffs' SSUMF ¶ 47**. Dr. Karas did not "see any concern" with this sequence of events because Ms. Wilson prescribed the Karas Covid Protocol on Friday night, and Ms. Hinely "probably wasn't in the jail on that Saturday or Sunday." **Plaintiffs' SSUMF ¶ 104**.[15]

This reckless approach to "approving" the decision to prescribe the Karas Covid Protocol after the fact suggests that obtaining informed consent on the frontend from these patients was not of primary concern (if it was of any concern at all). Ms. Wilson was not able to prescribe drugs to patients, nor could she treat them. She had one job: when a patient tested positive for COVID-19, she hit the button. This process ensured the implementation of the Karas Covid Protocol to detainees like Plaintiffs, but it likewise ensured that consent never factored into the equation.

### 3. KCH did not have a clear and uniform practice for when med-passers administered the Karas Covid Protocol.

The above section concerned KCH's careless process when prescribing the Karas Covid Protocol to Plaintiffs. This section concerns KCH's similarly sloppy practice when med-passers distributed the drugs to them. At the outset, Karas Defendants claim—relying primarily on the testimony of KCH's paramedic, Ms. Wilson—that it was KCH's practice "to inform patients at WCDC of the medicines they are offered for treatment." (Doc. 76, p. 26). But a review of the record as a whole—particularly testimony from other KCH employees—casts serious doubt on this purported practice.

---

[15] This is a curious statement because Dr. Karas's contract with WCDC requires 24-hour coverage. **Plaintiffs' SSUMF ¶ 94**.

Plaintiffs acknowledge that Ms. Wilson testified that it is KCH's practice to tell the jail patient what medicines she was ordering.[16] **Plaintiffs' SSUMF ¶ 59**. But Janna Hinely and Vladislava Alaytseva, two KCH med-passers who administered parts of the Karas Covid Protocol to the Plaintiffs, offered further testimony about KCH's practice. **Plaintiffs' SSUMF ¶¶ 52-60**. According to Vladislava Alaytseva, she is allowed to tell a patient what drug he or she is getting *if the patient asks*. **Plaintiffs' SSUMF ¶ 55**. Similarly, Janna Hinely—the KCH med passer who first administered ivermectin to Plaintiffs—testified that she "can always tell them what they're taking" *if the patient asks*, but she "can't tell them exactly what it is for or anything like that." **Plaintiffs' SSUMF ¶¶ 59, 61, 65-66**. Janna Hinely appeared concerned that giving too much information was outside her scope of practice because she is "not licensed" and "not a nurse." **Plaintiffs' SSUMF ¶ 63**. Indeed, Janna Hinely "really doesn't say anything to jail patients unless they ask her a question." **Plaintiffs' SSUMF ¶ 61**. This testimony is concerning in its own right, but it is particularly alarming because Janna Hinely is the individual who ultimately gave ivermectin to these Plaintiffs.

At worst, this testimony raises a genuine dispute of material fact regarding Karas Defendants' representation about its established practice when prescribing and administering drugs. And if these testimonial disputes are not enough, Kelley Hinely's supplemental testimony should put the issue to bed. As the Court is aware, Kelley Hinely submitted with Defendants' Motion for Summary Judgment a declaration supplementing her testimony about training.[17]

---

[16] Ms. Wilson merely responded "yes" when asked if it was her practice when she starts protocol meds to tell the patient what medicines they are going to get. **Plaintiffs' SSUMF ¶ 50**. But Ms. Wilson never testified as to what she told any Plaintiff regarding the drugs she was ordering. In fact, she does not remember her interactions with any of them. **Plaintiffs' SSUMF ¶ 51**.This testimony from Ms. Wilson cannot put KCH practice out of dispute.

[17] The mere fact that Kelley Hinely submitted supplemental testimony on this topic is notable. At her deposition, when asked about training related to conducting a pill call when KCH implemented the Karas Covid Protocol, Hinley deflected and said, "that would be a question specifically for those individuals

According to Kelley Hinely, after reviewing Janna Hinely's testimony, Kelley Hinely was so concerned that she "immediately" retrained all KCH staff, including all paramedics and med passers. **Plaintiffs' SSUMF ¶¶ 66-68**. This is of course notable because a core dispute in this case focuses on what, if anything, Janna Hinely said when she administered ivermectin to Plaintiffs (and whether she misled them). **Plaintiffs' SSUMF ¶ 69**. If Kelley Hinely thought her own employees' testimony about KCH practices required immediate retraining, a reasonable jury could most certainly conclude that these practices, whatever they were, were not up to constitutional snuff.[18]

Finally, it is worth mentioning that Karas Defendants' Statement of Facts completely ignores Janna Hinely's testimony. Defendants' Statement of Facts notably includes a section for *every* KCH employee who testified *except* for Ms. Janna Hinely. Defendants briefly mention Janna Hinley's testimony near the end, but they characterize her testimony as "confusing at best." (Doc. 77, ¶ 229). To be clear, Ms. Hinley's testimony was not confusing. Rather, it simply confirms that what Plaintiffs are alleging in this case actually happened—they were never told they were being given ivermectin and were misled. Defendants simply ignore this testimony and attempt to mitigate it with training that occurred mere months ago. But that training does not and cannot undo the constitutional violations that occurred in this case.

---

because I don't remember." **Plaintiffs' SSUMF ¶ 85**. Kelley Hinely, however, was apparently dissatisfied with answers from "those individuals" and felt compelled (after her memory apparently returned) to submit supplemental testimony about KCH's training and practices.

[18] The absence of a clear policy or practice is also notable because Karas Defendants stopped using written consent to treatment forms. **Plaintiffs' SSUMF ¶ 77**. If Karas Defendants stopped using written consent forms, then there should have been a clear, articulable practice about obtaining informed consent.

4.  **Karas Defendants' apparent position that Plaintiffs consented to the Karas Covid Protocol vis-à-vis the general consent form they signed at intake is nonsensical.**

It is undisputed that jail patients typically sign a general consent to treatment form when they enter WCDC. **Plaintiffs' SSUMF ¶ 70**. Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn all signed general consent to treatment forms. **Plaintiffs' SSUMF ¶ 71**. It appears Plaintiff Fritch did not sign a written consent form. Karas Defendants appear to take the position that these general consent to treatment forms operate as a carte blanche consent to being treated with the Karas Covid Protocol. In Dr. Karas's view, once a patient signs this consent form at intake, the patient has effectively consented to receiving all prescriptions.[19] **Plaintiffs' SSUMF ¶ 72**. This includes prescriptions for potentially dangerous medications. **Plaintiffs' SSUMF ¶ 73**. At best, this is nonsensical. At worst, it displays a highly problematic outlook when it comes to the protection of detainees' constitutional rights. Indeed, Kelley Hinley, Dr. Karas's nurse practitioner at KCH, disagreed with this carte blanche approach, noting that a patient retains the right to make decisions as to his or her treatment even after he or she signs the general consent to treatment form. **Plaintiffs' SSUMF ¶¶ 75-76**.

Finally, it is telling that Karas Defendants implemented a specific and detailed consent form for COVID-19 treatment on August 26, 2021.[20] **Plaintiffs' SSUMF ¶ 80**. This detailed consent form was different from the general consent to treatment form Plaintiffs signed at intake.

---

[19] This likely tells the Court all it needs to know regarding how Dr. Karas views informed consent with respect to the Karas Covid Protocol. If you signed the general consent to treatment form at intake, you have consented to it. And this view that the general consent to treatment form operates as complete consent to any prescription is a potential unconstitutional policy or custom that is sufficient to attribute liability to Karas Correctional Health P.L.L.C.

[20] Dr. Karas and his staff created the "new consent form" after "it hit the news." **Plaintiffs' SSUMF ¶ 83**. It is well-documented that this matter became public following a Washington County Finance and Budget Committee meeting that occurred on August 25, 2021. **Plaintiffs' Response to Defendants' SSUMF ¶ 129**.

Plaintiffs' **SSUMF ¶ 81**. Specifically, the new detailed consent for COVID-19 treatment form identifies each medication in the Karas Covid Protocol and the possible side effects. **Plaintiffs' SSUMF ¶ 84**. Importantly, as of August 26, 2021, a patient could not be prescribed the Karas Covid Protocol until he or she signed the specific, detailed consent form for COVID-19 treatment. **Plaintiffs' SSUMF ¶ 82**. If the Karas Defendants believed that a more detailed consent was necessary—and in fact, made the execution of such a consent form a condition precedent to prescribing the Karas Covid Protocol—a reasonable jury could certainly come to the same conclusion.

### 5. Summary.

In short, accepting these facts as true and resolving all inferences in favor of Plaintiffs, a reasonable jury could find that Karas Defendants violated Plaintiffs' right to bodily integrity. Dr. Karas created and developed the Karas Covid Protocol and invested significantly into researching its efficacy. Dr. Karas actively encouraged others to use the Karas Covid Protocol to treat and prevent COVID-19, and he had a clear motive (his research) to treat as many patients as possible with the Karas Covid Protocol. And Karas Defendants' implementation of the Karas Covid Protocol confirms this was the plan—when Plaintiffs tested positive for COVID-19 in August 2021, a paramedic who notably could not prescribe drugs or actually treat patients merely hit a button to order the Karas Covid Protocol. There was no alternative and there was no choice—it was a system designed with one purpose: to prescribe Dr. Karas's Karas Covid Protocol to anybody who tested positive for COVID-19.

### C. Dr. Karas was directly involved in the underlying constitutional deprivation.

Karas Defendants claim that Dr. Karas cannot be liable for Plaintiffs' constitutional deprivations as a matter of law because he never personally treated any of the Plaintiffs. (Doc. 76, p. 14 ("Indeed, it is undisputed that Dr. Karas . . . had no personal involvement in treating any of

16

the Plaintiffs.")).[21] Karas Defendants made the same argument in their Rule 12 motion, an argument this Court called "surprising." (Doc. 51, p. 6 n.4). This argument is even more surprising now, as it appears directly at odds with their other arguments and positions.

Specifically, Karas Defendants' argument goes like this: Dr. Karas is not responsible for the provision of ivermectin without informed consent because he only prescribed Plaintiffs his Karas Covid Protocol. Jolana Wilson, the KCH paramedic without prescriptive authority who ordered their pills, is likewise not responsible for the provision of ivermectin without informed consent because she only ordered Dr. Karas' Covid Protocol on behalf of Dr. Karas.[22] **Plaintiffs' SSUMF ¶¶ 31-36.** So where does the buck stop? Karas Defendants cannot be allowed to argue on one hand that Jolana Wilson is merely acting on behalf of Dr. Karas in ordering a pre-approved protocol set and, on the other, aver that Dr. Karas was not involved in patient treatment because Jolana Wilson was his foot soldier.

In short, it is simply untenable to suggest that Dr. Karas was not involved in the underlying constitutional violation in this case. Dr. Karas created the protocol, he was actively modifying the protocol and researching the efficacy of COVID-19 treatments, and he was solely responsible for the Karas Covid Protocol prescription set that was given to Plaintiffs. He may not have directly interacted with Plaintiffs, but he was certainly the brains behind their treatment. And as relevant here, resolving all reasonable inferences in favor of Plaintiffs, a reasonable jury could find that Dr. Karas was directly involved in Plaintiffs' treatment and underlying constitutional violation.

---

[21] Karas Defendants weave this line of thinking into many of their arguments. (*See e.g.*, Doc. 76, p. 20 ("In this case, the undisputed facts demonstrate that Dr. Karas . . . did not mislead Plaintiffs about Ivermectin, and if any employee of KCH did, it was against the clear practice of KCH and Dr. Karas.").

[22] Plaintiffs remain skeptical that this is all Ms. Wilson was doing. Regardless, Ms. Wilson ordered pre-set prescription drugs without provider oversight.

### D.     KCH

One final note as to KCH. Plaintiffs' due process claims against KCH should also proceed to trial for at least three reasons. *First*, as described above, interpreting the general consent to treatment as a consent to any prescription—but notably the Karas Covid Protocol—in perpetuity is fundamentally incompatible with the Due Process Clause. *Second*, there was an inadequate and unclear policy about what information (if any) patients were to be given about the medical treatments they were being prescribed or given. Karas Defendants point to an alleged "practice" of notifying a patient of the name of the drug or drugs each patient is being given, but such was inconsistent amongst the Karas Defendants witnesses, with two individuals testifying it was KCH's practice to give this information *only after* the patient inquired. **Plaintiffs' SSUMF ¶¶ 55, 64**. And *third*, a reasonable view of the evidence cited above is that Dr. Karas had a motive to prescribe his Karas Covid Protocol to as many jail patients as possible, as he was actively researching the efficacy of his treatment. Given the process for prescribing and administering the drug cocktail, this was done with no regard to consent or a patient's choice.

## II.     Qualified Immunity

At its core, qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Doe v. Gooden*, 214 F.3d 952, 954 (8th Cir. 2000). Notably, qualified immunity protects government officials only when they are performing discretionary functions that are part of his or her job duties. *Mitchell v. Ploudre*, 2015 WL 4448082, *4–5 (W.D. Ark. July 17, 2015). When evaluating whether an official is entitled to qualified immunity, the Court must first determine "whether the alleged facts demonstrate that the official's conduct violated a constitutional right, and whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted." *Groenewold v. Kelley*, 888 F.3d 365, 370–71 (8th Cir. 2018). For the reasons explained below, Dr. Karas is not entitled to qualified immunity.

**A.** **Dr. Karas should not be able to assert qualified immunity as an affirmative defense.**

As a threshold matter, in denying Defendants' Motion for Judgment on the Pleadings, the Court found that Dr. Karas should not be able to assert qualified immunity as an affirmative defense. The outcome should be the same here for two reasons: (1) Dr. Karas was not at all times performing discretionary functions delegated to him by the state; and (2) the Eight Circuit's holding in *Davis v. Buchanan County, Missouri*, 11 F.4th 604, 617–23 (8th Cir. 2021) supports not allowing Dr. Karas to invoke qualified immunity.

**1.** **Dr. Karas has failed to show that he was acting within the scope of his discretionary authority.**

As a threshold matter, Dr. Karas may assert qualified immunity only if he was exercising discretionary authority delegated to him by the government. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)); *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013). Indeed, it is well-settled law in the Eighth Circuit that "an official acting outside the clearly established scope of his discretionary authority is not entitled to claim qualified immunity under §1983." *Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011) (quoting *Hawkins v. Holloway*, 316 F.3d 777 (8th Cir. 2003)). Dr. Karas, as the party invoking the protections of qualified immunity, bears the burden of demonstrating his actions were within his discretionary authority at the time in question. *Accord id.* at 237–38 (collecting cases). In other words, Dr. Karas must show that he was acting as a government actor in accordance with his official duties.

Here, Dr. Karas should not be allowed to invoke the protections of qualified immunity for two reasons. *First*, Dr. Karas has not demonstrated that creating, developing, and testing the Karas

Covid Protocol was within the scope of the discretionary authority delegated to him by the government. As explained above, there is irrefutable evidence that Dr. Karas actively collected data from his jail patients (and even saved that data in a spreadsheet called "Detention Center Date") in an effort to research the efficacy of COVID-19 treatments and determine which medical protocols were working. **Plaintiffs' SSUMF ¶¶ 13-16**. Dr. Karas has not offered a shred of evidence that this practice was within his discretionary authority delegated to him by Washington County or the State of Arkansas.[23]

*Second*, it is unclear from the record when (or if) Dr. Karas was acting in his capacity as a government official during the creation and evolution of the Karas Covid Protocol. Dr. Karas has offered no evidence that Washington County tasked him with creating a novel, unique treatment plan for COVID-19 positive detainees. Moreover, to add to this confusion, Dr. Karas regularly blended his roles as jail doctor and private practitioner, but particularly when discussing the Karas Covid Protocol and his research. For example, Dr. Karas also sent McGill University data that he collected from his private practice patients. **Plaintiffs' SSUMF ¶ 7**. When discussing his Karas Covid Protocol, Dr. Karas communicated with *both* his private clinic providers and his jail staff *at the same time*. **Plaintiffs' SSUMF ¶ 6**. When Dr. Karas sent his WCDC data to the "researcher lady" at McGill University, he emailed *both* Kelley Hinely (his KCH nurse practitioner) and Tracey Moore (an Karas Health Care employee) letting them know that he had not received a response. **Plaintiffs' SSUMF ¶ 12**. When Kelley Hinley received an inquiry from the United States Marshal's about the use of ivermectin at WCDC, she included Tracey Moore in her response (at Tracey Moore's Karas Health Care email address). Most notably, however, Dr. Karas sent

---

[23] Indeed, Sheriff Helder did not even know about the use of ivermectin at Washington County Detention Center until after his call with Eva Madison, a former Justice of the Peace, on August 25, 2021. **Defendants' SSUMF ¶¶ 129-130**.

McGill University a letter to help secure funding for a study for a COVID-19 treatment. **Plaintiffs' SSUMF ¶ 9**. The letter exclusively focuses on Dr. Karas's research at WCDC, but Dr. Karas sent the letter on his private clinic (Karas Health Care) letterhead. **Plaintiffs' SSUMF ¶¶ 99-101**.

To assert qualified immunity, Dr. Karas must demonstrate that his actions were within the discretionary authority delegated to him by the government. Not only has he failed to meet that burden, but the evidence tends to suggest that he was acting outside the scope of his official duties—and in a role that blended his work as a private practitioner and a jail doctor. As such, the Court should deny his attempt to invoke the protections of qualified immunity.

## 2. The *Davis* factors once again weigh against allowing Dr. Karas to assert qualified immunity as an affirmative defense.

Even if the Court is convinced that Dr. Karas has shown he was acting within the scope of his discretionary authority, the Eighth Circuit's holding in *Davis v. Buchanan County, Missouri*, 11 F.4th 604, 617–23 (8th Cir. 2021) separately weighs against allowing Dr. Karas to invoke qualified immunity. As the Court is aware, in *Davis*, the Eighth Circuit acknowledged that qualified immunity is not available to third-party medical providers in certain circumstances. *Id.* at 622–23. This Court previously denied Dr. Karas's attempt to invoke qualified immunity at the pleading stage, and the result should be the same now.

In *Davis*, the Eighth Circuit held that private medical providers could not invoke qualified immunity primarily because the providers were "systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertaking that task for profit and potentially in competition with other [private companies]." *Davis*, 11 F.4th at 619. The same is true here. Sherrif Helder decided to hire a third-party medical provider shortly after the detention center moved to a new facility, which more than doubled the number of detainees in need of medical services. **Plaintiffs' SSUMF ¶ 103**. Dr. Karas bid on the contract in

2015, but another provider was awarded the contract. **Plaintiffs' SSUMF ¶¶ 91**. But Dr. Karas won the bid in 2016 after beating out an unknown number of competitors in a formal bidding process. **Plaintiffs' SSUMF ¶¶ 92-93**. When Dr. Karas won the bid, he created KCH to perform this work. **Plaintiffs' SSUMF ¶ 93**. In 2021, Karas Defendants were paid an astounding $1,518,900.00 to provide medical services at WCDC. **Plaintiffs' SSUMF ¶ 92**.

According to the contract between Karas Defendants and Washington County, Karas Defendants are responsible for providing "all medically necessary professional medical services to Detainees at the Facility." **Plaintiffs' SSUMF ¶ 102**. The contract requires that Karas Defendants provide 24-hour medical coverage at the jail, which was important to Sheriff Helder when awarding the contract. **Plaintiffs' SSUMF ¶ 94**. In short, KCH was quite literally organized to assume a major lengthy administrative task: to administer round-the-clock health care services to hundreds of detainees at the WCDC. And there was very little oversight in terms of patient treatment and care, as Washington County deferred to Dr. Karas and his team the same. **Plaintiffs' SSUMF ¶ 96**.

In their Motion, Karas Defendants endeavor to create this façade that KCH is a small organization that has lost money through its work at the WCDC. (Doc. 76, p. 21). It is incredibly difficult to take this representation at face value because Dr. Karas regularly blends the business operations of KCH and Karas Health Care. For example, Kelley Hinely, Jana Hinely, and Jolana Wilson (employees of KCH) all testified that they occasionally work at Karas Health Care, Dr. Karas's private clinic. **Plaintiffs' SSUMF ¶¶ 88-90**. Tracey Moore, a Karas Health Care employee, stated on the record that she has personal knowledge of Karas Correctional Health's profits and losses "as part of [her] duties working for Dr. Robert Karas." **Plaintiffs' SSUMF ¶¶**

**86-87**.[24] To the extent Dr. Karas is trying to argue that KCH is a small organization tasked with performing a limited and discrete function for the state, that suggestion is far from undisputed based on the record. To the contrary, the record demonstrates that Dr. Karas taps into his private clinic's resources, like Tracey Moore, to assist with work at the jail. And Dr. Karas took great pride in the fact that he was tasked with overseeing "the states 2nd largest county jail." **Plaintiffs' SSUMF ¶ 99**. In short, the *Davis* factors[25] weigh against allowing Dr. Karas to assert qualified immunity in this case.

> **B.      It was clearly established that Dr. Karas's actions would violate Plaintiffs' Due Process rights.**

Even assuming Dr. Karas may assert qualified immunity as a defense, he is not entitled to its protections. As explained above, there is a significant factual dispute as to whether Plaintiffs were informed of and consented to the Karas Covid Protocol. And accepting Plaintiffs' facts as true, a reasonable jury could resolve that dispute in favor of Plaintiffs and find that Dr. Karas's actions in this matter violated Plaintiffs' substantive due process rights. Defendants once again contend that they "could not have been on notice any alleged conduct they engaged in violated Plaintiffs' constitutional rights." (Doc. 76, p. 18). But this argument is bold and unpersuasive. As this Court noted in its earlier order, it is simply "not a close call" that "administering an experimental drug to prisoners without their knowledge or consent would violate their due process rights." (Doc. 51, p. 13). *Accord Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278 (1990); *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). The call is no closer now. If a jury resolves the factual disputes in favor of Plaintiffs, that necessarily means that Karas Defendants

---

[24] Dr. Karas testified that he did not know whether Tracey Moore was on KCH's payroll. **Plaintiffs' SSUMF ¶ 87**.
[25] The policy reasons discussed by the *Davis* court apply equally here and weigh against qualified immunity. *Davis*, 11 F.4th at 620–23.

administered ivermectin and the Karas Covid Protocol without Plaintiffs' knowledge or consent. There is no question such conduct violated Plaintiffs' right to bodily integrity.

### III.    Plaintiffs' battery claim.

Much of the discussion above applies equally to Plaintiffs' state law battery claim. The Court previously limited Plaintiffs' battery claim to "medical battery based on affirmative concealment and intentional—rather than negligent—failure to obtain informed consent." (Doc. 51, p. 14). As outlined extensively above, a reasonable jury could find that there was an intentional, coordinated effort to prescribe and administer the Karas Covid Protocol to every jail patient who tested positive for COVID-19. And the Court must accept as true that these Plaintiffs were told the drugs were mere vitamins, steroids, and antibiotics. **Plaintiffs' SSUMF ¶ 23**. These core material disputes are sufficient to send Plaintiffs' state law battery claim to trial.

Karas Defendants' remaining arguments on Plaintiffs' battery claim all miss the mark. *First*, Karas Defendants claim that Plaintiffs must have expert testimony to support their claim. This is incorrect. The case and statute Karas Defendants cite control when a plaintiff contends "that a medical care provider failed to supply *adequate* information to obtain the informed consent of the injured person." Ark. Code Ann. § 16-114-206(b). Plaintiffs here do not allege they were supplied with inadequate information to consent; they contend that they were not supplied with *any* information and were deceived about the treatment. Plaintiffs' claim for medical injury therefore lies outside the contours of section 206(b).

Next, Karas Defendants contend that there is no evidence of "wrongful intent." (Doc. 76, p. 29). They cite Brill's Arkansas Law of Damages for the proposition that medical battery requires "an intent to injury the victim" and a "harmful contact" that was "meant to injure or cause harm to the person." (Doc. 76, p. 29). But Brill notes further that the requisite intent can be a "purpose or

desire to bring about the consequences of an act." Howard W. Brill, et al., Arkansas Law of Damages §33:6, *Assault and battery* (Nov. 2022). And the contact need not be "harmful," it can also be "offensive," which is defined as contact that would "offend the personal dignity of a reasonable person." *Id.* A reasonable jury could find that Dr. Karas put the wheels in motion to prescribe the Karas Covid Protocol to Plaintiffs with the purpose or desire of ensuring that they were given the drug cocktail. That is all Arkansas law requires. A reasonable jury could find that administering his own COVID-19 protocol, which was not sanctioned by *any* accredited medical body, without disclosing that fact to his patients would offend a reasonable person's personal dignity, particularly during the height of COVID-19.[26] Karas Defendants' Motion for Summary Judgment should be denied.

## <u>CONCLUSION</u>

This case is not about the efficacy of the Karas Covid Protocol, or whether it rightfully or wrongfully included the drug ivermectin. Dr. Karas may create drug cocktails of his own devise, and his patients may accept or refuse his treatments. But patients must be informed of them. The problem here is that these patients were robbed of the choice to decide for themselves. Karas Defendants here decided to prescribe the Karas Covid Protocol to every patient that tested positive for COVID-19, without providing any information and with dishonesty. It is the violation of this "sacred right" for which Plaintiffs seek redress. *See Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

For these reasons, the Court should deny Defendants' motion for summary judgment, award judgment in Plaintiffs' favor, and/or allow this case to proceed to trial on the merits.

---

[26] Plaintiffs respectfully incorporate by reference their arguments in their Response to Defendants' Motion for Judgment on the Pleadings (Doc. 42, p. 23–24) that Ark. Code Ann. § 21-9-301 does not provide immunity to Defendants.

Respectfully submitted,

ROSE LAW FIRM,
a Professional Association
5100 West JB Hunt Drive, Ste 900
Rogers, Arkansas 72758
Telephone (479) 301-2444
Facsimile (479) 301-2449

Bourgon B. Reynolds
Arkansas Bar No. 2012290
breynolds@roselawfirm.com

ROSE LAW FIRM,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone (501) 375-9131
Facsimile (501) 375-1309

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Luke E. Vance
Arkansas Bar No. 2021141
lvance@roselawfirm.com

By: _/s/ Bourgon B. Reynolds_

*Attorneys for Plaintiffs*

*On behalf of the Arkansas Civil Liberties Union Foundation, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 30, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel of record.

*/s/ Bourgon B. Reynolds*