UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EDRICK FLOREAL-WOOTEN;
JEREMIAH LITTLE; JULIO GONZALES;
DAYMAN BLACKBURN; THOMAS FRITCH                                    PLAINTIFFS

v.                                    Case No. 5:22-cv-05011-TLB-CDC

TIM HELDER, SHERIFF OF WASHINGTON COUNTY,
ARKANSAS, in his individual capacity;
KARAS CORRECTIONAL HEALTH, P.L.L.C.;
DR. ROBERT KARAS, M.D., in his individual capacity              DEFENDANTS

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS AND SEPARATE
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF RESPONSE
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now, Plaintiffs Edrick Floreal-Wooten, Jeremiah Little, Julio Gonzales, Dayman

Blackburn, and Thomas Fritch ("Plaintiffs"), and for their Statement of Disputed Fact and Separate

Statement of Undisputed Material Facts in Support of their Response to Defendants' Motion for

Summary Judgment, state:

DISPUTED MATERIAL FACTS

1.      That Plaintiffs were not given any information about ivermectin or the Karas Covid

Protocol before they were prescribed the drug cocktail.

2.      That Plaintiffs were not given any information about ivermectin or the Karas Covid

Protocol at the time that they were given the drug cocktail.

3.      That Plaintiffs did not consent to being given ivermectin or the Karas Covid

Protocol as a treatment for COVID-19.

4.      That during and after the Delta wave, the Karas Covid Protocol was the only

treatment plan Karas Defendants used for jail patients with COVID-19, including Plaintiffs.

5.     That Dr. Karas was personally involved in the underlying constitutional because he created the Karas Covid Protocol and directed that only it be used at the jail as a COVID treatment.

6.     That Dr. Karas was personally involved in the underlying constitutional deprivation because he effectively treated Plaintiffs because he was solely responsible for the Karas Covid Protocol.

7.     That it was not Karas Defendants' practice to notify jail patients of the drugs Karas Defendants were prescribing or giving jail patients.

8.     That it was not Karas Defendants' practice to notify jail patients of the drug Karas Defendants were giving to them as part of the Karas Covid Protocol only if a patient asked.

9.     That Karas Defendants told Plaintiffs the Karas Covid Protocol was vitamins, antibiotics, and steroids.

10.    The general consent to treatment forms jail patients sign at intake do not constitute a complete consent of all medical treatment or all prescriptions in perpetuity at the WCDC.

11.    Any other fact Plaintiffs dispute in their Response to Defendants' Statement of Facts filed contemporaneously on this date.

**PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.     Dr. Karas's Covid Protocol.**

1.     Dr. Karas was the architect of the covid protocols used at the Washington County Detention Center (WCDC). **Exhibit A**, Karas Dep. 34:23-35:4 ("Q: And so why did you use the range that you used rather than the range that the FLCCC --- A: We were having good success at our jail with our treatment, and the dosing that we had, that's what we stayed on. We didn't follow the FLCC's exactly. I independently came up with our protocols, and they – and, you know, they are very similar to the FLCCC's website protocols, but not exact.").

2

2.      Dr. Karas's Covid Protocols "changed often." **Exhibit B**, K. Hinely Dep. 65:14-21; **Exhibit A**, Karas Dep. 36:2-10; ("[I]t evolved, yes. It evolved the whole time.").

3.      When revising his covid protocol, Dr. Karas relied on his own personal experience and research. **Exhibit A**, Karas Dep. 81:11-13.

4.      Dr. Karas's research included reading online articles, browsing Facebook pages, following "a guy named John Campbell, Dr. John Campbell, on YouTube," a "nice cartoon thing" from Dr. Marik "explaining the pathophysiology of COVID in the lungs," and generally communicating with friends and colleagues. **Exhibit A**, Karas Dep. 36:11-37:13; 81:18-82:1.

5.      The Karas Covid Protocol that he used at the jail was different than the covid protocol he used at his private practice clinic. **Exhibit A**, Karas Dep. 31:17-32:20.

6.      When developing and modifying his COVID-19 protocol, Dr. Karas would communicate with both his private clinic staff and Kelley Hinely, his nurse practitioner at KCH. **Exhibit C**, KARAS000013.

7.      Importantly, Dr. Karas collected and documented outcomes and treatment regimens for his jail patients who were being treated for COVID-19. **Exhibit A**, Karas Dep. 135:2-138:17; **Exhibit D**, KARAS003437. He organized this research in an excel spreadsheet, which contained information for over 300 jail patients, including first and last initials, date of birth, ethnicity, and intake date, among other things.  **Exhibit E**, Detention Center Data.[1]

8.      In April 2021, Dr. Karas emailed this spreadsheet to an individual at McGill University in Quebec, Canada, who was researching the efficacy of one of the drugs in Dr. Karas's Covid Protocol drug cocktail, montelukast. **Exhibit F**, KARAS003433-3435. Dr. Karas sent his

---

[1] Plaintiffs have attached **Exhibit E** a PDF version of this excel spreadsheet.  Given the volume of information contained therein, and the need to protect the identity of the individuals, Plaintiffs redacted the first and last initials and dates of birth.  To be clear, this information was redacted by Plaintiffs, not Karas Defendants.

3

jail research to this individual because "I had talked to a guy on that Facebook page, a physician out of Colorado, and he says, 'Oh, you might' . . . I was telling people what I was using for treatment of COVID-19 on . . . that website, you know, pretty much our 'Evolution' and tell them, 'Hey, I'm using this, this, this, and this.' They're like, 'Oh, there's a lady I know who's doing research on montelukast out of Canada. You might want to contact her.' And I think that's how I contacted her." **Exhibit A**, Karas Dep. 139:6-19.

9.       In July 2021, Dr. Karas sent an email to Dr. Martha Sharkey, the Washington County Health Officer, about the McGill research. **Exhibit D**, KARAS003437; **Exhibit A**, Karas Dep. 145:8-14. Notably, in this email to Dr. Sharkey, Dr. Karas references a letter that he sent to McGill University to help secure funding for a study for a COVID treatment. **Exhibit D**, KARAS003437.

10.      Dr. Karas sent both "our jail data" and "data from our 4000 plus clinic patients" to the individual at McGill University. **Exhibit D**, KARAS003437. Dr. Karas did not tell the jail patients their information would be shared with these third parties, and he did not direct Kelley Hinely to notify the jail patients of this fact. **Exhibit A**, Karas Dep. 147:14-148:17.

11.      Dr. Karas sent his "Detention Center Data" to the individual at McGill University because it would "help support her premise" for her research. **Exhibit A**, Karas Dep. 139:20-22. Dr. Karas said the data showed "whatever we did worked . . . it's fairly statistically significant." **Exhibit A**, Karas Dep. 143:5-144:10.

12.      In an email to Kelley Hinely, a KCH employee, and Tracey Moore, an employee at Dr. Karas's private clinic, Dr. Karas notified Ms. Hinely and Ms. Moore that he had not received a response from the "researcher lady" whom he sent his "Detention Center Data." **Exhibit F**, KARAS003433-435.

13.     Dr. Karas did not create this spreadsheet; he directed Kelley Hinely to do so. **Exhibit A**, Karas Dep. 137:20-138:10. Dr. Karas told Kelley Hinely to include "[a]ll our treatment protocol, whatever we used, if you looked at all that: the IV vitamin C, vitamin pack, melatonin, Decadron, prednisone, Pepcid, steroid inhaler, albuterol inhaler, Tylenol, ivermectin, D3. So all our treatment medicines." **Exhibit A**, Karas Dep. 140:6-13.

14.     Dr. Karas asked Kelley Hinely to collect this information to "gather[] data and try[] to help other providers start to research and – options that could be used to treat covid, repurpose drugs." **Exhibit A**, Karas Dep. 138:14-17; 140:19-141:1 ("Because sometimes you – *for our research*, if you're – if they took the – if we ordered it, but they didn't take it, and that – we want to know that they didn't take it." (emphasis added)).

15.     Dr. Karas sent his "Detention Center Data" to third parties, including individuals unrelated to Washington County or the State of Arkansas. **Exhibit A**, Karas Dep. 145:8-14 ("It looks like I sent it to Dr. Sharkey, who was the Washington County health officer, and she's – she's a physician. I – I sent it to Dr. Marik, and then I sent it to the [researcher] lady at McGill, the university that – that was trying to get the study on – on the – on the Singulair, or montelukast.").

16.     The purpose of collecting and gathering his "Detention Center Data" was to further research endeavors. **Exhibit A**, Karas Dep. 139:6-22; **Exhibit D**, KARAS003437; **Exhibit F**, KARAS003433-435; **Exhibit CC**, *Defendant Dr. Robert Karas's and KCH's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production*, dated March 20, 2023 ("Information was gathered for the purpose of determining what medical protocols were working.").

17.     Dr. Karas openly and actively encouraged others to use his covid protocol, but particularly ivermectin, as a covid treatment. **Exhibit B**, K. Hinely Dep. 113:2-23; **Exhibit D**, KARAS003437; **Exhibit F**, KARAS003433-435; **Exhibit G**, KARAS0003425.

**II.     Plaintiffs are given Dr. Karas's Covid Protocol without their knowledge or consent.**

18.     Each Plaintiff was given Ivermectin as a treatment for COVID-19. **Exhibit H**, Floreal-Wooten Records, p. 5-6; **Exhibit I**, Little Records, pp. 5-6; **Exhibit J**, Gonzales Records, pp. 4-5; **Exhibit K**, Blackburn Records, pp. 5-6; **Exhibit P**, Fritch Records, pp. 3-4.

19.     Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn were prescribed ivermectin as part of the Karas Covid Protocol in August 2021. **Exhibit H**, Floreal-Wooten Records, p. 3; **Exhibit I**, Little Records, p. 4; **Exhibit J**, Gonzales Records, p. 3; **Exhibit K**, Blackburn records, page 4.

20.     Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn were never told the drug cocktail contained ivermectin. **Exhibit L**, Floreal-Wooten Dep. 68:15-17.; **Exhibit M**, Little Dep. 32:23-25; **Exhibit N**, Gonzales Dep. 43:25-44:3; **Exhibit O**, Blackburn Dep. 52:2-3.

21.     Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn were not given any information about the side effects of taking ivermectin. **Exhibit L**, Floreal-Wooten Dep. 68:15-17; **Exhibit M**, Little Dep. 27:8-25; **Exhibit N**, Gonzales Dep. 44:4-6; **Exhibit O**, Blackburn Dep. 51:24-52:1.

22.     Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn were not given any information about the Karas Covid Protocol. **Exhibit S**, Alaytseva Dep. 16:10-17:2; **Exhibit T**, J. Hinely Dep. 11:11-12:5; **Exhibit L**, Floreal-Wooten Dep. 68:15-17; **Exhibit M**, Little Dep. 27:8-25; **Exhibit N**, Gonzales Dep. 43:25-44:25; **Exhibit O**, Blackburn Dep. 51:16-18.

23.     When Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn asked about the Karas Covid Protocol, they were told the drug cocktail was vitamins, antibiotics, and steroids, and the drugs would make them feel better and get over covid. **Exhibit L**, Floreal-Wooten Dep. 68:22-69:8; **Exhibit M**, Little Dep. 27:8-17; **Exhibit N**, Gonzales Dep. 50:7-10; **Exhibit O**, Blackburn Dep. 25:20-26:16.

24.     Plaintiff Fritch is HIV-positive. **Exhibit Q**, Fritch Dep. 13:25-14:3. Plaintiff Fritch was given ivermectin in December 2020. **Exhibit P**, Fritch Records, pp. 3-4. Fritch was told the drug was "for parasites." **Exhibit Q**, Fritch Dep. 39:20-40:13. When he questioned the drug, Janna Hinely said, "I don't know. It's what we're [giving] for COVID." *Id.* Plaintiff Fritch was "never told [what] ivermectin was and what it exactly was intended for" and he was never "given an option to take something else for the COVID." **Exhibit Q**, Fritch Dep. 38:16-39:7. Plaintiff Fritch was never told anything about the side the side effects of that drug, including any risks related to his status as an HIV-positive patient.  *Id.* Plaintiff Fritch sought a second opinion about the use of ivermectin and asked for information about the drug, but he does not recall exactly when he made those requests. **Exhibit Q**, Fritch Dep. 58:3-59:12.

25.     Had Plaintiffs been informed about ivermectin or the Karas Covid Protocol, they would have refused to take it. **Exhibit L**, Floreal-Wooten Dep. 53:3-10; **Exhibit M**, Little Dep. 33:4-6, **Exhibit N**, Blackburn Dep. 53:22-24; **Exhibit Q**, Fritch Dep. 45:18-21.

**III.     The only treatment plan: the Karas Covid Protocol.**

26.     Prior to April 2021, patient treatment for COVID-19 was not a one-size-fits-all-approach. K. Hinely Dep. 114:20; 115:17-116:5. Before the Delta wave, there wasn't a "hard and fast protocol per se," the treatment would depend "if the inmate was over 40 or under 40, if they

had diabetes, some risk factors." **Exhibit A**, Karas Dep. 26:8-17; **Exhibit B**, K. Hinely Dep. 115:17-116:5.

27.     In spring of 2021, in response to the "Delta Wave," Dr. Karas began encouraging the use of his protocol. **Exhibit B**, K. Hinely Dep. 113:2-23 ("Dr. Karas did not encourage the use [of the Karas Covid Protocol] as it is listed here . . . until Delta was prevalent in the jail.").

28.     When the Delta wave hit, Dr. Karas "used all the meds on everybody." **Exhibit A**, Karas Dep. 130:5-17 (Q: Did the jail protocol take those other considerations into account? A: Yes, we did. We – that's why we started using everything at the jail.  But for the – during the Delta wave, it was very – I thought it was a more dangerous strain, and so we used all the meds on everybody."). Indeed, "with the Delta wave, I believe we – we gave everybody the same – same meds." **Exhibit A**, Karas Dep. 130:20-22.

29.     After Dr. Karas created or revised his covid protocols, he and/or Kelley Hinely would "build a prescription set" based on the protocols.  **Exhibit B**, K. Hinely Dep. 65:4-21; **Exhibit A**, Karas Dep. 100:24-101:11.

30.     This prescription set included whatever assortment of medications Dr. Karas wanted as part of the drug cocktail. **Exhibit B**, K. Hinely Dep. 65:4-21.

31.     According to Plaintiffs Floreal-Wooten's, Little's, Gonzales's, and Blackburn's chart notes, on August 21, 2021, Jolana Wilson, a paramedic, "ordered" the Karas Covid Protocol for them. **Exhibit H**, Floreal-Wooten Records, p. 3; **Exhibit I**, Little Records, p. 4; **Exhibit J**, Gonzales Records, p. 3; **Exhibit K**, Blackburn Records, p. 4.

32.     According to Plaintiffs Floreal-Wooten's, Little's, Gonzales's, and Blackburn's chart notes, Jolana Wilson added various prescriptions for the drugs that were part of the protocol's

drug cocktail. **Exhibit H**, Floreal-Wooten Records, p. 2; **Exhibit I**, Little Records, pp. 3-4; **Exhibit J**, Gonzales Records, pp. 2-3; **Exhibit K**, Blackburn Records, pp. 3-4.

33.     Jolana Wilson is a paramedic who does not have prescriptive authority, meaning she cannot prescribe drugs. **Exhibit A**, Karas Dep. 101:12-16 ("Q: Okay. But Jolana Wilson is putting in the order for these prescriptions? Is that what you're saying? A: Yes. It looks – yes, it looks like that. A: And does a paramedic have prescriptive authority? A: No.").

34.     Jolana Wilson does not prescribe the medication; she merely orders a prescription on behalf of Kelley Hinely or Dr. Karas. **Exhibit B**, K. Hinely Dep. 69:17-20; **Exhibit A**, Karas Dep. 103:20-104:3 ("Yeah, I'd say they're not prescribing. They're – or they enter a protocol that's been approved.").

35.     For each prescription, the chart notes identify the "Doctor" as "PROTOCOL." **Exhibit H**, Floreal-Wooten Records, p. 2; **Exhibit I**, Little Records, pp. 3-4; **Exhibit J**, Gonzales Records, pp. 2-3; **Exhibit K**, Blackburn Records, pp. 3-4.

36.     Dr. Karas "is in charge of all the protocols."  **Exhibit B**, K. Hinely Dep. 68:20-22. And Dr. Karas was the final decision-maker regarding patient care when he was the provider responsible for treating the patient. **Exhibit A**, Karas Dep. 18:19-20 ("I would say if I'm treating the patient, I have the final decision.").

37.     When a patient tested positive for COVID-19, Jolana Wilson hit a "button" that automatically ordered Dr. Karas's Covid Protocol. **Exhibit R**, Wilson Dep. 20:1-14 ("Q: And just so I'm clear on this, can you elaborate on what "started protocols" mean? A Okay. Like I told you, there was a button that we pushed. It was "COVID-positive." It would automatically put the medications that were protocol for COVID-positive patients that would go to review for the provider to review.");

38.     When Jolana Wilson hit the button, the medications were automatically put into the system for distribution and administration. **Exhibit B**, K. Hinely Dep. 66:1-3 ("Well, prescription set, when she pushed that button, it put these orders right here automatically into the system for the med passers.").

39.     This was different than Dr. Karas' private clinic. **Exhibit A**, Karas Dep. 30:25-31:5 ("So explain to me what you mean the 'Washington County Jail protocol.'  A: Well, there we have to – you know, we had to set up where you could hit buttons to put the meds in, you know? So that's – that's what I'm talking about. We don't have that in the clinic. You just write a script or whatever.").

40.     In addition to ordering the prescriptions, Jolana Wilson put the patient "on review" so that the provider could review the treatment regimen. **Exhibit R**, Wilson Dep. 29:21-23 ("And – and I put 'placed on review,' so this means it automatically goes to Kelley to review, or to Dr. Karas, whoever is doing their review.").

41.     Jolana Wilson could only click the button to order the Karas Covid Protocol, she could not personally treat patients because doing so is "not in [her] scope" of practice. **Exhibit R**, Wilson Dep. 15:12-14.

42.     As related to Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn, a provider did not conduct a review of Jolana Wilson's decision to start the protocol medicines until *after* each plaintiff had already started taking the drug cocktail. **Exhibit H**, Floreal-Wooten Records, p. 5-6; **Exhibit I**, Little Records, pp. 5-6; **Exhibit J**, Gonzales Records, pp. 4-5; **Exhibit K**, Blackburn Records, pp. 5-6.

43.    Specifically, with respect to Plaintiff Floreal-Wooten, Jolana Wilson started Dr. Karas's Covid Protocol for him at 11:40 pm on August 21, 2021. **Exhibit B**, K. Hinely Dep. 65:11-15; **Exhibit H**, Floreal-Wooten Records, p. 3.

44.    Plaintiff Floreal-Wooten was given the drug cocktail at approximately 8:30 am and 7:15 pm on August 22, 2021, and approximately 7:30 am on August 23, 2021. **Exhibit B**, K. Hinely Dep. 65:11-15; **Exhibit H**, Floreal-Wooten Records, p. 5-6.

45.    According to Plaintiff Floreal-Wooten's chart notes, Kelley Hinely conducted her review at 8:32 am on August 23, 2021. **Exhibit H**, Floreal-Wooten Records, p. 2.

46.    According to Plaintiff Floreal-Wooten's chart notes, Kelley Hinely "approved" the treatment regimen at 8:32 am on August 23, 2021. **Exhibit H**, Floreal-Wooten Records, p. 2.

47.    The sequence of events was the same with Plaintiffs Blackburn, Gonzales, and Little, who were similarly given the Karas Covid Protocol before Kelley Hinely's review and approval. **Exhibit I**, Little Records, pp. 1-6; **Exhibit J**, Gonzales Records, pp. 1-5; **Exhibit K**, Blackburn Records, pp. 1-6.

## IV.    "Informed" consent.

48.    No Karas Defendant or their witnesses testified about the information Plaintiffs received when they were given ivermectin or the Karas Covid Protocol.

49.    No Karas Defendant or their witnesses testified that these Plaintiffs were given *any* information at all about ivermectin or the Karas Covid Protocol.

50.    According to Jolana Wilson, it was KCH's practice to tell a patient what medicines he or should was going to get when she ordered a protocol. **Exhibit R**, Wilson Dep. 38:5-10 (Q: Jo, we've talked before. Is the practice when you start protocol meds to tell the patient – inmate what the meds they are going to get are? A: Yes, sir.).

11

51.     Jolana Wilson does not recall her specific interactions with any of the Plaintiffs. **Exhibit R**, Wilson Dep. 19:14-25, 20:15-21:22.

52.     Vladislava Alaytseva is a med-passer for Defendant KCH. **Exhibit S**, Alaytseva Dep. 8:21-25.

53.     Vladislava Alaytseva's employee identification number is 7872. **Exhibit S**, Alaytseva Dep. 22:23-24.

54.     Vladislava Alaytseva administered part of the Karas Covid Protocol to Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn on the morning of August 24, 2021.  **Exhibit H**, Floreal-Wooten Records, p. 5; **Exhibit I**, Little Records, p. 5; **Exhibit J**, Gonzales Records, p. 4; **Exhibit K**, Blackburn Records, p. 5.

55.     Vladislava Alaytseva is allowed to tell a patient what drug the patient is receiving, but only if the patient asks, and she refers any additional questions to the kiosk. **Exhibit S**, Alaytseva Dep. 16:10-17:2 ("Q: Do you remember any instruction as to whether you were to identify to the detainee what medication they were receiving? A: Yes. In any case, anytime a detainee or patient is given any new medications, they are allowed to ask us what they are. I'm allowed to answer what they are. And as far as any further questions, as far as side effects or things like that, I ask them to refer those questions back to the kiosk so that a provider can answer those.").

56.     Janna Hinely is a med-passer for Defendant KCH. **Exhibit T**, J. Hinely Dep. 7:9-11.

57.     Janna Hinely's employee identification number is 3249.  **Exhibit T**, J. Hinely Dep. 21:21-25.

58.     Janna Hinely administered part of the drug cocktail to Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn on the evening of August 22, 2021.  **Exhibit H**, Floreal-Wooten

Records, pp. 5-6; **Exhibit I**, Little Records, pp. 5-6; **Exhibit J**, Gonzales Records, p. 6; **Exhibit K**, Blackburn Records, p. 6.

59.     Janna Hinely administered ivermectin to Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn on the evening of August 22, 2021. **Exhibit H**, Floreal-Wooten Records, pp. 5-6; **Exhibit I**, Little Records, pp. 5-6; **Exhibit J**, Gonzales Records, p. 6; **Exhibit K**, Blackburn Records, p. 6.

60.     Janna Hinely administered ivermectin to Plaintiff Fritch on December 22, 2020. **Exhibit H**, Fritch Records, p. 4.

61.     Janna Hinely "really [doesn't] say anything" to jail patients when administering medication. **Exhibit T**, J. Hinely Dep. 11:11-14 ("Q: Well, did you receive any training on what to say to a detainee when you gave them medication? A: I really don't say anything to them unless they ask me a question.").

62.     Janna Hinely gives jail patients information only if they ask her questions. **Exhibit T**, J. Hinely Dep. 11:11-14. ("Q: Well, did you receive any training on what to say to a detainee when you gave them medication? A: I really don't say anything to them unless they ask me a question.").

63.     Janna Hinely could not give this information because she is "not licensed" and "not a nurse."  Janna Hinely would instead instruct detainees to direct any questions to a provider because she "[doesn't] know all the information."  **Exhibit T**, J. Hinely Dep. 11:15-22 ("Q: Okay. And what were you trained to do if they asked you a question? A: I am not licensed. I'm not a nurse. I'm just a med passer. So I always instruct the detainees, if they do have a question, to put it in the kiosk systems so a paramedic – a nurse can speak to them, because I don't know all the

information. So I'd rather them get something from an actual person who knows what they're talking about.").

64.     Janna Hinely can tell a patient what he or she is taking if the patient asks her. **Exhibit T**, J. Hinely Dep. 11:23-12:5.

65.     Even if they ask her a question, Janna Hinely "can't tell [the patients] exactly what [the medication] is for or anything like that." **Exhibit T**, J. Hinely Dep. 11:23-12:5.

66.     Kelley Hinely "immediately" "scheduled retraining" of all KCH staff after reviewing testimony in this case related to KCH employees' practices when administering medicine to jail patients. Doc. 75-2, p. 3, ¶ 16, *Exhibit B to Defendants' Motion for Summary Judgment*.

67.     This retraining was focused on proper practices when administering medications, specifically about the amount of information to provide to patients when administering medications. *Id.*

68.     Kelley Hinely was particularly concerned about Janna Hinely's testimony related to her practices when administering medications.  *Id.*

69.     Janna Hinely is the med-passer who administered ivermectin to every plaintiff. **Exhibit H**, Floreal-Wooten Records, pp. 5-6; **Exhibit I**, Little Records, pp. 5-6; **Exhibit J**, Gonzales Records, p. 6; **Exhibit K**, Blackburn Records, p. 6; **Exhibit P**, Fritch Records, p. 4.

70.     Jail patients typically sign a general consent to treatment form when they enter WCDC.  **Exhibit U**, Helder Dep. 35:7-15, **Exhibit V**, Consent Form.

71.     Plaintiffs Floreal-Wooten, Little, Gonzales, and Blackburn all signed general consent to treatment forms. Doc. 75-20, *Exhibit S to Defendants' Motion for Summary Judgment*.

72.     Dr. Karas believes that once a patient signs the general consent form, he or she has effectively consented to receiving all prescriptions. **Exhibit A**, Karas Dep. 94:19-25.

73.     This includes prescriptions for potentially dangerous medications. **Exhibit A**, Karas Dep. 94:15-25 ("Q: Okay. So with respect to the informed consent that patients sign at intake, is it your position that they are consenting to prescription of potentially dangerous drugs? A: Yes. Q: Any kind of drug, even if it could kill them, they're – they've consented to [omitted objection]. . . a prescription for that drug? A: Correct. Like every medicine – like the antidepressants, you increase your risk of suicide 3 percent. Do we use antidepressants at the jail? Yes.").

74.     Dr. Karas stated that he need not tell patients of all the dangerous side effects, only the ones that he thought were significant or severe. **Exhibit A**, Karas Dep. 95:1-96:3.

75.     Kelley Hinely believes a patient retains the freedom of choice even after signing the consent form at intake.  **Exhibit B**, K. Hinely Dep. 127:22-128:5.

76.     Kelley Hinely believes the general consent to treatment does not "give [her] permission to do whatever [she] want[s] with no basis."  **Exhibit B**, K. Hinely Dep. 125:18-25.

77.     Early on in COIVD, Karas Defendants stopped using written consents to treatment forms and instead obtained consent verbally. **Exhibit U**, Helder Dep. 65:18-67:9, 82:2-6.

78.     Sheriff Tim Helder urged Karas Defendants to resume the use of written general consents to treatment. **Exhibit U**, Helder Dep. 70:22-23.

79.     Sheriff Helder's conversation with Kelley Hinely about using written consent forms occurred after Plaintiffs were given ivermectin in August 2021. **Exhibit U**, Helder Dep. 70:24-71:3.

80.     On August 26, 2021, Kelley Hinely told a United States Department of Justice employee that, "starting today," Karas Defendants was going to start using a "detailed consent" with each individual drug [in the Kars Covid Protocol] listed." **Exhibit W**, KARAS000212-213. Kelley Hinely copied Tracey Moore, an employee of Dr. Karas's private clinic, to her response at Tracey Moore's Karas Health Care email address. ***Id.***

81.     This detailed "Covid specific treatment consent" was different from the general consent to treatment form Plaintiffs signed at intake. **Exhibit X**, KARAS000164.

82.     On August 26, 2021, Kelley Hinely notified KCH individuals that each patient must sign the detailed COVID specific treatment consent before the patient could be started on the Karas Covid Protocol. **Exhibit Y**, KARAS000228.

83.     Dr. Karas and his staff created the "new consent form" immediately after "it hit the news." **Exhibit A**, Karas Dep. 164:23-165:10.

84.     An example of the detailed consent for treatment of COVID-19 used at the WCDC lists all medications, as well as possible side effects. **Exhibit Z**, KARAS000205-207.

85.     At her deposition, Kelley Hinely did not recall any retraining related to pill call after Karas Defendants started using the Karas Covid Protocol and deferred any questions about that training to the med-passers. **Exhibit B**, K. Hinely Dep. 52:19-53:2 (Q: "When Karas Correctional Health started the treatment protocol, was there any training related to pill call for the treatment protocol? A: I don't recall specifically. So as I stated, the way that we were doing treatment was changing based on information as it was given to us. So I do know anytime there's a change, COVID-related, not COVID-related, then there's retraining at that time. That would be a question specifically for those individuals because I don't remember.").

16

86.     Tracey Moore is an employee of Karas Health Clinic, not Karas Correctional Health.  *See* Doc. 75-17, p. 2, ¶ 1, *Exhibit P to Defendants' Motion for Summary Judgment*.

87.     Tracey Moore "is familiar with and has personal knowledge of the profits and losses of Karas Correctional Health as part of [her] duties working for Dr. Robert Karas." *Id.* at ¶ 2. Tracey Moore performs various administrative functions for Karas Correctional Health at the jail. **Exhibit A**, Karas Dep. 11:22-12:4. Dr. Karas "[does not] know if [Tracey Moore is] on Karas Correctional Health payroll or if she's only on Karas Health Care payroll." **Exhibit A**, Karas. Dep. 12:5-8.

88.     Janna Hinely worked at Karas Health Care from January 2020 until April 2020. J. **Exhibit B**, J. Hinely Dep. 6:15-7:2.

89.     Jolana Wilson had worked at Karas Health Care before, "just off and on when needed." **Exhibit R**, Wilson Dep. 7:17-21.

90.     Kelley Hinely works at Karas Health Care "on occasion." **Exhibit B**, K. Hinely Dep. 13:5-23.

91.     In 2015, Dr. Karas lost the bid on the contract to provide medical services at WCDC. **Exhibit A**, Karas Dep. 16:10-21, 17:15-17.

92.     In 2016, Dr. Karas rebid on the contract to provide medical services at WCDC and won the bid. **Exhibit A**, Karas Dep. 16:10-21, 17:22-24; **Exhibit U**, Helder Dep. 26:15-28:7. As of 2021, Dr. Karas was awarded a contract in the amount of $1,518,900.00 to provide medical services at WCDC. **Exhibit AA**, KARAS000327-KARAS000343, at KARAS000333.

93.     When Dr. Karas won the bid to provide medical services at WCDC, he was one of an unknown number of bidders. **Exhibit A**, Karas Dep. 17:25-18:4; **Exhibit U**, Helder Dep. 27:16-23.

94.    Sheriff Helder sought to hire a third-party to provide 24-hour medical services for the hundreds of jail inmates. **Exhibit U**, Helder Dep. 26:21-28:7. The contract between Karas Defendants and Washington County requires that Karas Defendants provide 24-hour coverage for emergencies.  **Exhibit AA**, KARAS000327-KARAS000343, at KARAS000329.

95.    Karas Correctional Health was created when Dr. Karas won the bid to provide medical services at WCDC. **Exhibit A**, Karas Dep. 13:17-25, 15:24-16:9.

96.    Washington County did not directly supervise Karas Defendants when Karas Defendants administered medical services or made medical decisions. **Exhibit U**, Helder Dep. 34:21-35:4 ("Q: Was there any oversight for the type of treatment that wouldn't been provided to a detainee? A: Not internally. That's what we relied on the medical team to do, was to treat patients."); **Exhibit A**, Karas Dep. 18:14-19:24.

97.    In July 2021, the Karas Covid Protocol included "doxycycline 100 milligrams BID for five days; Singulair, which is montelukast, 10 milligrams daily for seven to ten days; vitamin C, D, and zinc packets.  I believe we would do ivermectin for five days, if you're under 150 at 12 milligrams; if you're above 150, it's 24. And we would do high-dose vitamin D 100,000 a day for three days. . . . And then steroids possibly if they got sicker." **Exhibit A**, Karas Dep. 27:6-16; **Exhibit W**, KARAS000212-213.

98.    Dr. Karas sent a letter to a professor at McGill University to help the professor secure funding to research the efficacy of a drug that Dr. Karas used in his Karas Covid Protocol as a COVID treatment. **Exhibit BB**, KARAS003465.

99.    The letter notes Dr. Karas is a "medical physician and owner of Karas Correctional Health in the State of Arkansas, USA. We have had the medical contract overseeing the states 2nd

largest county jail (20 employees, 500-700 inmates) for the last 6 years." **Exhibit BB**, KARAS003465.

100.    The letter discusses Dr. Karas's research at the WCDC, describing generally his "anecdotal evidence" related to the efficacy of part of the Karas Covid Protocol. **Exhibit BB**, KARAS003465.

101.    Notably, Dr. Karas sent this email from his Karas Health Care letterhead.  **Exhibit BB**, KARAS003465.

102.    The contract between Karas Defendants and Washington County provides that Karas Defendants are responsible for providing "all medically necessary professional services to Detainees at the Facility." **Exhibit AA**, KARAS000327-KARAS000343, at KARAS000328.

103.    After the WCDC moved to a new facility, which more than doubled the number detainees, it "became apparent" to Sheriff Helder that he needed to "move in a different direction" and contract the provision of medical services to a third-party provider. **Exhibit U**, Helder Dep. 26:21-27:10.

104.    Dr. Karas was not concerned with the fact that Kelley Hinely did not review Ms. Wilson's decision to prescribe the Karas Covid Protocol until after Plaintiffs received multiple rounds of the treatment. **Exhibit A**, Karas Dep: 103:13-19 ("Q: Okay. Is there any concern that she did not review the prescription until two days later? A: The – is there some concern? Well, I looked it up. 8/23 is Monday, I believe, so probably it was Friday night when it was put in, and Kelley probably wasn't in the jail on that Saturday or Sunday. But is there any concerns? No, I don't see any concern with it.").

Respectfully submitted,

ROSE LAW FIRM,
a Professional Association
5100 West JB Hunt Drive, Ste 900
Rogers, Arkansas 72758
Telephone (479) 301-2444
Facsimile (479) 301-2449

Bourgon B. Reynolds
Arkansas Bar No. 2012290
breynolds@roselawfirm.com

ROSE LAW FIRM,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone (501) 375-9131
Facsimile (501) 375-1309

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Luke E. Vance
Arkansas Bar No. 2021141
lvance@roselawfirm.com

By: /s/ *Bourgon B. Reynolds*

*Attorneys for Plaintiffs*

*On behalf of the Arkansas Civil Liberties Union Foundation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel of record.

*/s/ Bourgon B. Reynolds*