1 A    -- I believe --

2 Q    Sorry.  Go ahead.

3 A    -- I believe.

4            MR. MOSLEY:  Doctor, let him finish his question

5        before you answer.

6            Go ahead, Ryan.  I'm sorry.

7 Q    (By Mr. Smith)  And, Dr. Karas, you said there was about a

8 six-week or two-month span, approximately, around November of

9 2020 that you would go there pretty much every day.  Is that

10 what you --

11 A    Yeah.

12 Q    Okay.

13 A    Yes.  Yes.

14 Q    Okay, so putting aside the part of your job where you

15 would see patients, is it fair to say that, you know, the other

16 stuff that you listed -- that you hired people; come up with

17 protocols; staffing; things like that -- that's kind of more,

18 you know, administrative?  I mean, if I use the term

19 "administrative" versus "medical services," is that a fair sort

20 of characterization of it?

21 A    Yes.  I -- I --

22 Q    Okay.  Is there anybody else at Karas Correctional Health

23 that does these administrative-type roles -- responsibilities,

24 if you will?

25 A    The -- Tracey, she might do -- she might do some

1  administrative stuff for the jail.

2  Q    And is she a --

3  A    She helps with the contracts and getting us malpractice

4  insurance and things like that.

5  Q    -- and is she an employee of Karas Correctional Health?

6  A    That's a good question.  I don't know if she's on Karas

7  Correctional Health payroll or if she's only on Karas Health

8  Care payroll.  I don't know that.

9  Q    And in your own words, how would you describe

10  Kelley Hinely's job responsibilities?

11  A    She was -- she's the -- she's the full-time medical

12  manager at the jail.

13  Q    And does Kelley Hinely report directly to you?

14  A    Yes.

15  Q    And as the full-time medical manager, what kind of

16  services or functions for Karas Correctional Health does she

17  provide?

18  A    She would do the scheduling, I -- I believe.  I don't know

19  if she still does the scheduling.  She has a new person that

20  helps her.  But she would schedule people.  She would do a lot

21  of the education and training, if not all of it.  And what else

22  would she do?  Scheduling, administration, and she would see

23  patients every day pretty much.  She would see patients as a

24  provider as well.  And, yeah, that's about -- yeah, she would

25  take care of the administrative stuff and see patients as well.

1  Q   Okay.  Who --

2              MR. SMITH:  Or strike that.

3  Q   (By Mr. Smith)  Karas Correctional Health is a

4  professional limited liability company; is that right?

5  A   I don't know.  I -- I'd have to ask my lawyer and look at

6  the paperwork.  I don't know if it's -- I don't know.

7  Q   Do you know who the -- are there any other owners or

8  members besides yourself?

9  A   No.

10  Q   Has there ever been any other owners or members?

11  A   No.

12  Q   And so as we're sitting here today, how many employees

13  does Karas Correctional Health have?

14  A   I think -- I think we have about 20 or 25 if you count our

15  part-time, med passers, and things like that.  But I -- I don't

16  know exactly, but I would guess about 20.

17  Q   Okay.  Do you recall when Karas Correctional Health first

18  started providing medical services to the Washington County

19  Detention Center?

20  A   I believe it was 2016, January.

21  Q   And at that time, do you remember --

22              MR. SMITH:  Or strike that.

23  Q   Did Karas Correctional Health exist prior to 2016?

24  A   We maybe incorporated a month before or two months before

25  to get the contract.

1          (Witness reviews document.)

2          THE WITNESS:  Yeah, it's just the contract, so

3     if I -- if you have questions, I'll just look to the

4     section of the contract that has the questions.

5   Q   (By Mr. Smith)  Yeah.  And I'll represent to you,

6   Dr. Karas, that I don't have any substantive questions other

7   than:  Is this your signature at the bottom?

8   A   Yes.

9   Q   Okay.

10  A   Yeah.

11  Q   And, once again, can you describe this document for me or

12  what it is?

13  A   It's the contract between Karas Correctional Health and

14  Washington County Detention Center for medical services for --

15  I believe, for the January 2022 year.

16  Q   Okay.  Thank you, Dr. Karas.

17          MR. MOSLEY:  Are you going to attach that, Ryan?

18          MR. SMITH:  Yeah.  Thanks, Mike.

19          I'll move to enter that as Plaintiff's

20     Exhibit 1.

21          MR. MOSLEY:  No objection.

22          (Whereupon, Plaintiff's Exhibit 1 was marked for

23     identification and is attached hereto.)

24  Q   (By Mr. Smith)  Dr. Karas, can you remind me, what year

25  did you say Karas Correctional Health started providing medical

1  services to --

2  A    I believe it was --

3  Q    -- Washington County Detention Center?

4  A    -- I believe 2016.

5  Q    2016?

6  A    I believe so.  I could --

7  Q    Okay.

8  A    -- I could be wrong.  I -- you'd have to ask Tracey or

9  somebody.

10 Q    And can you describe for me how, I guess, the business

11 relationship sort of began between Karas Correctional Health

12 and the Washington County Detention Center?

13              MR. MOSLEY:  Object to form.

14              You answer.

15 A    We -- we bid on the contract the initial year they put it

16 out for bid, which I believe was 2015.  And they -- we got in

17 on the bidding process fairly late, and they went with another

18 company in 2015, some national company.  And then at the end of

19 2015, they contacted us, I believe, that they were going to

20 open it for bid again.  And we rebid on it and got it for 2016,

21 I believe.

22 Q    (By Mr. Smith)  And how were you notified that -- at the

23 prior, not when they recontacted you the second time -- but how

24 did you learn that the bidding process was open for this

25 contract?

1  A    It was in the newspaper -- the local newspaper.  They were

2  bidding for medical services, the Washington County Jail was --

3  Detention Center.

4  Q    And do you recall if your bid changed when you, I guess,

5  resubmitted your bid the second time?

6  A    You're talking different years, I believe.  Right?

7  Q    I think you said that originally they went with a large

8  company --

9  A    In --

10  Q    -- and then they didn't go with a large company, and

11  they --

12  A    -- in 2015 --

13  Q    -- and they contacted --

14  A    -- in 2015, you mean?

15  Q    Okay, so walk me through what happened in 2015.

16  A    We made a bid on it, and we didn't get it.  They gave it

17  to another company.

18  Q    I understand.  Okay.  And then that company had it for,

19  like, a year?

20  A    One year.  Uh-huh.

21  Q    Okay.  Okay.  You're right.  I was misunderstanding.

22      Okay, so then in -- and in 2016, you then bid on the

23  contract and were awarded the contract?

24  A    Yes.

25  Q    Okay.  In 2016, do you recall how many other bidders there

1  were?

2  A    I don't -- I don't recall.

3  Q    Was it more than just Karas Correctional Health?

4  A    I believe so, but I -- I don't -- I don't remember.

5  Q    And did you ever speak with anybody at the county as to

6  why Karas was awarded the bid?

7  A    No.  I mean, we talked to the sheriff.  I think our bid

8  was maybe the cheapest.  I don't know if it was the cheapest or

9  not.  But they -- they chose us.

10  Q    And in 2016, how many employees did you have -- or Karas

11  Correctional Health have?

12  A    We probably -- probably had less than 10 when we first

13  started.

14  Q    As between Karas Correctional Health and Washington

15  County, who has the final decision-making authority when it

16  comes to patient care?

17                    MR. MOSLEY:  Object to form.

18                    You still answer, Doctor.

19  A    We -- I would say if I'm treating the patient, I have the

20  final decision.

21  Q    (By Mr. Smith)  Do you ever consult with anybody at

22  Washington County about patient care?

23  A    About patient care.  Can you be more specific?

24  Q    Sure.  When, let's say, you are evaluating a patient and

25  want to proceed with a specific course of treatment, do you

1 ever have to run that by anybody at Washington County?

2 A    No.

3 Q    Is there any time that you consult with Washington County,

4 or anybody at Washington County, related to patient care?

5 A    I mean, we ask them -- what's the question again?

6 Q    Is there any time that you consult with anybody at

7 Washington County about patient care?

8 A    You know, occasionally, we might talk to a prosecuting

9 attorney if somebody needs to have something done or they have

10 to go out on an ankle brace or ankle monitor; or if it's a

11 psychiatric patient that needs an inpatient stay at a

12 psychiatric hospital, we might talk to the prosecutor -- which

13 they're not Washington County, I don't believe -- or I don't

14 know who hires them -- and -- and see about whether or not

15 they're able to be put out on ankle monitor; or what we need to

16 do if we want to send somebody to the hospital, we might ask

17 them, you know, "We're needing to send these people to the

18 hospital.  We need transport."  So you'd have to talk to people

19 about that.

20 Q    Any instances related to specific medical care for, like,

21 a specific patient?

22 A    No, I don't -- I don't think so, no.  No, we don't talk

23 with them about medical just like they don't talk with us about

24 how to house their -- you know, their -- we do the medical.

25 Q    Does Karas Correctional Health have its own set of

1  I've seen the phrase "COVID protocol."  If I use that term,

2  that phrase, do you know what I'm talking about?

3  A    Yeah.  There was a period of time where we did have a

4  COVID protocol.

5  Q    Okay.  And in your own words, can you describe for me what

6  the COVID protocol is or was?

7  A    What time period?

8  Q    Let's start with -- well, when did you first create a

9  COVID protocol?

10 A    I -- I believe it was in 2021 with the Delta wave is when

11 we started using the protocol.  Before that, the first wave at

12 the jail, I was there every day, and I was just doing

13 everybody's treatments, or I was typing in most of the

14 treatments.  Maybe Kelley was too.  And -- and it wasn't a

15 hard-and-fast protocol per se.  You know, it would depend if

16 the inmate was over 40 or under 40, if they had diabetes, some

17 risk factors.

18 Q    Okay.  So we'll go back to the 2020 period that you're

19 describing in just a second, but let's focus in now on the 2021

20 when you said you created and started using the COVID protocol.

21      So when you created the protocol in 2021, do you recall

22 what month that was?

23 A    No, I don't recall what month, but it was probably in the

24 summer, I believe, thereabouts, when -- when Delta wave started

25 hitting pretty hard in -- it started in June here, I believe --

1  or, no, July.  It started in July in Arkansas.

2  Q    And are you saying the -- you're saying the Delta wave

3  started in July or the protocol started in July?

4  A    I believe the -- the protocol started shortly after the

5  Delta wave started -- when the Delta wave started in July.

6  Q    Okay.  So beginning in approximately July of 2021, can you

7  describe for me what the COVID protocol was?

8  A    It -- it was doxycycline -- it was probably our MID-D3

9  protocol:  doxycycline 100 milligrams BID for five days;

10  Singulair, which is montelukast, 10 milligrams daily for seven

11  to ten days; vitamin C, D, and zinc packets.  I believe we

12  would do ivermectin for five days, if you're under 150 at 12

13  milligrams; if you're above 150, it's 24.  And we would do

14  high-dose vitamin D 100,000 a day for three days.  And I

15  believe that's most of it.  And then steroids possibly if they

16  got sicker.

17  Q    Okay.  So you've just listed off a number of medications,

18  drugs; is that correct?

19  A    Correct.

20  Q    So is it -- I mean, is it fair to say that the COVID

21  protocol is the, I guess, drug regimen that you're going to be

22  administering to people that are -- either tested positive or

23  are preventing COVID?  Is it just a drug cocktail, I guess, is

24  my question.

25             MR. MOSLEY:  Object to form.

1 for Karas Health Care?

2              MR. MOSLEY:  Object to form.

3 A    Me.  I mean, and then I would -- we would talk.  Everybody

4 would talk.  I mean, we would talk with the other -- my

5 providers that worked for us, and then you read things as well,

6 you know.  There was a website on Facebook called "The COVID-19

7 USA Physicians and APP Group," and I -- I read that a lot as

8 well, as far as when we were researching and trying to figure

9 out the disease and the process and the treatment.

10 Q    (By Mr. Smith)  And you say "when we were researching."

11 Who else was a part of that process?

12 A    I'd say all my nurse practitioners were reading on it.

13 We'd -- I had physician assistants.  And I don't remember when

14 Dr. Hoover came.  But, I mean, most people were reading up on

15 COVID all the time, most physicians, or they should have been.

16 Q    And so when you were creating the COVID protocol, you

17 would consult with or collaborate with the other providers at

18 your facilities.  Is that what you're saying?

19 A    Yeah, my facilities, other colleagues in -- some in town,

20 some out of town, and yeah.

21 Q    And you mentioned that you started using the COVID

22 protocol in approximately July of 2021 at Washington County

23 Detention Center; is that right?

24 A    The Washington County Jail protocol, yeah.

25 Q    Okay.  So explain to me what you mean by "the Washington

1 County Jail protocol."

2 A    Well, there we have to -- you know, we had to set up where

3 you could hit the buttons to put the meds in, you know?  So

4 that's -- that's what I'm talking about.  We don't have that in

5 the clinic.  You just write a script or whatever.

6 Q    So I don't know what you mean by, you know, pressing the

7 buttons to get the meds, so walk me through --

8 A    Oh, at the jail?

9 Q    -- what you're sort of describing there.

10 A    For our COVID protocol meds, you'd -- at the jail, you'd

11 get on the electronic health records out there; a patient

12 tested positive; you'd go over in the meds how you'd prescribe

13 any meds:  You have to write them in, or there's some pre-set

14 orders for different meds that are already written in there,

15 and then we had the COVID meds too that you could click -- you

16 could click the different meds to prescribe.

17 Q    And so was the Washington County Jail protocol somehow

18 different than the protocol you used at your private clinic?

19 A    It was a little bit.  But if you've read that -- I don't

20 know if you have it or not, but I -- I --

21              MR. MOSLEY:  Oh, they have it.

22 A    -- did print up --

23              THE WITNESS:  Huh?

24              MR. MOSLEY:  Oh, they have it.

25              THE WITNESS:  Oh.

1  A      -- the "Evolution of Karas Health Care Protocols," if you

2  read that, I -- I note it in there.  At the jail we -- we did

3  not go up on our doses of ivermectin like everybody was doing

4  out in the -- the FLCC went up 0.2 to 0.4 milligrams per

5  kilogram, then they went up to 0.6 -- 0.4 to 0.6 milligrams per

6  kilogram.  And we never did that at the jail and -- because our

7  patients never got very sick.

8       And we -- so we -- our -- our dosing at the jail for

9  ivermectin was a little less than the dosing on patients -- not

10 always less, but potentially less -- than patients during a

11 certain set time period.  About -- if you look at the FLCC's

12 website, I think in 8/27, they went up -- 8/27/21, they

13 increased from 0.2 to 0.4 per dose to 0.4 to 0.6.  Before that,

14 for a while, it was 0.2 to 0.4.  And initially the ivermectin

15 dosing was 0.2 on Day 1 and Day 3.  Initially, that's the way

16 people were treating it, and that's the way we did it early on

17 too with COVID, but then we went to a 5-day regimen.  And, like

18 I said, some places or some people kept going up on the

19 ivermectin, and at the jail we stayed with the 0.2 to 0.4 range

20 of dosing.

21 Q    (By Mr. Smith)  And I believe you mentioned earlier when

22 you were going over the drug cocktail, or the protocol, that,

23 for ivermectin, if a patient weighed less than 150 pounds, it

24 was 12 milligrams; is that correct?

25 A    Correct.

1  A    Well, 150 pounds is about 75 kilos.  75 times 0.2, it

2  would be 14.  So it -- it was about a 0.2.  It just depends.

3  If you got 24 milligrams and you weighed 160 pounds, then

4  that's more on the 0.4 end of the spectrum.  So it just depends

5  on where you're at.

6  Q    Well, sure.  But it looks like, I mean, you -- you know,

7  if somebody was to weigh 148 pounds, on your protocol they

8  would get 12 milligrams.

9  A    Correct.

10  Q    And if somebody was to weigh 152 pounds, they'd get double

11  that.

12  A    Correct.

13  Q    Okay.  And so that strikes me as being pretty different

14  from 0.2 to 0.4 milligram per kilogram.  That takes the

15  individual --

16  A    Well --

17  Q    -- the weight into account for each 0.2 milligram.

18  A    -- it's -- it's a range.  You can go on the high end or

19  low end of the range.  A lot of medicines do that.  Like

20  amoxicillin, or whatever, you can use 40 to 90 milligrams per

21  kilogram, and it's up to the clinician to pick what dose or

22  what range he wants.

23  Q    Okay.  And so why did you use the range that you used

24  rather than the range that the FLCCC --

25  A    We were having good success at our jail with our

1  treatment, and the dosing that we had, that's what we stayed

2  on.  We didn't follow the FLCC's exactly.  I independently came

3  up with our protocols, and they -- and, you know, they are very

4  similar to the FLCCC's website protocols, but not exact.

5       They also went to twice-a-week prophylaxis dosing on

6  ivermectin where you take it two times a week to prevent COVID,

7  and we never did that in our treatment, outpatient or -- and we

8  never did any prophylaxis at the jail.

9  Q    Okay.  So you say that you independently came up with the

10 protocols.  But you -- and so how did -- you took the FLCCC

11 into account when creating your protocols?  Is that what you're

12 saying?

13 A    Well, I -- I was familiar with their protocols, and -- and

14 we -- I'm trying to think with what we took off of them.  They

15 didn't -- if you read that Evolution of Karas Health Care COVID

16 Protocols, the treatment evolution, we used Singulair, which is

17 montelukast, and they used quercetin.  And I believe they're

18 similar.  One's an over-the-counter, and one's a prescription.

19 But their -- their pharmacological properties are similar,

20 so -- so that was similar to them.

21      They didn't use doxycycline.  We use doxycycline.  They

22 didn't use such big doses of vitamin D.  We used higher doses

23 of vitamin D than they did.  And we just used a little lower

24 doses of -- or of the ivermectin.  And as far as prophylaxis,

25 we use less frequent dosing for prophylaxis as well.  Not in

1  the jail.  That was outpatient in the clinic.

2  Q    Okay.  And you just described the different ways that your

3  protocol was different from the FLCCC protocol; is that

4  correct?

5  A    Correct.  And theirs has changed frequently too.  And --

6  Q    So yours changed frequently?

7  A    We -- it evolved, yes.  It evolved the whole time.  We --

8  we don't treat now the same way we treated back in June of

9  2021.  Generally, now we're back down to ivermectin just twice

10  usually for -- for two doses, not five doses.

11  Q    Okay.  So for all the differences that you just described,

12  what sources of data did you rely on when deciding to do things

13  differently than the FLCCC?

14  A    That was just we -- you know, we started reading as soon

15  as we -- you hear about COVID, and -- and you would -- that

16  website I -- or the Facebook page, the U.S.A. Physicians

17  COVID-19, there was lots of information being shared by

18  physicians and physician assistants and nurse practitioners

19  throughout the country, and actually throughout the world, of

20  what people were trying, using, and having success with.

21       There's -- you know, there's other scientific articles

22  that came out.  There's a nice cartoon thing of the -- of

23  the -- or of the -- of -- from -- Dr. Marik had a video out

24  explaining the pathophysiology of COVID in the lungs which was

25  helpful.

1  Q    Okay.  So I'm understanding you correctly, you're saying

2  that you relied on some social media Facebook posts from U.S.A.

3  Physicians COVID-19 page, various scientific articles, a

4  cartoon from Dr. Marik, all of those things, when sort of

5  creating your COVID-19 protocols?

6  A    And from --

7                  MR. MOSLEY:  Object to form.

8  A    -- and -- and also from 20 years of medical experience of

9  treating viruses.

10  Q    (By Mr. Smith)  All right.  Anything else?

11  A    I followed a guy named John Campbell, Dr. John Campbell,

12  on YouTube.  He was very helpful.  I had a -- a colleague, a

13  med school friend of mine, that was very helpful as well.

14  Q    Who is that?

15  A    That was a Dr. Lance Hoover, H-O-O-V-E-R, not related to

16  Dr. Hoover who works --

17  Q    Okay, that --

18  A    -- with us.  That's --

19  Q    Sorry.  That was going to be my question.  That's not the

20  Dr. Hoover that you mentioned a second ago?

21  A    No.  No, he -- he's an anesthesiologist and travels the

22  country doing anesthesiology.

23  Q    Okay.  And any -- anything else?

24  A    No, that's the main thing, the sources.

25  Q    Okay.  What about --

1  A    -- then.

2  Q    Did it change five times or more?

3  A    I don't know.

4  Q    Was it more than once, more than one change?

5  A    There -- yeah, I think we -- we added some things.  I

6  believe we added -- Luvox came around -- I can't remember if

7  that's the name -- an old antidepressant we maybe -- well, no,

8  that wasn't protocol.  It was an option.  Yeah, we had it out

9  there.  I -- I can't remember if it made the protocol list or

10  not, but we -- I believe we used it on some inmates.

11  Q    Okay.  And those changes, were those, again, based on your

12  experiences, or was that based on research that you were doing?

13  A    Both.

14              MR. MOSLEY:  Objection --

15  Q    (By Mr. Smith)  Okay.  What kind --

16              MR. MOSLEY:  -- to form.  I --

17              Go ahead.

18  Q    (By Mr. Smith)  And what kind of research were you doing

19  at that time?

20  A    Just reading, reading, like, online, you know, like

21  everybody was.  That -- that one Facebook page was pretty good

22  and with -- with good discussion, good articles, so, yeah.  And

23  then I also mentioned that Dr. John Campbell, who's a professor

24  in England, he had helpful information.  And then I also

25  frequently emailed my -- my friend from med school that was --

1  read a lot and researched a lot on COVID.

2            MR. SMITH:  Okay.  I'm kind of at a stopping

3        point now, Mike, if you still want to take a break.

4            MR. MOSLEY:  Oh, no.  No, we -- you go on.  You

5        keep asking this.  I -- you just get done.

6            MR. SMITH:  Okay.

7            MR. MOSLEY:  If you want to -- do you understand

8        what you've alleged in the first amended complaint?

9        Do you want me to send you a copy of that?

10           MR. SMITH:  Mike, I asked you if you wanted to

11       take a break or not.  It's a yes or no question.

12           MR. MOSLEY:  You don't get to tell me how I

13       answer anything you ever say out of your mouth.  Do

14       you understand?

15           MR. SMITH:  Mike, this is my ----

16           MR. MOSLEY:  Do you want to take a break?

17           MR. SMITH:  -- Mike --

18           MR. MOSLEY:  Let's take a break.

19           MR. SMITH:  -- this is my deposition.

20           MR. MOSLEY:  At this point we need to contact

21       Judge Brooks, is my opinion.

22           MR. SMITH:  I want to get this on the record.

23       On what basis?

24           MR. MOSLEY:  On the basis of 26(c), as I said

25       earlier, annoyance.  You have alleged that your

1  know.

2  Q    (By Mr. Smith)  And why wouldn't you write a

3  contraindicated -- a prescription for a contraindicated

4  medication?

5  A    They might have a side effect to it --

6  Q    Okay.

7  A    -- that might --

8  Q    Sorry.

9  A    -- yeah, that's all.  If it was contraindicated, it could

10  cause bleeding, I suppose, or -- it just depends on what the

11  contraindication was.  Some meds you can't mix.  You don't want

12  to take too many different blood thinners.

13  Q    Because it's dangerous?

14  A    Yes.

15  Q    Okay.  So with respect to the informed consent that

16  patients sign at intake, is it your position that they are

17  consenting to prescription of potentially dangerous drugs?

18  A    Yes.

19  Q    Any kind of drug, even if it could kill them, they're --

20  they've consented to --

21              MR. MOSLEY:  Objection to form.

22  Q    (By Mr. Smith)  -- a prescription for that drug?

23  A    Correct.  Like every medicine -- like the antidepressants,

24  you increase your risk of suicide 3 percent.  Do we use

25  antidepressants at the jail?  Yes.

1  Q    And would you prescribe those drugs without telling the

2  patient that they were receiving that drug?

3  A    I would -- would I tell them all the side effects of the

4  medication?  Most likely not, no.

5  Q    Not what I asked, Dr. Karas.  Would you prescribe it

6  without telling them what the drug was?

7  A    No.  I would tell them what the drug was.

8  Q    Okay.  And why would you tell them what the drug was?

9  A    We -- we tell them what the drug -- every medicine we give

10 them, we tell them what it is.

11 Q    And if it could -- if there were potentially dangerous

12 side effects, would you --

13 A    Every medicine --

14 Q    -- tell them about those?

15 A    -- every medicine has potential dangerous side effects, so

16 I wouldn't tell them about all of them, no.  I mean, you --

17 Q    Would you tell them about any of them?

18 A    If they were significant or severe, we would talk with the

19 patient and weigh the benefits and the -- and the positives and

20 the negatives.

21 Q    And when you say if it's significant or severe, are you

22 saying if you think it's significant or severe or if the

23 patient --

24 A    Or if it could be.

25 Q    -- thinks it's significant or severe?

1              MR. MOSLEY:  Object to form:  Makes no sense.

2   A    Okay.  It would be, I guess, if -- if I thought it was

3   significant.

4              MR. SMITH:  Let's take a five-minute break.

5              MR. MOSLEY:  I'll be right here.

6              THE WITNESS:  Okay.

7              MR. SMITH:  Okay.

8              (Whereupon, a recess was taken, after which the

9         proceedings continued as follows, to-wit:)

10  BY MR. SMITH:

11  Q    Dr. Karas, did anything happen during that break that

12  would prevent you from --

13  A    No.

14  Q    -- testifying truthfully?

15  A    No.

16  Q    Okay.  All right, Dr. Karas, I have a few more questions

17  on training really quick.

18       As protocols evolved through COVID-19 and ivermectin was

19  used in the treatment regimen, did you have any meetings with

20  KCH employees regarding the use of ivermectin as a treatment

21  for COVID-19?

22  A    Oh, we talked about ivermectin.  It's -- we have, like,

23  one small room where all the medical staff operates in the

24  jail, and so we're in there working on the computers, talking

25  away, and I'm sure we talked about what we were doing, why we

1    A    Correct.

2    Q    -- and it says "Med Call."  Do you see that?

3    A    Yes.

4    Q    Okay.  This second line right here says:  "COVID-positive

5    8/21 of '21" -- or --

6    A    Correct.

7    Q    -- let me rephrase -- yes -- is that what that means?

8    A    I believe so.

9    Q    Okay.  And then it lists Mr. Wooten's weight as 158

10   pounds.  Is that right?

11   A    Correct.  But, yeah, we don't know if that's his intake

12   weight or what, but yes.

13   Q    Okay.  And it says -- at the bottom right here, it says:

14   "Protocol meds started.  Placed on review."

15        Did I read that correctly?

16   A    Yes.

17   Q    Okay.  And this was entered, it appears, by Jolana Wilson;

18   is that right?

19   A    Yes.

20   Q    And do you, Dr. Karas, know who Jolana Wilson is?

21   A    Yes.  She's a paramedic that still works for us at the

22   jail.

23   Q    Okay, she's a paramedic.

24        And when it says "Protocol meds started," what does that

25   mean?

1    A     That means that we -- those prescription order set that we

2    had set up for COVID, those meds were entered.  That's what it

3    means.

4    Q     And so is Jolana Wilson ordering the prescriptions?

5    A     She's following the protocol.

6    Q     Okay.  Is she ordering the prescriptions?

7    A     "Protocol meds started."  She is entering the medicines to

8    be ordered.  So I guess you'd have to define "ordered."  And I

9    would say since it's a protocol, it's us ordering it.  We use

10   that for when they have tooth pain, or we have other protocols

11   where they can start medicines as well.

12   Q     Okay.  But Jolana Wilson is putting in the order for these

13   prescriptions?  Is that what you're saying?

14   A     Yes.  It looks -- yes, it looks like that.

15   Q     And does a paramedic have prescriptive authority?

16   A     No.

17   Q     And so this is dated August 21st of 2021.  Did you know

18   that paramedics were ordering prescriptions for the protocol?

19   A     Yes.

20   Q     As of that date?

21   A     I -- I assume I did, yes.

22   Q     Okay.  I'm -- oh, and then at the end, it said "Placed on

23   review."  Do you know what the purpose of placing it on review

24   was?

25   A     Yes.  Yeah, on the protocols, you have to have the

1   A    Correct.

2   Q    Is that right?

3   A    Correct.

4   Q    Okay.  And Ms. Hinely, I'll represent to you, testified

5   that this was her reviewing the order.  Does that seem -- does

6   it appear to you that that's what this is sort of documenting?

7   A    Yes --

8   Q    Okay.

9   A    -- I believe so.

10  Q    Okay.  And it looks like she did her review on 8/23 of

11  2021.

12  A    Correct.

13  Q    Okay.  Is there any concern that she did not review the

14  prescription until two days later?

15  A    The -- is there some concern?  Well, I looked it up.  8/23

16  is Monday, I believe, so probably it was Friday night when it

17  was put in, and Kelley probably wasn't in the jail on that

18  Saturday or Sunday.  But is there any concerns?  No, I don't

19  see any concern with it.

20  Q    Okay.  No concern with a paramedic prescribing drugs and

21  there not being any check until two days later?

22              MR. MOSLEY:  Object to form.

23  A    Yeah, I'd say they're not prescribing.  They're -- or they

24  enter a protocol that's been approved.  And when it's an

25  infectious disease process where time is of the eminence or --

1  then the sooner you start the medicines, the less likely you're

2  going to have a bad outcome.  So in this scenario, I -- I think

3  it's appropriate.

4  Q   (By Mr. Smith)  And so you say it's "not prescribing."  So

5  what's the difference between what happened here and

6  prescribing a drug?

7  A   Say that again?

8  Q   Sure.  You testified that you wouldn't say it's

9  prescribing a drug, so my question is:  What is the difference

10 between what's happening here and prescribing a drug?

11 A   It's -- it's -- she is following a protocol, I would say,

12 and that's -- so I would say it's not prescribing.  She was

13 just data-entering the medicines.

14 Q   Okay.  We talked earlier about the protocol for ivermectin

15 and that it was based on weight; correct?

16 A   Correct.

17 Q   And you testified that if a patient weighed over 150

18 pounds, he should be getting 24 milligrams of ivermectin based

19 on the protocol; is that --

20 A   Correct.

21 Q   -- correct?

22 A   Correct.

23 Q   And based on this sheet, Mr. Wooten --

24 A   Correct.  Correct.

25 Q   -- weighed 158 pounds at that -- based on the sheet, we

1  A    -- already seven days in.  His oxygen is not bad, so most

2  likely he wasn't going to start getting the COVID pneumonia;

3  although, I can't remember if he did.  Yeah, he was better.  He

4  didn't get any IV vitamin C like the other gentleman.

5  Q    Besides the patient's finances and the number of days that

6  the patient had symptoms, what other clinical factors might be

7  taken into account when deciding where on the spectrum the

8  dosage should fall?

9                 MR. MOSLEY:  Object to form.

10  A    Weight of the patient, age of the patient, other medical

11  factors like diabetes or other risk factors.

12  Q    (By Mr. Smith)  Did the jail protocol take those other

13  considerations into account?

14  A    Yes, we did.  We -- that's why we started using everything

15  at the jail.  But for the -- during the Delta wave, it was very

16  -- I thought it was a more dangerous strain, and so we used all

17  the meds on everybody.  At first -- in the first -- when I was

18  there for that 6- to 8-week period, we -- we'd do Day 1 and 3

19  of ivermectin, and we -- we would save that for the high-risk

20  patients that were over 40 or had diabetes.  But -- but with

21  the Delta wave, I believe, we -- we gave everybody the same --

22  same meds.

23  Q    And it wasn't, like, on a range.  It was either

24  12 milligrams if you're under 150, or it was 24 if you're over

25  150.

1 one.  This one was more like a vaccine.

2          MR. SMITH:  Okay.  All right, and now I'm going

3        to pull up Document 16.  The Bates stamp on this is

4        3437.

5        I'm sharing my screen with you, Dr. Karas.  Let

6        me know -- can you see my screen?

7        THE WITNESS:  Yes.

8        MR. SMITH:  Okay.

9        THE WITNESS:  7/13 --

10       MR. SMITH:  Is --

11       THE WITNESS:  -- so that's June.

12       MR. SMITH:  Yeah, is this -- oh, I'm sorry.

13       THE WITNESS:  I'm just looking.  Yep, that's one

14       of them I looked over this morning.

15 Q   (By Mr. Smith)  Excellent.  Okay.  Do you recognize the

16 document?

17 A   Yes, sir, I recognize from seeing it.  I don't remember

18 writing it, but I remember I --

19 Q   Okay.

20 A   -- or if I did write it -- or wrote it.

21 Q   Do you have any reason to dispute that you wrote this

22 email?

23 A   No.  No.

24 Q   Okay.  And it does say "Isaac Karas."

25 A   Yeah.

1  Q    I've seen that on a couple of documents.  Can you explain

2  why it might say that?

3  A    Somehow my son got into my emails, and now it shows up

4  that it's Isaac Karas instead of me, but -- but it's my email

5  account.

6  Q    Okay.  All right.  And about midway on the page, it says,

7  starting with "Attached" (as read):  "Attached is a McGill

8  University researcher's letter to get funding for a study.

9  About halfway through is a letter from myself.  This study was

10 specifically for montelukast.  She used our jail data" -- sorry

11 -- "she used our jail data on the 311 cases we had at the jail

12 with no deaths and only one hospitalization.  She initially

13 tried to mine or EMR data from our 4,000-plus clinic patients,

14 but her software wouldn't talk to ours.  I'll forward you our

15 jail data in Excel."

16      Did I read that correctly?

17 A    Correct.

18 Q    Okay.  All right.  All right, I'm now pulling up --

19              THE COURT REPORTER:  Did you want to mark that

20         last one?

21              MR. SMITH:  Oh, yeah.  Thank you, Amy.  I am

22         going to enter that as Plaintiff's --

23              THE COURT REPORTER:  -- 9.

24              MR. SMITH:  -- 9.  That's what I was going to

25         say.

1          MR. MOSLEY:  Objection:  Irrelevant.  Objection:

2      Has nothing to do with this lawsuit.  And I'll

3      preserve my right to strike it.

4          And if we're going to sit here and talk about

5      montelukast, we'll go to -- we're about to be done.

6          (Whereupon, Plaintiff's Exhibit 9 was marked for

7      identification and is attached hereto.)

8  Q    (By Mr. Smith)  Dr. Karas, do you recognize this Excel

9  spreadsheet that's on my screen?

10  A    Yes.

11  Q    Does this appear to be the, I think the phrase was, "jail

12  data in Excel" that the last email referred to?

13  A    I believe so.

14  Q    All right.  And I'm looking at the columns.  It has

15  initials, date of birth, sex.  Are those descriptors for, like,

16  patients?  Is that patients that -- or, I guess, jail patients?

17  A    Correct.

18  Q    Okay.

19  A    Or I think so.

20  Q    Dr. Karas, did you create this Excel spreadsheet?

21  A    No, I did not.

22  Q    Do you know who did?

23  A    I think Kelley did, Kelley and her staff.

24  Q    And who -- when you say, "her staff," who would that

25  include?

1  A    I don't know who she would've had worked on it.  If

2  Johnathan worked on it, if Rachael, or if anybody worked on it,

3  I'm not sure.

4  Q    Okay.  Did you ask or direct her

5              MR. SMITH:  Or strike that.

6  A    I did --

7  Q    Did you --

8  A    -- I did -- I asked.

9  Q    -- did you direct her to make this spreadsheet?

10 A    Yes.

11 Q    Okay.  And do you recall when you would have directed her

12 to make this spreadsheet?

13 A    No, I don't recall when.

14 Q    Why did you direct her to make this spreadsheet?

15 A    Gathering data and trying to help other providers start to

16 research and -- and options that could be used to treat COVID,

17 repurpose drugs.

18 Q    All right, Dr. Karas, I'm scrolling to basically the last

19 few columns.  Or I guess let me -- all right, I'm looking at

20 Column AJ -- not AJ.  I'm sorry -- AF.

21 A    Yes, sir.

22 Q    And it mentions Singulair.  That is also known as

23 montelukast; is that correct?

24 A    Correct.

25              MR. MOSLEY:  Object to form.

1   Q    (By Mr. Smith)  And you had mentioned that the study in

2   that last email was for montelukast; is that right?

3                   MR. MOSLEY:  Object to form.

4   A    She was -- she was trying to get funding to study

5   montelukast as a preventive treatment for COVID.

6   Q    (By Mr. Smith)  And so why did you send this -- why did

7   you send this spreadsheet to her?

8   A    You have to have a premise for your research, and she had

9   a premise that -- that the mechanism action of Singulair, or

10  montelukast, that it would prevent the cytokine storm.  So she

11  -- she was looking.

12      I had talked to a guy on that Facebook page, a physician

13  out of Colorado, and he says, "Oh, you might" -- and I was -- I

14  was telling people what I was using for treatment of COVID-19

15  on the -- in that website, you know, pretty much our

16  "Evolution" and tell them, "Hey, I'm using this, this, this,

17  and this."  They're like, "Oh, there's a lady I know who's

18  doing research on montelukast out of Canada.  You might want to

19  contact her."  And I think that's how I contacted her.

20  Q    And did you send this spreadsheet because you thought it

21  would help her research?

22  A    I thought it would help her -- help support her premise.

23  Q    Why is that?

24  A    Because none of our inmates died, and they -- they took --

25  if you look, most of them took the Singulair -- well, now --

1  now, not all of them, but -- actually, let's see.  I can't

2  tell, but.

3  Q    Okay.  And it looks like under Column AO, it also includes

4  ivermectin; is that correct?

5  A    Correct.

6  Q    And when you directed Ms. Hinely to create this

7  spreadsheet, did you tell her to include Singulair and

8  ivermectin on the spreadsheet?

9  A    All our treatment protocol, whatever we used, if you

10  looked at all that:  The IV vitamin C, vitamin pack, melatonin,

11  Decadron, prednisone, Pepcid, steroid inhaler, albuterol

12  inhaler, Tylenol, ivermectin, D3.  So all our treatment

13  medicines.

14  Q    Okay.  And what does -- in Column AQ, what does

15  "Medication Compliance Y/N" -- what does that mean?

16  A    Did they take the medicine.

17  Q    Did they take the medicine?

18  A    Um-hum.

19  Q    Okay.  So under AO, it has "Ivermectin Y/N," and for Row

20  Number 2 right here, it has a "Y."  What does "Y" under

21  "Ivermectin Y/N" mean?

22  A    It looks -- it was ordered.

23  Q    Okay.

24  A    Because sometimes you -- for our research, if you're -- if

25  they took the -- if we ordered it, but they didn't take it, and

1  that -- we want to know that they didn't take it.

2  Q    Okay.  And, okay, so what does -- under "Medication

3  Compliance," what would "N/A" mean?

4  A    Not applicable.  Looks like we -- looks like we didn't

5  order anything for that guy.  It might have been when we

6  were -- if you go back to the -- all the way left --

7  Q    Um-hum.

8  A    -- let's see --

9  Q    Looks like --

10  A    -- and you got a vitamin pack --

11            MR. MOSLEY:  Wait.  Wait.  He asked you to go

12        all the way left.

13            THE WITNESS:  Yeah.

14            MR. MOSLEY:  He asked you to go back all the way

15        left.

16  A    Yeah, so that's -- was it Line 2 or 3?

17  Q    (By Mr. Smith)  Let's go back and look.  Line 3.

18  A    3, okay.  So Line 3 was a young person.  They were born in

19  2000.  Looks like we just gave them only vitamins.  So -- and I

20  don't -- oh, that's on-intake vitamins.  Keep going to where --

21  or I got to move my camera thing here.

22  Q    Here, and I'll highlight Row 3 to make it -- try and make

23  it easy for you.

24  A    Oh, it looks like he got released.  He got released, so he

25  got out.

1   right?

2   A   Or to help further the COVID information and -- and

3   hopefully help with treatments, like I said in the letter, I

4   believe.

5   Q   Okay. So how did this spreadsheet do that? How did

6   you -- what was your sort of takeaway from these data points?

7   A   Well, the main takeaway was whatever we did worked.

8   Right? Early on with COVID, in the first wave, the first year

9   and a half, there was a 1.5 percent infection fatality rate.

10   Right? And so we had, I think, in the first -- you know, I

11   don't remember the exact dates, but we had well over 300 to 500

12   with no deaths. So we should've had 1.5 times 5, 3 to 5, so we

13   should've had 4, 5, 6, 8 deaths.

14      Arkansas -- there's a thing called the Marshall Project.

15   Arkansas, I think, was the second-highest infection rate in the

16   correctional facilities, and they were in the top five for

17   deaths percentage-wise for -- for inmates with COVID. So here

18   we had this -- we have this -- you know, the second-largest

19   jail in the state, probably about the seventh-largest

20   correctional facility in the state, and -- and we had zero

21   deaths, and we kept it out of our jail, initially.

22      If you remember, COVID hit -- hit the -- hit the -- it

23   first hit the jails, right, all the correctional facilities.

24   That's where it first hit, Cummins and the other one and I

25   think one of the federal ones, and then it hit the meat-packing

1   plants.  But it didn't hit Washington County.  It didn't get

2   in, so I said the Indians -- like that email that you saw where

3   I said "Finally, the" -- "the Indians broke through" or

4   whatever.  It finally hit our jail in November.  So it hit the

5   other jails -- big jails in April.

6       So what our data did show is that whatever we did worked

7   and -- and would have -- you know, it's -- it's fairly

8   statistically significant -- or I don't know.  I'm not a great

9   statistician.  But -- but -- so that's the first sign that what

10  we were doing was helpful, in my opinion.

11  Q    And you said that you made independent decisions when --

12               MR. SMITH:  Or, well, strike that.

13  Q    Did you use, or did you refer to, this data when, I guess,

14  creating your COVID protocol?

15  A    Did I refer to it?  I -- I knew -- I knew what our outcome

16  was at the jail.  I knew we had hundreds of patients with zero

17  deaths.  But I wanted to see -- like, you can track their

18  oxygen level.  Did their oxygen drop?  What -- if so, we could

19  look back and see what day their oxygen drops.

20      So it gives you insight on the pathological process of the

21  disease.  Which, we already knew because we -- we -- at my

22  Lowell clinic in Lowell, we had probably 40 of the first 100

23  cases in the state at the Lowell clinic with the -- with the

24  poultry workers that have a large Hispanic population there.

25  And so we saw firsthand right away how severely sick people

1 could become with COVID and how life-threatening it was.

2 And -- and so I would say we -- that's where we first started

3 our protocols, was at the Lowell clinic -- or our regimen or

4 our -- what we were going to use to try to treat it.

5 Q    And did you use this spreadsheet when creating your

6 treatment regimen?

7 A    No.

8 Q    Did you send this spreadsheet to any other third-party not

9 affiliated with Karas Correctional Health or Karas Health Care?

10 A    It looks like I sent it to Dr. Sharkey, who was the

11 Washington County health officer, and she's -- she's a

12 physician.  I -- I sent it to Dr. Marik, and then I sent it to

13 the lady at McGill, the university that -- that was trying to

14 get the study on -- on the -- on the Singulair, or montelukast.

15 Q    Okay.  You said Dr. Marik, the McGill University, and then

16 who was the -- who is the first one you mentioned?

17 A    That's in the email where that letter is -- the letter you

18 had up -- Dr. Sharkey.

19 Q    I understand.  And the -- let's see if I -- this one?

20 A    Yeah.

21 Q    Martha Ann B. Sharkey?  Okay.

22      And who is Martha Sharkey?

23 A    She's a pediatrician in town, trained at John Hopkins,

24 that was the -- got elected.  As soon as COVID hit, they hired

25 a county medical director -- county -- and she was the county

1  Q    Okay.  Dr. Karas, I only have a few questions left.  I am

2  sharing my screen again.  Can you see my screen, Dr. Karas?

3  A    Yes.

4  Q    And this is the spreadsheet that we were looking at just

5  before we took our break; is that correct?

6  A    Correct.

7  Q    Okay.

8            MR. SMITH:  I am going to enter this as

9        Plaintiff's 10.

10            THE COURT REPORTER:  Yes.

11            MR. MOSLEY:  Objection.

12            (Whereupon, Plaintiff's Exhibit 10 was marked

13        for identification and is attached hereto.)

14  Q    (By Mr. Smith)  Dr. Karas, what do you understand each of

15  these rows to be?

16            MR. MOSLEY:  Objection:  Asked and answered.

17  A    I believe they're -- each row is the -- an individual,

18  starting with Row 2.

19  Q    (By Mr. Smith)  Okay.  An individual, I guess, jail

20  patient at the Washington County Detention Center?

21  A    Correct.  Correct.

22  Q    And, Dr. Karas, to your knowledge, did any of these

23  individuals agree to have their information shared with

24  Dr. Sharkey?

25  A    Not that I know of.

1  Q    And, Dr. Karas, to your knowledge, did any of these -- or

2  did any of these individuals agree to have their information

3  shared with Paul Marik?

4  A    Not that I know of.

5  Q    And, Dr. Karas, to your knowledge, did any of these

6  individuals agree to have their information shared with

7  McGill University?

8  A    I don't believe so.

9           MR. MOSLEY:  Object to form:  Lack of

10         foundation.

11  Q    (By Mr. Smith)  You can answer, Dr. Karas.

12  A    I don't believe so.

13  Q    Did you -- when you directed Ms. Hinely to create this

14  spreadsheet, did you ask Ms. Hinely to confer with each of

15  these individual jail patients that their information might be

16  shared?

17  A    I did not.

18           MR. SMITH:  All right, I'll pass the witness.

19           MR. MOSLEY:  Let's leave -- put that back up.

20           MR. SMITH:  Okay.

21                 CROSS-EXAMINATION

22  BY MR. MOSLEY:

23  Q    Doc, no inmate patient's name appears on Document

24  Number 17, which is Exhibit 8 --

25           MR. MOSLEY:  Is that correct, Amy?

1  Q    (By Mr. Mosley)  And the medical board took no action;

2  correct?

3  A    Correct.

4              MR. SMITH:  Foundation.

5  Q    (By Mr. Mosley)  Right.  And that was after you supplied

6  the standard informed consent that had been being used by Karas

7  Correctional Health that showed that the plaintiffs had signed

8  those documents; correct?

9  A    Correct.

10             MR. SMITH:  Form and foundation.

11 Q    (By Mr. Mosley)  And then a -- then, all of a sudden,

12 August the 25th, the allegation is made that, I guess, you --

13 but you've just testified you didn't administer any medicine to

14 the plaintiffs -- but I guess the allegation was made that the

15 plaintiffs weren't given informed consent, or didn't even know

16 they were given ivermectin, right, and that hit the news;

17 right?

18             MR. SMITH:  Form.

19 A    I guess --

20 Q    (By Mr. Mosley)  Is that correct?

21 A    Correct.

22             MR. SMITH:  Form.

23 Q    (By Mr. Mosley)  And then after it hit the news, to ensure

24 that there was no question that inmates and clinic patients and

25 everybody knew that you were using ivermectin and its basis,

1  i.e., in part, the FLCCC -- you saw Mr. Smith show you those

2  clinic patient records.  They were after the allegations hit

3  the news in August of 2021, weren't they?

4  A    Yes.

5            MR. SMITH:  Form.

6  Q    (By Mr. Mosley)  And in order to deal with anyone's

7  concerns that you weren't getting consent, you -- there was an

8  attempt to make a new consent form for the jail by Kelley is

9  what you understand?

10 A    Yes.

11 Q    And there were some doctors in your clinic were making

12 sure that everybody knew that you guys had been following the

13 rules all along by putting it in writing; correct?

14           MR. SMITH:  Form.

15 A    Correct.  Other providers did, and I didn't.

16 Q    (By Mr. Mosley)  Right.  So let me ask you this.  And I

17 say that because --

18           MR. MOSLEY:  So this press statement I want to

19        be Exhibit 2.  I'll take the amended complaint as

20        Exhibit 3, the "Evolution of Karas Health Care" as

21        Exhibit 4.

22           You got that, Amy?

23           THE COURT REPORTER:  I have 1 as the press

24        statement, 2 as the "Evolution."

25           MR. MOSLEY:  Okay.  1, press statement; 2,